UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DANIELLE HENKEL,

       Plaintiff,

   v.

DEPARTMENT OF EDUCATION,

     Defendant.

Civil Action No. 24-1676 (SLS)

**DEFENDANT'S MEMORANDUM OF POINTS AND**
**<u>AUTHORITIES IN SUPPORT OF MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

BACKGROUND .............................................................................................................. 1

I.      A Furnisher of Information's Duty Under the Fair Credit Reporting Act to Investigate and, If Necessary, Correct Inaccurate Information ........................................................ 1

II.     Factual Background ............................................................................................... 2

LEGAL STANDARDS ..................................................................................................... 6

I.      Lack of Subject-Matter Jurisdiction ........................................................................ 6

II.     Failure to State a Claim Upon Which Relief Can Be Granted ....................................... 6

ARGUMENT ................................................................................................................ 6

I.      Henkel Does Not Plausibly Allege Standing .............................................................. 7

        A.      Henkel's "Lost Credit Opportunities" Theory Fails ........................................... 9

                1.      Henkel Does Not Plausibly Allege Lost Credit Opportunities ................ 10

                2.      Henkel Does Not Plausibly Allege that Any Lost Credit Opportunities Are Traceable to the Department's Alleged Section 1681s-2(b) Violation ...................................................................... 12

        B.      Henkel's "Harm to Credit Reputation and Credit Score" Theory Fails ............... 14

                1.      Henkel Does Not Allege Dissemination of the Affected Credit Information ....................................................................................... 14

                2.      Henkel Does Not Plausibly Allege that Any Harm to Credit Score or Credit Reputation is Traceable to the Alleged Section 1681s-2(b) Violation ....................................................................................... 18

                3.      Any Drop Credit Score or Reputation Did Not Actually Injure Henkel ... 18

        C.      Henkel's "False Light" and "Invasion of Privacy" Theories Fail ....................... 19

        D.      Henkel's "Waste of Time and Resources" Theory Fails .................................... 19

        E.      Henkel's "Emotional Harm" Theory Fails ...................................................... 21

II.     Henkel Does Not Plausibly Allege Actual Damages ................................................... 21

III.    Henkel Fails to State a Claim Under Section 1681s-2(b) Against the Department .......... 22

        A.      The Department Did Not Furnish the Disputed Information to Any Consumer Reporting Agencies or Receive Notice of Henkel's Dispute ............................... 23

        B.      Section 1681s-2(b) Does Not Make the Department Responsible for Nelnet's Alleged Failure to Investigate or Correct the Disputed Information .................... 25

CONCLUSION ............................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Abdellatif v. Dep't of Homeland Sec.*,
  109 F.4th 562 (D.C. Cir. 2024) ............................................................................8

*Adams v. United States*,
  420 F.3d 1049 (9th Cir. 2005) ............................................................................30

*Angulo v. Truist Bank*,
  Civ. A. No. 22-0923, 2023 WL 1863049 (N.D. Ill. Feb. 9, 2023) .........................................11

*Arias v. Universal Music Grp.*,
  640 F. Supp. 3d 84 (D.D.C. 2022) .......................................................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................passim

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017) ............................................................................20

*Atwater v. City of Lago Vista*,
  532 U.S. 318 (2001) .....................................................................................28

*Bank of Am., N.A. v. Knight*,
  725 F.3d 815 (7th Cir. 2013) ............................................................................24

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015) ..........................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .....................................................................................25

*Cal. Ass'n of Physically Handicapped, Inc. v. FCC*,
  778 F.2d 823 (D.C. Cir. 1985) ..........................................................................13

*Casella v. Equifax Credit Info. Servs.*,
  56 F.3d 469 (2d Cir. 1995) .............................................................................21

*Chambliss v. Carefirst, Inc.*,
  189 F. Supp. 3d 564 (D. Md. 2016) ......................................................................20

*Chanler v. Stonich*,
  156 F. App'x 945 (9th Cir. 2005) .....................................................................30, 32

**Cases (cont.)**

*Citrus El Dorado, LLC v. Stearns Bank,*
   552 F. App'x 625 (9th Cir. 2014) ........................................................................30

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...................................................................................passim

*Comm'cns Satellite Corp. v. FCC,*
   611 F.2d 883 (D.C. Cir. 1977) ..........................................................................30

*Conn v. Equifax Credit Reporting,*
   Civ. A. No. 21-0558, 2022 WL 2439795 (D. Nev. Mar. 15, 2022)..........................11

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,*
   447 U.S. 102 (1980) ........................................................................................26

*Ctr. for Nat'l Sec. Studies v. Dep't of Just.,*
   331 F.3d 918 (D.C. Cir. 2003) ..........................................................................28

*Davis v. Mich. Dep't of Treasury,*
   489 U.S. 803 (1989) ........................................................................................26

*Dean v. United States,*
   556 U.S. 568 (2009) ........................................................................................26

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
   601 U.S. 42 (2024) ............................................................................................1

*Dep't of Homeland Sec. v. MacLean,*
   574 U.S. 383 (2015) ........................................................................................27

*Desmarattes v. Equifax,*
   Civ. A. No. 22-3330, 2023 WL 8473362 (E.D.N.Y. Dec. 7, 2023) ........................10

*Doe v. Lee,*
   Civ. A. No. 19-0085 (DLF), 2020 WL 759177 (D.D.C. Feb. 14, 2020) ..................17

*Evans v. Am. Collection Enter.,*
   624 F. Supp. 3d 593 (D. Md. 2022) ....................................................................15

*Ewing v. MED-1 Sols., LLC,*
   24 F.4th 1146 (7th Cir. 2022) ............................................................................15

*Fed. Aviation Admin. v. Cooper,*
   566 U.S. 284 (2012) ....................................................................................21, 22

**Cases (cont.)**

*Foster v. PNC Bank, N.A.*,
   52 F.4th 315 (7th Cir. 2022) ...................................................................................13

*Grauman v. Equifax Info. Servs., LLC*,
   549 F. Supp. 3d 285 (E.D.N.Y. 2021)...............................................................11, 16

*Gross v. TransUnion, LLC*,
   607 F. Supp. 3d 269 (E.D.N.Y. 2022)......................................................................11

*Grosz v. Cavalry Portfolio Servs., LLC*,
   Civ. A. No. 17-3166, 2019 WL 4888583 (E.D.N.Y. Sept. 30, 2019)......................31

*Hammond v. Bank of N.Y. Mellon Corp.*,
   Civ. A. No. 08-6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010).......................20

*Hanken v. TRT Holdings, Inc.*,
   Civ. A. No. 20-3717 (JDB), 2021 WL 6617463 (D.D.C. Mar. 18, 2021) ...............31

*Hawthorne v. Rushmore Loan Mgmt. Servs., LLC*,
   Civ. A. No. 20-0393 (RDM), 2023 WL 6388928 (D.D.C. Sept. 29, 2023)............12

*Henderson v. Source for Pub. Data, L.P.*,
   53 F.4th 110 (4th Cir. 2022) ...................................................................................15

*Humane Soc'y of U.S. v. Babbitt*,
   46 F.3d 93 (D.C. Cir. 1995).....................................................................................21

*Humane Soc'y of U.S. v. Perdue*,
   935 F.3d 598 (D.C. Cir. 2019)...................................................................................7

*In re Adobe Sys., Inc. Priv. Litig.*,
   66 F. Supp. 3d 1197 (N.D. Cal. 2014).....................................................................20

*In re Leopold*,
   964 F.3d 1121 (D.C. Cir. 2020)...............................................................................28

*In re Sci. Applications Int'l Corp. Backup Tape Data Theft Litig.*,
   45 F. Supp. 3d 14 (D.D.C. 2014).............................................................................20

*Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.*,
   758 F.3d 378 (D.C. Cir. 2014)..................................................................................29

*Kareem v. Haspel*,
   986 F.3d 859 (D.C. Cir. 2021).............................................................................7, 17

**Cases (cont.)**

*Klonis v. Marine Corps Ass'n*,
    Civ. A. No. 24-0046, 2024 WL 2721875 (D.N.M. May 28, 2024) ........................................19

*Lamando v. Rocket Mortg.*,
    Civ. A. No. 23-0147, 2024 WL 264034 (N.D.N.Y. Jan. 24, 2024).........................................15

*LaSalle Bank Nat. Assoc. v. Citicorp Real Est., Inc.*,
    Civ. A. No. 02-7868, 2003 WL 21671812 (S.D.N.Y. July 16, 2003) ....................................30

*Lewis v. Experian Info. Sols., Inc.*,
    Civ. A. No. 23-0857, 2024 WL 1308705, at (E.D.N.Y. Mar. 27, 2024) ................................10

*Lewis v. Old Navy*,
    Civ. A. No. 21-9131, 2024 WL 98293 (S.D.N.Y. Jan. 9, 2024) ............................................15

*Lo Shippers Action Comm. v. Interstate Com.*,
    *Comm'n*, 808 F.2d 64 (D.C. Cir. 1986)................................................................................13

*Logue v. United States*,
    412 U.S. 521 (1973)............................................................................................................29

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990).........................................................................................................8, 10

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,
    19 F.4th 58 (2d Cir. 2021) ..................................................................................................10

*MCI Telecomms. Corp. v. AT&T Co.*,
    512 U.S. 218 (1994)............................................................................................................29

*Merck v. Walmart, Inc.*,
    114 F.4th 762 (6th Cir. 2024) .............................................................................................19

*Metcalf v. Nat'l Petrol. Council*,
    553 F.2d 176 (D.C. Cir. 1977).............................................................................................10

*Mickens v. U.S. Bank Nat'l Ass'n*,
    Civ. A. No. 18-0928 (KBJ), 2021 WL 3418955 (D.D.C. Aug. 5, 2021)................................17

*Microwave Acquisition Corp. v. FCC*,
    145 F.3d 1410 (D.C. Cir. 1998)...........................................................................................13

*Milchtein v. Milwaukee Cnty.*,
    42 F.4th 814 (7th Cir. 2022) ...............................................................................................24

**Cases (cont.)**

*Murthy v. Missouri*,
603 U.S. 43 (2024) ...................................................................................19

*Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) ...................................................................20

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019) .................................................................................29

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023) ...................................................................30

*Niedermeier v. Off. of Max S. Baucus*,
153 F. Supp. 2d 23 (D.D.C. 2001) .............................................................17

*Norman v. Bosak Motors of Burns Harbor LLC*,
Civ. A. No. 20-0051, 2021 WL 4749617 (N.D. Ind. Oct. 12, 2021) ......................16

*Om v. Bank of Am., N.A.*,
Civ. A. No. 12-0496, 2012 WL 12941701 (W.D. Wash. June 15, 2012) ................25

*Owens v. Bank of Am.*,
Civ. A. No. 17-2110 (ABJ), 2018 WL 4387572 (D.D.C. Sept. 14, 2018) ...............12

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Dep't of Transp.*,
879 F.3d 339 (D.C. Cir. 2018) ..............................................................8, 15

*Page v. Comey*,
628 F. Supp. 3d 103 (D.D.C. 2022) ...........................................................24

*PeaceTech Lab, Inc. v. C5 Accelerate LLC*,
Civ. A. No. 20-0922 (JDB), 2021 WL 106718 (D.D.C. Jan. 12, 2021) ..................17

*Peterson v. Experian Info.*,
*Sols.*, 44 F.4th 1124 (8th Cir. 2022) ..........................................................16

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*,
656 F. Supp. 3d 137 (D.D.C. 2023) ...........................................................21

*Phillips v. Spencer*,
390 F. Supp. 3d 136 (D.D.C. 2019) ...........................................................30

*Reid v. Hurwitz*,
920 F.3d 828 (D.C. Cir. 2019) ....................................................................6

**Cases (cont.)**

*Rosenberg v. LoanDepot, Inc.*,
  Civ. A. No. 21-8719, 2023 WL 1866871 (S.D.N.Y. Feb. 9, 2023) ...................................11, 15

*Rubin v. Islamic Republic of Iran*,
  583 U.S. 202 (2018) ........................................................................................................27

*Russello v. United States*,
  464 U.S. 16 (1983) ..........................................................................................................27

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) .............................................................................................................1

*Shafran v. Harley-Davidson, Inc.*,
  Civ. A. No. 07-1365, 2008 WL 763177 (S.D.N.Y. Mar. 20, 2008) .......................................20

*Slinski v. Bank of Am., N.A.*,
  981 F. Supp. 2d 19 (D.D.C. 2013) ....................................................................................31

*Spira v. Trans Union, LLC*,
  Civ. A. No. 21-2367, 2022 WL 2819469 (S.D.N.Y. July 19, 2022) .......................................11

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................................7, 8, 9

*Swainson v. Lendingclub Corp.*,
  Civ. A. No. 21-5379, 2022 WL 2704629 (S.D.N.Y. June 24, 2022)......................................15

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ....................................................................................8, 14, 15, 16

*Twin Rivers Paper Co. LLC v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019)..............................................................................................8

*United States v. Hudson*,
  86 F.4th 806 (7th Cir. 2023) .............................................................................................31

*United States v. Moore*,
  486 F.2d 1139 (D.C. Cir. 1973) .........................................................................................28

*United States v. Texas*,
  507 U.S. 529 (1993) ........................................................................................................28

*Viasat, Inc. v. FCC*,
  47 F.4th 769 (D.C. Cir. 2022)...............................................................................................8

**Cases (cont.)**

*Wan v. Trans Union, LLC,*
  Civ. A. No. 22-0115, 2022 WL 955290 (E.D.N.Y. Mar. 30, 2022) ........................................11

*Wash. Ass'n for Television & Children v. FCC,*
  712 F.2d 677 (D.C. Cir. 1983) ........................................................................30

*Welborn v. IRS,*
  218 F. Supp. 3d 64 (D.D.C. 2016) ...................................................................20

*Whitehead v. Grant & Weber, Inc.,*
  Civ. A. No. 22-6517, 2022 WL 19762152 (E.D.N.Y. Dec. 30, 2022)....................................16

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ...................................................................................8

*Wiener v. Bankers Tr. Co.,*
  Civ. A. No. 11-10770, 2012 WL 4088944 (E.D. Mich. Sept. 17, 2012) ...............................30

*Wilson v. Good Humor Corp.,*
  757 F.2d 1293 (D.C. Cir. 1985)......................................................................29

*Zlotnick v. Equifax Info. Servs., LLC,*
  583 F. Supp. 3d 387 (E.D.N.Y. 2022) ...............................................................15

**Statutes**

15 U.S.C. § 1681.........................................................................................1

15 U.S.C. § 1681d(a).....................................................................................27

15 U.S.C. § 1681i(a)(1)(A)..............................................................................1, 2

15 U.S.C. § 1681s-2(b)..................................................................................2, 26

15 U.S.C. § 1681s-2(c)(1) ..............................................................................12, 26

15 U.S.C. §§ 1681i(a)(2)(A).............................................................................25

15 U.S.C. §§ 1681n(a)(1)(A).............................................................................21, 22

Consumer Credit Reporting Reform Act of 1996, 110 Stat. 3009-426, 3009 (Tit. II, Subtit. D,
  Ch. 1, Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208 ......................29

**Rules**

Fed. R. Civ. P. 12(b)(1)...................................................................................................6

Fed. R. Civ. P. 12(b)(6)...................................................................................................6

Fed. R. Evid. 201(b)......................................................................................................30

Defendant Department of Education ("Department"), by and through undersigned counsel, respectfully files this memorandum of points and authorities in support of its motion to dismiss Plaintiff Danielle Henkel's amended complaint, ECF No. 20.

## BACKGROUND

A brief overview of the relevant provisions of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, and background factual allegations follows.

I.    **A Furnisher of Information's Duty Under the Fair Credit Reporting Act to Investigate and, If Necessary, Correct Inaccurate Information**

"Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). "As originally enacted in 1970, the FCRA focused largely on two groups." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 46 (2024). "First, it addressed consumer reporting agencies . . . charging them with various new duties designed to ensure the accuracy and confidentiality of their work." *Id.* "Second, it imposed new regulations on persons who procure credit information from consumer reporting agencies." *Id.*

"In the Consumer Credit Reporting Reform Act of 1996, Congress amended the FCRA to broaden its reach." *Kirtz*, 601 U.S. at 46. "As relevant here, Congress added provisions addressing those who furnish information to consumer reporting agencies." *Id.* In general, when a consumer disputes "the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency" and so "notifies the [consumer reporting] agency," the consumer reporting "agency shall . . . conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file" within thirty days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(1)(A). Within five days of receiving the notice, the consumer reporting "agency shall provide notification

of the dispute to any person who provided any item of information in dispute," which "shall include all relevant information regarding the dispute that [it] has received." *Id.* § 1681i(a)(2)(A).

The FCRA also imposes certain duties on a furnisher of information upon receiving notice of the dispute. *See* 15 U.S.C. § 1681s-2(b). "After receiving notice . . . of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the [furnisher] shall" take certain actions. *Id.* § 1681s-2(b)(1). Specifically, the furnisher shall "conduct an investigation with respect to the disputed information," "review all relevant information provided by the consumer reporting agency," and "report the results of the investigation to the consumer reporting agency." *Id.* § 1681s-2(b)(1)(A)-(C). "[I]f the investigation finds that the information is incomplete or inaccurate," the furnisher shall "report those results to all other consumer reporting agencies to which the [furnisher] furnished the information and that compile and maintain files on consumers on a nationwide basis." *Id.* § 1681s-2(b)(1)(D).

Finally, "if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation," then "for purposes of reporting to a consumer reporting agency only," the furnisher shall, "as appropriate, based on the results of the reinvestigation promptly" take one of three actions: either (1) "modify that item of information," (2) "delete that item of information," or (3) "permanently block the reporting of that item of information." 15 U.S.C. § 1681s-2(b)(1)(E). The furnisher "shall complete all investigations, reviews, and reports . . . regarding information provided by the person to a consumer reporting agency, before" thirty days have elapsed from when the consumer reporting agency received notice of the dispute with respect to the challenged information from the consumer. *Id.* § 1681s-2(b)(2).

## II.    <u>Factual Background</u>

The Department takes the following facts to be true solely for the purpose of evaluating the sufficiency of Henkel's pleadings. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Department "oversee[s] various federal student loan programs, including that pursuant to which [Henkel] took out loans to finance her education." Am. Compl. ¶ 37. "In the normal course of business, [the Department] maintains detailed business records concerning, *inter alia,* student loan borrowers' account balances and repayment histories," and "routinely furnishes [this information] to [consumer reporting agencies], including Experian, Equifax, and Trans Union, either directly or indirectly through its servicers." *Id.* ¶¶ 42, 44. The Department "routinely transfers the servicing of federal student loans to other entities for various reasons, including for the purpose of evaluating borrowers' eligibility for Total and Permanent Disability discharge and the Public Service Loan Forgiveness program, among other federal programs." *Id.* ¶ 62.

Henkel "obtained federal student loans to finance her education." Am. Compl. ¶ 63. "By late 2021, she had either paid off her outstanding loan balances or consolidated any outstanding loans into two direct consolidation loans from [the Department] in the amounts of $28,772.91 and $39,733.97, respectively." *Id.* "Nelnet is an entity with which [the Department] contracts for the servicing of certain federal student loans such as" Henkel's. *Id.* ¶ 4. "Until approximately June 2023, . . . Nelnet was the servicer of [Henkel's] federal student loans." *Id.* ¶ 64. "During this period, [the Department] furnished . . . information about [Henkel's] federal student loans each month to [the consumer reporting agencies] Experian, Equifax, and TransUnion as 'DEPARTMENT OF EDUCATION/NELNET' and similar variations." *Id.*

In early 2023, Henkel applied "for forgiveness of her loans from [the Department] through the Public Service Loan Forgiveness [ ] program." Am. Compl. ¶ 67. "At that time, the outstanding principal balance on [her] loans from [the Department] was approximately $68,500." *Id.* ¶ 68. The Department "transferred [her] loan servicing from Nelnet to the Missouri Higher Education Loan Authority ('MOHELA')." *Id.* ¶ 70. After the Department "transferred the servicing of [her] student

loan account from Nelnet to MOHELA, [her] Department of Education/Nelnet account was closed and MOHELA opened a new Department of Education account for [her] with a new loan number." *Id.* ¶ 72. Rather than report to consumer reporting agencies "that the balances of [her] transferred student loan account at Nelnet was $0," the Department "continued to report or caused to be reported . . . that the balance of [her] student loan account at Nelnet was $68,505." *Id.* ¶¶ 73-74.

In January of 2024, Henkel reviewed her credit reports and discovered that the Department, "as DEPARTMENT OF EDUCATION/NELNET . . . was still directly and/or indirectly reporting that she had an open student loan account with a balance of approximately $68,505." Am. Compl. ¶ 75. "Simultaneously, [the Department], as 'MOHELA/DEPT OF ED' . . . was directly and/or indirectly reporting that [she] had an additional federal student loan account due to [it] with a total balance of approximately $68,548." *Id.* ¶ 76. "That is, notwithstanding having itself transferred [her] single loan account with a balance of $68,505 from Nelnet to MOHELA, [the Department] directly and/or indirectly through its agents furnished information to" consumer reporting agencies "that [she] owed it more than $137,000 in total." *Id.* ¶ 77. In reality, she "no longer had any open student loan accounts with Nelnet and did not owe it any amount for a student loan." *Id.* ¶ 78.

Henkel then "disputed [the Department's] false, duplicative balance reporting through the [consumer reporting agencies], including Experian, Equifax, and TransUnion throughout 2023 and 2024." Am. Compl. ¶ 81. The consumer reporting agencies "provided notice of [her] disputes to [the Department] directly and/or indirectly through its agents." *Id.* ¶ 82. "Nevertheless, in its responses to [her] disputes through the" consumer reporting agencies, the Department "directly and/or indirectly through its agents repeatedly failed to correct or reduce the duplicative balance to $0 and to fulfill its other obligations under [Section] 1681s-2(b)." *Id.* ¶ 83. "Instead, it continued

to verify, directly and/or indirectly through its agents, that [Henkel] owed it more than $137,000 in federal student loans, including approximately $68,505 through Nelnet." *Id.*

Henkel "also sent complaints about [the Department's] duplicative credit reporting to the Better Business Bureau and the Federal Student Aid Ombudsman Group in January of 2024 to which Nelnet responded on [the Department's] behalf." Am. Compl. ¶ 84. "In correspondence dated January 25, 2024 . . . Nelnet responded as follows:"

> On behalf of [the Department], we must furnish your account data to the [consumer reporting agencies]. Under the [FCRA], we have an obligation to ensure the data we furnish is accurate and complete. Because the account has transferred to another [Department] servicer, a suppression has been added to the account, at the direction of [the Department]. Nelnet has not actively furnished any data to the [consumer reporting agencies] since May 31, 2023. Once we receive direction from [the Department] to remove the suppression, we will furnish data reflecting that your account has a $0.00 balance and was transferred to another entity.

*Id.* ¶ 85 (emphasis added in Henkel's complaint). "Nelnet repeated the 'suppression' explanation in subsequent communications with [Henkel] dated January 26, 2024, January 30, 2024, and February 1, 2024." *Id.* ¶ 86. Henkel "repeatedly requested an explanation of the 'suppression' [that the Department] added to her account, but Nelnet never provided it." *Id.* ¶ 87.

"As a result of [the Department's] conduct, Plaintiff . . . appeared on [her] credit reports to owe to [the Department] far more in federal student loans than [she] actually did," i.e., "double the amount actually owed." Am. Compl. ¶ 90. Due to the Department's failure to investigate or correct the disputed information, Henkel says, she "suffered injury and damages in the form of lost credit opportunities, harm to credit reputation and credit score, and waste of time and resources." *Id.*

Henkel filed suit, raising a single claim challenging the Department's failure to investigate or correct the disputed information. *See* Am. Compl. ¶¶ 119-22. She does not challenge the initial furnishing of the disputed information to the consumer reporting agencies—only the Department's failure to investigate or correct the disputed information after she disputed it. *Id.* Henkel also seeks

to certify two classes—(1) one class of individuals whose loan accounts the Department transferred from one servicer to another without reporting a $0 balance for the pre-transfer account, and (2) another class of individuals on whose accounts the Department allegedly placed a suppression after transferring the account from one servicer to another. *See id.* ¶¶ 111-18.

## LEGAL STANDARDS

### I.    Lack of Subject-Matter Jurisdiction

A claim warrants dismissal for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Generally, "a district court considering a motion to dismiss for lack of subject matter jurisdiction accepts the allegations of the complaint as true." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). A plaintiff "must allege well-pleaded facts that support a plausible inference" of subject-matter jurisdiction. *Reid v. Hurwitz*, 920 F.3d 828, 837 (D.C. Cir. 2019).

### II.    Failure to State a Claim Upon Which Relief Can Be Granted

A claim also warrants dismissal for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This rule "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## ARGUMENT

Henkel lacks standing because she does not plausibly allege injury in fact or that any such injury fairly is traceable to the Department's alleged Section 1681s-2(b) violation. Nor does she plausibly allege that she has sustained actual damages within the FCRA's meaning. In any event,

Section 1681s-2(b) neither (1) imposes a duty on the Department itself to investigate or correct the disputed information nor (2) makes the Department responsible for Nelnet's alleged failure to do so.[1] Henkel thus cannot rely on principles of agency law to hold the Department responsible for Nelnet's alleged Section 1681s-2(b) violation. Regardless, even if agency law principles applied here, Henkel still would not plausibly allege that the Department is responsible for Nelnet's alleged Section 1681s-2(b) violation. For these reasons, this Court should dismiss her amended complaint.

## I.   <u>Henkel Does Not Plausibly Allege Standing</u>

Henkel does not plausibly allege that she has standing to sue. "The Constitution limits the 'judicial Power of the United States' to 'Cases' or 'Controversies.'" *Humane Soc'y of U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019) (quoting U.S. Const. art. III, §§ 1, 2). "To state a case or controversy under Article III, a plaintiff must establish standing." *Id.* "The test for standing is settled: a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quotation marks omitted). "[A]t the pleading stage, the complaint must state a plausible claim that each element of standing is satisfied." *Id.* (quotation marks omitted). As such, "threadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice." *Kareem v. Haspel*, 986 F.3d 859, 865-66 (D.C. Cir. 2021) (cleaned up).

The Supreme Court has articulated several principles that govern standing analysis, and particularly, whether an injury in fact exists. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339

---

[1]    The Department assumes solely for purposes of this motion that Nelnet violated Section 1681s-2(b). Should this case proceed beyond the motion to dismiss stage, the Department anticipates disputing many of the facts that Henkel pleads in her amended complaint.

(2016) (quotation marks omitted). A plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 341. So too, "threatened injury must be certainly impending to constitute injury in fact, and [ ] allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* Courts are especially "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414. A theory of injury that leads "into the area of speculation and conjecture" lies "beyond the bounds of [a court's] jurisdiction." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Lastly, "conclusory allegations [in a] complaint" are insufficient to establish standing. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) ("barebones statements do not suffice" to establish standing (quotation marks omitted)); *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 614 (D.C. Cir. 2019) ("barebones" assertions are insufficient to establish standing).

The Supreme Court and D.C. Circuit have made clear that the mere fact that a consumer reporting agency internally maintains inaccurate information about how much money Henkel owes does not constitute injury in fact—at least, not without the dissemination of this information, which Henkel does not plausibly allege. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 434 (2021) ("The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm."); *Abdellatif v. Dep't of Homeland Sec.*, 109 F.4th 562, 568 (D.C. Cir. 2024) ("Put in standing terms, maintaining erroneous information, without more, does not create a concrete injury of the sort Article III requires." (quotation marks omitted)); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Dep't of Transp.*, 879 F.3d 339, 345 (D.C. Cir. 2018) ("the mere

existence of inaccurate database information is not sufficient to confer Article III standing" without "the dissemination of that information"). To establish injury in fact, Henkel must plausibly allege more than just that consumer reporting agencies possess inaccurate information about how much she owes—she must plausibly allege that this has resulted in some sort of cognizable injury to her.

Recognizing as much, Henkel does not argue that a "a bare procedural violation," *Spokeo*, 578 U.S. at 339, of Section 1681s-2(b) suffices to establish standing. Instead, she alleges that she has "suffered injury and damages in the form of lost credit opportunities, harm to credit reputation and credit score, and waste of time and resources." Am. Compl. ¶ 90. Henkel also appears to assert standing based on the theories that the Department's alleged Section 1681s-2(b) violation cast her "in a false light and interfered with [her] ability to control [her] personal information," which she compares to "an invasion of [her] right to privacy," and caused her emotional harm. *Id.* ¶¶ 101-04. As explained below, none of these theories suffice to support a plausible inference of standing.

### A. Henkel's "Lost Credit Opportunities" Theory Fails

Henkel's "lost credit opportunities" theory of standing fails for two reasons—she does not plausibly allege either that (1) she lost credit opportunities or (2) the Department's alleged failure to investigate or correct the disputed information is what caused her to lose credit opportunities. Henkel's allegations of lost credit opportunity are wholly conclusory. Moreover, any loss of credit opportunity is attributable to the initial furnishing of the disputed information, which Henkel does not challenge, rather than to the Department's alleged failure to investigate or correct the disputed information. At the most, the Department's alleged failure to investigate or correct the disputed information did not abate the loss of credit opportunity that the initial furnishing of this information had caused, but that is not a cognizable theory of traceability under D.C. Circuit precedent.

1.     <u>Henkel Does Not Plausibly Allege Lost Credit Opportunities</u>

Henkel's allegation that she "suffered . . . lost credit opportunities," Am. Compl. ¶ 90, is vague and conclusory. She might have standing if she plausibly alleged that the Department had caused her to lose some specific credit opportunity that she would have taken had it been available to her. But she does not allege that she either sought or was denied credit opportunities during the relevant period. Nor does she identify any specific credit opportunity that she lost, the pertinent loan terms—such as how much money she tried to borrow or what the interest rate would have been—what the loan would have been for, or how many "opportunities," *id.*, she lost. And even assuming that Henkel lost credit opportunities, she does not allege that she was unable to obtain credit elsewhere on equally favorable terms, which would foreclose a plausible inference of injury in fact. *See Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 65 (2d Cir. 2021) (no injury if alleged "risk" of being unable to obtain credit never "materialized"). Indeed, she does not allege any monetary loss due to the alleged loss of credit opportunity, much less try to quantify such monetary loss. "The fact that [she] cannot specify in any way the monetary losses associated with [her] asserted consumer injuries detracts greatly from the strength of [her] standing argument." *Metcalf v. Nat'l Petrol. Council*, 553 F.2d 176, 187 n.109 (D.C. Cir. 1977). In sum, Henkel's allegation of lost credit opportunities is wholly "conclusory," and thus insufficient to support a plausible inference that she suffered an injury in fact. *Lujan*, 497 U.S. at 888.

Unsurprisingly, since *TransUnion*, a growing chorus of courts have recognized that generic allegations of "lost credit opportunities" are insufficient to support a plausible inference of standing. *See, e.g.*, *Lewis v. Experian Info. Sols., Inc.*, Civ. A. No. 23-0857, 2024 WL 1308705, at *5 (E.D.N.Y. Mar. 27, 2024) (allegations that "a result of the defendants' conduct, multiple institutions denied [the plaintiff] credit related and loan products . . . are vague and conclusory and . . . insufficient to establish standing" (cleaned up)); *Desmarattes v. Equifax*, Civ. A. No. 22-3330,

2023 WL 8473362, at *10 (E.D.N.Y. Dec. 7, 2023) (no standing where plaintiff failed to identify "specific instances in which [the] credit reporting resulted in a denial of credit"); *Rosenberg v. LoanDepot, Inc.*, Civ. A. No. 21-8719, 2023 WL 1866871, at *5 (S.D.N.Y. Feb. 9, 2023) ("loss of credit" allegation was "entirely conclusory and insufficient to establish standing" where plaintiff "failed to identify either a single lender that reacted adversely to the information on her Credit Report or a single loan that she was denied"); *Angulo v. Truist Bank*, Civ. A. No. 22-0923, 2023 WL 1863049, at *4 (N.D. Ill. Feb. 9, 2023) (plaintiff "pleads no facts showing he ever lost credit opportunities"); *Gross v. TransUnion, LLC*, 607 F. Supp. 3d 269, 273 (E.D.N.Y. 2022) (no injury in fact where the plaintiff failed to identify "specific lost credit opportunity"); *Spira v. Trans Union, LLC*, Civ. A. No. 21-2367, 2022 WL 2819469, at *4 (S.D.N.Y. July 19, 2022) ("absent specific allegations of reputational or monetary harm, plaintiffs lack constitutional standing"); *Wan v. Trans Union, LLC*, Civ. A. No. 22-0115, 2022 WL 955290, at *1 (E.D.N.Y. Mar. 30, 2022) ("a vague claim of 'limited credit opportunities' . . . is insufficient to confer standing"); *Grauman v. Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 292 (E.D.N.Y. 2021) (a "generalized allegation" that an FCRA violation threatened plaintiff's "ability to acquire additional credit" failed because plaintiff made "no claim that he tried or was imminently planning to try to use his credit report to procure credit, or that he personally experienced any other financial harm"); *cf. Conn v. Equifax Credit Reporting*, Civ. A. No. 21-0558, 2022 WL 2439795, at *2 (D. Nev. Mar. 15, 2022), *R. & R. adopted*, 2022 WL 2439793 (D. Nev. Apr. 8, 2022) ("general allegation[s] of 'lost credit opportunities' [are] too vague to state a claim for damages"). Henkel's barebones allegation of "lost credit opportunities," Am. Compl. ¶ 90, is indistinguishable from similar allegations that courts have ruled insufficient to support a plausible inference of injury in fact.

2.     Henkel Does Not Plausibly Allege that Any Lost Credit Opportunities Are
       Traceable to the Department's Alleged Section 1681s-2(b) Violation

Henkel likewise does not plausibly allege that any lost credit opportunities are traceable to

the Department's alleged failure to investigate or correct the challenged information. Henkel does

not plausibly allege that she would have received any particular credit opportunity or opportunities

but for the Department's alleged Section 1681s-2(b) violation, such as, for example, by pleading

facts to support a plausible inference that a lender would have offered her credit if her credit report

had showed only $68,505 rather than $137,000 in outstanding student loan debt. Nor does Henkel

specify how much—if at all—her credit score decreased because of the Department's alleged

Section 1681s-2(b) violation or plead facts to support a plausible inference that a lender would

have given her credit at her previous higher credit score, but not at her alleged new lower score. In

short, Henkel's assertion that the Department's alleged Section 1681s-2(b) violation cost her credit

opportunities that she otherwise would have received is "too speculative for Article III purposes."

*Clapper*, 568 U.S. at 409. That is all the more so given that Henkel's theory of traceability "rest[s]

on speculation about the decisions of independent actors," *id.* at 414—i.e., the would-be creditors.

Indeed, it is hard to see how the Department's alleged failure to investigate or correct the

disputed information logically could have cost Henkel credit opportunities. Recall, Henkel does

not challenge the initial furnishing of the disputed information to consumer reporting agencies.

That is just as well, as the FCRA does not provide a private right of action to challenge the initial

furnishing of inaccurate information to a consumer reporting agency. *See* 15 U.S.C. § 1681s-

2(c)(1), (d); *see also Owens v. Bank of Am.*, Civ. A. No. 17-2110 (ABJ), 2018 WL 4387572, at *8

(D.D.C. Sept. 14, 2018) ("a claim premised on that section of the FCRA could not survive, because

the FCRA does not create a private right of action enabling an individual to enforce this

provision"); *Hawthorne v. Rushmore Loan Mgmt. Servs., LLC*, Civ. A. No. 20-0393 (RDM), 2023

WL 6388928, at *3 (D.D.C. Sept. 29, 2023) (The "set of duties imposed by § 1681s-2(a) does not provide a private right of action and thus cannot be enforced by an individual." (collecting cases)).

Rather, Henkel challenges only the Department's subsequent failure to investigate and correct the disputed information after she disputed it with consumer reporting agencies. *See* Am. Compl. ¶¶ 119-21 (claims for relief). But logically, any loss of credit opportunities is attributable to the initial furnishing of the disputed information to consumer reporting agencies—not to any subsequent failure to investigate or correct the disputed information. Her theory of traceability is that the Department's alleged Section 1681s-2(b) violation did not "abat[e] [the] pre-existing injury" to her ability to obtain credit that the initial furnishing of the disputed information caused— a theory that the D.C. Circuit repeatedly has rejected. *Lo Shippers Action Comm. v. Interstate Com. Comm'n*, 808 F.2d 64, 65 (D.C. Cir. 1986); *see also Cal. Ass'n of Physically Handicapped, Inc. v. FCC*, 778 F.2d 823, 825 (D.C. Cir. 1985) (claim that a challenged action "will furnish no cure," i.e., "will not cause the [existing] injury to abate . . . . will not suffice" to establish traceability).

Finally, Henkel does not even specify when she ostensibly lost the credit opportunities. *See* Am. Compl. ¶ 90. As best her pleadings show, she may have lost these credit opportunities before —not after—the Department allegedly failed to investigate or correct the challenged information, which would foreclose any inference of traceability. *See Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410, 1412 (D.C. Cir. 1998) (no traceability if injury "occurred before" challenged action); *Cal. Ass'n*, 778 F.2d at 827 (a plaintiff "cannot tenably trace the asserted injury to" the challenged action as "alleged injury occurred before, [and] existed at the time of . . . the challenged [agency] action"); *Foster v. PNC Bank, N.A.*, 52 F.4th 315, 322 (7th Cir. 2022) (in a Section 1681s-2(b) case, defendant's "conduct in 2012 (i.e., its alleged failure to reasonably investigate) cannot have caused [plaintiff's] credit score to drop in late 2011"). Her only allegation about when she

lost credit opportunities is that she lost them "[a]s a result of Defendant's conduct," Am. Compl. ¶ 90, which implies that the alleged Section 1681s-2(b) violation came first—but this conclusory assertion is just the sort of "unadorned, the-defendant-unlawfully-harmed-me accusation" that will not suffice to support a plausible inference of standing. *Iqbal*, 556 U.S. at 678.

### B.    Henkel's "Harm to Credit Reputation and Credit Score" Theory Fails

Henkel's "harm to credit reputation and credit score" theory of standing fails for three reasons. First, Henkel does not plausibly allege that any credit reporting agency disseminated the affected credit information to anyone. Second, she does not plausibly allege that the Department's alleged failure to investigate or correct the disputed information is what caused her this purported harm, as opposed to the initial furnishing of the disputed information. Third, she does not plausibly allege that any drop in her credit score or reputation actually injured her, as she does not plausibly allege that any such drop in credit score or reputation actually prevented her from obtaining credit.

### 1.    Henkel Does Not Allege Dissemination of the Affected Credit Information

Henkel's allegation of "harm to credit reputation and credit score," Am. Compl. ¶ 90, fails because she does not plausibly allege that consumer reporting agencies disseminated the affected information to third parties. As *TransUnion*, 594 U.S. at 434, explained, harm to credit reputation "causes no concrete harm" if the affected information "is not disclosed to a third party." Injury in fact occurs only if "consumer reporting agencies disseminate" the affected credit information "to third party creditors." *Id.* If an FCRA violation affects a plaintiff's credit information but consumer reporting agencies never disseminate that information, "the plaintiffs' harm is roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer. A letter that is not sent does not harm anyone, no matter how insulting the letter is." *Id.* Applying this principle, the Court concluded that class members "whose credit reports were disseminated to third-party businesses during the class period suffered a concrete harm" but "class members whose

internal [ ] credit files were not disseminated to third-party businesses did not suffer a concrete harm." *Id.* at 439; *see also Owner-Operator*, 879 F.3d at 345 ("inaccurate database information is not sufficient to confer Article III standing" absent "the dissemination of that information").

Since *TransUnion*, courts have recognized that harms to credit reputation or score cause no injury in fact unless a consumer reporting agency actually disseminates the credit information—otherwise, the information just sits in a metaphorical drawer, injuring nobody. *See, e.g.*, *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 126 (4th Cir. 2022) (plaintiff must show that someone "disseminated information to third parties to satisfy Article III standing"); *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1152 (7th Cir. 2022) ("*TransUnion* alters our [prior] understanding" that "consumers had standing because they alleged a risk of concrete financial harm caused by an inaccurately low credit score"); *Lamando v. Rocket Mortg.*, Civ. A. No. 23-0147, 2024 WL 264034, at *4 (N.D.N.Y. Jan. 24, 2024) ("absence of allegations of dissemination to third parties requires dismissal"); *Lewis v. Old Navy*, Civ. A. No. 21-9131, 2024 WL 98293, at *3 (S.D.N.Y. Jan. 9, 2024) ("a lowered credit score cannot, by itself, demonstrate a concrete harm for purposes of standing unless coupled with allegations of dissemination to third parties"); *Rosenberg*, 2023 WL 1866871, at *5 ("a lowered credit score in and of itself is not a concrete harm" (cleaned up)); *Evans v. Am. Collection Enter.*, 624 F. Supp. 3d 593, 599 (D. Md. 2022) ("After *TransUnion*, however, [plaintiff] must show that his allegedly artificially deflated credit score was disseminated to a third party"); *Zlotnick v. Equifax Info. Servs., LLC*, 583 F. Supp. 3d 387, 391 (E.D.N.Y. 2022) ("Where a plaintiff claims that an improper notation on his credit report resulted in a credit score reduction that could cause him reputational and financial harm, the absence of allegations of dissemination to third parties requires dismissal"); *Swainson v. Lendingclub Corp.*, Civ. A. No. 21-5379, 2022 WL 2704629, at *8 (S.D.N.Y. June 24, 2022), *R.&R. adopted*, 2022 WL 2704486

(S.D.N.Y. July 12, 2022) ("absent dissemination, an inaccuracy in a credit report, standing alone, does not give a consumer standing to bring a FCRA claim"); *Whitehead v. Grant & Weber, Inc.*, Civ. A. No. 22-6517, 2022 WL 19762152, at \*2 (E.D.N.Y. Dec. 30, 2022), *R.&R. adopted*, 2023 WL 3260029 (E.D.N.Y. May 4, 2023) ("Since *TransUnion*, [a]llegations of an improper notation on a credit report or a credit score reduction is insufficient unless coupled with allegations of dissemination to third parties"); *Grauman*, 549 F. Supp. 3d at 292 ("the lack of dissemination of [plaintiff's] credit report renders him unable to adequately allege a concrete injury"); *Norman v. Bosak Motors of Burns Harbor LLC*, Civ. A. No. 20-0051, 2021 WL 4749617, at \*3 (N.D. Ind. Oct. 12, 2021) ("Following the logic of *TransUnion*, a lower credit score . . . without proof of dissemination, is an insufficient injury to support standing"); *cf. Peterson v. Experian Info. Sols.*, 44 F.4th 1124, 1127 (8th Cir. 2022) ("To the extent [one] alleges injury solely from diminution in her credit score, that type of abstract harm does not support actual damages").

Henkel's argument that she suffered harm to her credit score and credit reputation flounders on this requirement. Even assuming the Department's alleged Section 1681s-2(b) violation harmed her credit score or credit reputation, Henkel does not plausibly allege that any consumer reporting agency (or anyone else) disseminated the affected credit information to anyone. Henkel thus was not injured by any impact that the Department's alleged Section 1681s-2(b) violation had on her credit score or credit reputation. Rather, the affected credit information is analogous to the defamatory letter stored in a desk drawer referenced in *TransUnion*, 594 U.S. at 434. Because no one disseminated the affected information, at least as far as Henkel's pleadings show, she does not plausibly allege that any impact on her credit score or credit reputation actually caused her harm.

Resisting this conclusion, Henkel argues that "[u]pon information and belief," one or more of the consumer reporting agencies disseminated her credit information to prospective creditors,

Am. Compl. ¶¶ 96-99, but bald "information and belief" allegations such as these are not entitled to be presumed true. The D.C. Circuit "require[s] that [all] allegations based on information and belief be accompanied by a statement of the facts upon which the allegations are based." *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (quotation marks omitted). Accordingly, "[i]t is well-settled that such conclusory allegations supported by information and belief are insufficient to survive a motion to dismiss." *Doe v. Lee*, Civ. A. No. 19-0085 (DLF), 2020 WL 759177, at *6 (D.D.C. Feb. 14, 2020) (quoting *Niedermeier v. Off. of Max S. Baucus*, 153 F. Supp. 2d 23, 31 (D.D.C. 2001)); *see also Mickens v. U.S. Bank Nat'l Ass'n*, Civ. A. No. 18-0928 (KBJ), 2021 WL 3418955, at *5 (D.D.C. Aug. 5, 2021) (plaintiff "merely alleges [certain facts] 'upon information and belief'" and "provide no additional information . . . as necessary to give rise to a plausible [ ] claim"); *PeaceTech Lab, Inc. v. C5 Accelerate LLC*, Civ. A. No. 20-0922 (JDB), 2021 WL 106718, at *8 (D.D.C. Jan. 12, 2021) (an "information and belief" allegation "is conclusory" if there is "no factual support for [a] claim"). But Henkel provides no "statement of the facts upon which" her "information or belief" allegations "are based." *Kareem*, 986 F.3d at 866. Rather, her "information and belief" allegations are threadbare and conclusory, and as such are not entitled to a presumption of truth. *Id.*; *Kareem*, 986 F.3d at 866; Am. Compl. ¶¶ 96-99; *see also Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of [the] allegations . . . that disentitles them to the presumption of truth"). For this reason, Henkel's "information and belief" allegations do not support a plausible inference that any credit reporting agency disseminated her credit information to prospective creditors.

Henkel's allegation that, on information and belief, credit reporting agencies disseminated her credit information to "existing creditors," Am. Compl. ¶ 96, meanwhile, fails for all the reasons discussed above, plus another. Disseminating Henkel's credit information to her existing creditors could not affect the credit terms that they already had extended her, and thus could not injure her.

2.    Henkel Does Not Plausibly Allege that Any Harm to Credit Score or Credit Reputation is Traceable to the Alleged Section 1681s-2(b) Violation

Even assuming any harm to Henkel's credit score or credit reputation truly injured her, Henkel does not plausibly allege that such injury is traceable to the Department's Section 1681s-2(b) violation. Henkel fails to show traceability with respect to her credit score or credit reputation for essentially the same reason that she fails to show traceability with respect to her ostensible lost credit opportunities—these asserted injuries are traceable to the initial furnishing of the disputed information, which she does not challenge, not the Department's alleged failure to investigate or correct the disputed information, the only thing that Henkel challenges. *See supra* § I.A.2, n.1. At most, the Department's alleged failure to investigate or correct the disputed information may have caused the alleged harm to Henkel's credit score or credit reputation to continue unabated, but as explained, the D.C. Circuit has squarely and repeatedly rejected that theory of standing. *See id.*

3.    Any Drop Credit Score or Reputation Did Not Actually Injure Henkel

Finally, Henkel's "harm to credit score or credit reputation" theory fails for an additional reason—even if the Department's alleged Section 1681s-2(b) violation caused her credit score or reputation to fall, she does not plausibly allege that any such drop in her credit score or reputation actually prevented her from obtaining credit. The purpose of having a good credit score or credit reputation is to obtain credit on more favorable terms. Yet as explained, Henkel does not plausibly allege that she tried to obtain credit during the relevant period. *See supra* § I.A.1. Nor, as explained, does she plausibly allege that even if she tried to obtain credit during this period, she was unable to obtain credit due to the Department's alleged Section 1681s-2(b) violation. *See supra* § I.A.2. As such, even if her credit score or reputation fell due to the Department's alleged Section 1681s-2(b) violation, she still does not plausibly allege that this preventing her from obtaining credit.

### C.    Henkel's "False Light" and "Invasion of Privacy" Theories Fail

Henkel's "false light" and "invasion of privacy" theories of injury in fact, *see* Am. Compl.

¶¶ 100-02, fail because she does not plausibly allege dissemination of her credit information. *See*

*supra* § I.B.1; *Merck v. Walmart, Inc.* 114 F.4th 762, 784 (6th Cir. 2024) ("Unreasonable publicity

of someone's private life and false light liability both have a publication requirement. Like in

*TransUnion*, that dooms [plaintiff's] claim," as he "cannot show that anyone beyond" defendant

"received the information. . . . So like in *TransUnion*, the lack of a publication means that the harm

from these torts does not qualify as close enough in kind to generate Article III standing"); *Klonis*

*v. Marine Corps Ass'n*, Civ. A. No. 24-0046, 2024 WL 2721875, at *7 (D.N.M. May 28, 2024)

(false light theory of standing failed because "any injury to Plaintiff from Defendants' statements

. . . can only be described as speculative, conjectural, and theoretical, not actual or concrete").

### D.    Henkel's "Waste of Time and Resources" Theory Fails

Next, Henkel's allegation of harm based on the "waste of time and resources," Am. Compl.

¶ 90, that the Department's alleged Section 1681s-2(b) caused her fails as well. Henkel alleges that

the Department's failure to investigate or correct the disputed information made her "waste time

and resources lodging futile disputes and trying to correct [its] false credit reporting." *Id.* ¶ 14.

But a plaintiff does not show standing by "incur[ing] certain costs as a reasonable reaction

to a risk of harm"—at least, not unless she independently establishes that "the harm [she] seek[s]

to avoid" is "certainly impending." *Clapper*, 568 U.S. at 416. "In other words, [the plaintiff] cannot

manufacture standing merely by inflicting harm on [herself] based on [her] fears of hypothetical

future harm that is not certainly impending," i.e., she cannot "bring [an] action based on costs [she]

incurred in response to a speculative threat." *Id.*; *accord Murthy v. Missouri*, 603 U.S. 43, 73

(2024) (same). As the D.C. Circuit has "consistently held . . . self-inflicted harm doesn't satisfy

the basic requirements for standing," as "[s]uch harm does not amount to an 'injury' cognizable

under Article III" and is not "fairly traceable to the defendant's challenged conduct." *Nat'l Fam.*

*Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).

Accordingly, "[c]ourts have uniformly ruled that the time and expense of credit monitoring

to combat an increased risk of future identity theft is not, in itself, an injury that the law is prepared

to remedy." *Shafran v. Harley-Davidson, Inc.*, Civ. A. No. 07-1365, 2008 WL 763177, at *3

(S.D.N.Y. Mar. 20, 2008); *accord Hammond v. Bank of N.Y. Mellon Corp.*, Civ. A. No. 08-6060,

2010 WL 2643307, at *9 (S.D.N.Y. June 25, 2010) (same). A plaintiff's "self-imposed risk-

mitigation costs, when incurred in response to a speculative threat, do not fulfill the injury-in-fact

requirement." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) (quotation marks

omitted); *see also In re Sci. Applications Int'l Corp. Backup Tape Data Theft Litig.*, 45 F. Supp.

3d 14, 26 (D.D.C. 2014) ("Nor is the cost involved in preventing future harm enough to confer

standing, even when such efforts are sensible;"); *Welborn v. IRS*, 218 F. Supp. 3d 64, 78 (D.D.C.

2016) ("the time and money spent monitoring and assessing the potential risk of future harm . . . .

does not constitute an injury-in-fact"); *Chambliss v. Carefirst, Inc.* 189 F. Supp. 3d 564, 571 (D.

Md. 2016) ("courts have consistently held that plaintiff may not use mitigation costs alone to

establish a cognizable injury in fact"); *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197,

1217 (N.D. Cal. 2014) ("costs incurred in an effort to mitigate the risk of future harm to constitute

injury-in-fact" only if "the future harm being mitigated is "imminent").

As explained above, Henkel does not plausibly allege any "certainly impending" injury,

*Clapper*, 568 U.S. at 416, resulting from the Department's alleged failure to investigate or correct

the disputed information. *See supra* § I.A-B. Rather, her allegation of lost credit opportunities and

harm to credit reputation and credit score are "speculative" at best. *Clapper*, 568 U.S. at 416.

Because she does not plausibly allege that the Department's alleged Section 1681s-2(b) violation

caused certainly impending injury, Henkel lacks standing based on the time and resources that she spent trying to mitigate these speculative harms. *See id.* ("allowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents' first failed theory of standing"); *see also Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 156 (D.D.C. 2023) ("efforts to mitigate potential future injury are inseparable from the imminence of the future injuries themselves. . . . the cognizability of such costs depends on whether Plaintiffs have met the standard for alleging a substantial increase in the risk of harm. As the Court has just explained, that is not so" (cleaned up)); *cf. Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995) (a plaintiff's "expenses incurred merely to notify [consumer reporting agency] of inaccurate credit information, and not to force their compliance with any specific provision of the statute, cannot be compensable as actual damages for a violation of the FCRA" (quotation marks omitted)).

### E.    Henkel's "Emotional Harm" Theory Fails

Finally, Henkel's theory that she has standing because the Department caused her injury-in-fact in the form of emotional harm, *see* Am. Compl. ¶¶ 102-104, fails because the D.C. Circuit has held that "general emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." *Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995).

## II.    Henkel Does Not Plausibly Allege Actual Damages

The FCRA's civil liability provisions entitle a consumer to "any actual damages sustained by the consumer as a result of the failure" to comply with the FCRA. 15 U.S.C. §§ 1681n(a)(1)(A), 1681o(a)(1). When a statute authorizes recovery of "actual damages" against the United States but leaves the term "actual damages" undefined, courts "adopt an interpretation of 'actual damages' limited to proven pecuniary or economic harm." *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 299 (2012). This rule of construction flows from the familiar principle that "[w]hen waiving the

Government's sovereign immunity, Congress must speak unequivocally," which means that "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *Id.* at 290, 292.

But Henkel does not plausibly allege that the Department's alleged Section 1681s-2(b) violation caused her any proven pecuniary or economic harm. Emotional harm inherently is not pecuniary or economic in nature. *See Cooper*, 566 U.S. at 300 ("emotional distress" not pecuniary or economic). Henkel pleads no facts, meanwhile, to support a plausible inference that either the alleged invasion of her privacy or her alleged false light portrayal caused her proven pecuniary or economic harm. Lost credit opportunity may be pecuniary or economic in nature, but Henkel does not plausibly allege either that she actually lost any credit opportunity or that such a loss was "as a result of" the Department's alleged Section 1681s-2(b) violation, 15 U.S.C. §§ 1681n(a)(1)(A), 1681o(a)(1), for the same reasons that she does not plausibly allege injury in fact or traceability based on a lost credit opportunity theory. *See supra* § I.A. To the extent Henkel argues that her drop in credit score or reputation harmed her because it cost her credit opportunities, meanwhile, it fails for the same reason, while to the extent that she does not rely on lost credit opportunities to argue that her drop in credit score or reputation harmed her, she does not plausibly allege that her drop in credit score or reputation caused her proven pecuniary or economic harm. Finally, while Henkel may have spent time or resources correcting the Department's alleged Section 1681s-2(b) violation, she does not plausibly allege that this caused her any proven pecuniary or economic harm either. For all these reasons, this Court should dismiss Henkel's claims for actual damages.

III.    **Henkel Fails to State a Claim Under Section 1681s-2(b) Against the Department**

Henkel fails to state a claim under Section 1681s-2(b) because she does not plausibly allege that the Department satisfies either of the two FCRA conditions that trigger a duty to investigate disputed information in the first place. Henkel pleads no facts to support a plausible inference that the Department either (1) furnished the disputed information to consumer reporting agencies or

(2) received notice of her dispute from the consumer reporting agencies. Rather, her pleadings show that Nelnet is the entity that furnished the disputed information to consumer reporting agencies and received notice of her dispute. Indeed, Henkel does not seem to disagree. She instead appears to contend that Section 1681s-2(b) makes the Department responsible for Nelnet's failure to investigate or correct the disputed information.

Not so. Section 1681s-2(b) does not make the Department responsible for Nelnet's alleged failure to investigate or correct the disputed information. Nothing in Section 1681s-2(b)'s plain text makes the Department responsible for Nelnet. That is a conspicuous omission given that other provisions of the FCRA expressly make one actor responsible for a different actor's actions, which only confirms that Section 1681s-2(b) does not do so. Because Congress has spoken directly to the issue, Henkel cannot invoke agency law principles to hold the Department responsible for Nelnet's alleged failure to investigate or correct the disputed information. Even if principles of agency law applied here, moreover, the Department still would not be responsible for Nelnet's alleged Section 1681s-2(b) violation because Nelnet is an independent contractor, not the Department's servant. For all these reasons, Henkel fails to state a claim under Section 1681s-2(b).

### A. The Department Did Not Furnish the Disputed Information to Any Consumer Reporting Agencies or Receive Notice of Henkel's Dispute

"After receiving notice. . . of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall . . . conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)(1)(A). As such, Section 1681s-2(b) imposes on an actor a duty to investigate and correct disputed information only if two separate conditions are met: the actor must have (1) furnished the disputed information to a consumer reporting agency and (2) received notice of the consumer's dispute from the consumer reporting agency. But Henkel does not plausibly allege that the Department satisfies either prong

of this test—the Department did not furnish the disputed information or receive notice of Henkel's dispute from the consumer reporting agency. Rather, Nelnet did.

*First*, Henkel does not plausibly allege that the Department is the actor that furnished the disputed information to any consumer reporting agency. Rather, she alleges that Nelnet furnished this information to consumer reporting agencies. *See* Am. Compl. ¶ 4 ("Nelnet is an entity with which Defendant contracts for the servicing of certain federal student loans such as Plaintiff's"); *id.* ¶ 5 (Department contracts with servicers like Nelnet "for furnishing of credit information to [consumer reporting agencies] about federal student loans"); *id.* ¶ 6 ("Nelnet and other agents must follow Defendant's instructions with respect to reporting federal student loan information").

True, Henkel alleges that "Defendant directly and/or indirectly through its agents [the disputed] information . . . to [consumer reporting agencies]," Am. Compl. ¶ 64, but this equivocal, conclusory assertion does not plausibly allege that the Department specifically, not Nelnet, is the one that furnished this information. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief," and "conclusory statements" are insufficient (quotation marks omitted)); *Arias v. Universal Music Grp.*, 640 F. Supp. 3d 84, 93 (D.D.C. 2022) (plaintiff does not state a claim if "[t]he few factual allegations . . . in the complaint refer[red] to Defendants as an undifferentiated group"); *Page v. Comey*, 628 F. Supp. 3d 103, 128 (D.D.C. 2022) ("plaintiff cannot satisfy the minimum pleading requirements . . . by lumping all the defendants together" (quotation marks omitted)); *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022) ("An allegation that a group of defendants is liable without any details about who did what does not state a claim for relief." (quotation marks omitted)); *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("An allegation that *someone* [did something wrong] does not propound a

plausible contention that *a particular person* did anything wrong" (emphasis in original)); *Om v. Bank of Am., N.A.*, Civ. A. No. 12-0496, 2012 WL 12941701, at *6 (W.D. Wash. June 15, 2012) ("stating that [either one party] or another party took certain action is insufficient to give rise to a reasonable inference that [the first party] is liable for the misconduct alleged . . . . alleging that certain acts were committed by either one defendant or another defendant is insufficient to satisfy *Iqbal*'s pleading standard"). Henkel's allegation that the Department either furnished the disputed information itself or caused Nelnet to furnish it is equally consistent with the idea that Nelnet furnished the information, and an allegation that is "just as much in line with" non-liable as liable behavior is insufficient to state a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

*Second*, Henkel does not plausibly allege that the Department itself received notice of her dispute, as needed to trigger a duty to investigate. *See* 15 U.S.C. §§ 1681i(a)(2)(A), 1681s-2(b)(1). She alleges only that "Defendants directly and/or indirectly through its agents" received "notice of a dispute," Am. Compl. ¶ 13; *see also id.* ¶ 82 (consumer reporting agencies "provided notice of [her] disputes to Defendant directly and/or indirectly through its servicing agents"); *id.* ¶ 120 (same), without ever specifying whether the Department or Nelnet is the one that received this notice. This generalized assertion treats the Department and Nelnet as a single entity, and thus fails to support a plausible inference that the Department itself received the notice.

Simply put, because Henkel does not plausibly allege that the Department furnished the disputed information or receive notice of Henkel's dispute from the consumer reporting agency, it had no duty to investigate or correct the disputed information under Section 1681s-2(b).

### B.    Section 1681s-2(b) Does Not Make the Department Responsible for Nelnet's Alleged Failure to Investigate or Correct the Disputed Information

Henkel does not appear to disagree that Nelnet, rather than the Department, furnished the disputed information and received notice of her dispute. She instead seems to contend that Section

1681s-2(b) makes the Department responsible for Nelnet's alleged failure to investigate or correct the disputed information. Not so. Section 1681s-2(b)'s plain language makes an actor responsible only for failing to investigate or correct disputed information that it itself furnished, and then only if the actor received notice of the dispute from a consumer reporting agency. Nothing in Section 1681s-2(b)'s text makes one actor responsible for an entirely different actor's failure to investigate or correct such information. Accordingly, as far as Henkel's pleadings show, Section 1681s-2(b) imposed a duty to investigate and correct the disputed information only on Nelnet, and did not make the Department responsible for Nelnet's alleged failure to discharge this duty.

The "starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). Section 1681s-2(b)'s plain language imposes the duty to investigate and correct disputed information only on the actor that actually furnished such information to the consumer reporting agencies and received notice of the dispute from the consumer reporting agency. *See* 15 U.S.C. § 1681s-2(b); *supra* § I.A. Nothing in Section 1681s-2(b)'s text makes one actor responsible for an entirely different actor's failure to investigate or correct such information. Courts "ordinarily resist reading words or elements into a statute that do not appear on its face," *Dean v. United States*, 556 U.S. 568, 572 (2009), and Henkel furnishes no good reason to depart from this principle here. For these reasons, Section 1681s-2(b) imposed a duty to investigate and correct the disputed information only on Nelnet, and did not make the Department responsible for Nelnet's alleged failure to satisfy this duty.

The omission from Section 1681s-2(b) of any language making one actor responsible for a different actor's actions is conspicuous because other provisions of the FCRA—those concerning consumer reports—expressly contain such language. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a

statute must be read in their context and with a view to their place in the overall statutory scheme"). One such provision provides that "a person may not procure a consumer report, *or cause a consumer report to be procured*, for employment purposes with respect to any consumer, unless," as relevant, "a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured *or caused to be procured*, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes." 15 U.S.C. § 1681b(b)(2)(A)(i) (emphasis added). A separate provision requires notice to and consent of a consumer "before a consumer report is procured *or caused to be procured* in connection with" certain applications for employment. *Id.* § 1681b(b)(2)(B). Yet another provision, in turn, provides that "[a] person may not procure *or cause to be prepared* an investigative consumer report on any consumer unless" certain conditions are met. 15 U.S.C. § 1681d(a) (emphasis added). It further requires "[a]ny person who procures *or causes to be prepared* an investigative consumer report on any consumer" to disclose certain information upon request. *Id.* § 1681d(b) (emphasis added).

The fact that the FCRA's consumer report provisions make an actor responsible for another actor's actions, but Section 1681s-2(b) does not, "is significant because Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)). "Had Congress likewise intended [Section 1681s-2(b)] to have such an effect"—*i.e.*, make one actor responsible for another actor's actions—it knew how to say so." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 216 (2018). The

fact that Congress chose to make one actor responsible for a different actor's actions under other provisions of the FCRA but chose not to do so under Section 1681s-2(b) is telling.

Because Congress has spoken directly to the issue, Henkel cannot rely on agency principles to hold the Department responsible for Nelnet's alleged Section 1681s-2(b) violation. Congress's choice to omit from Section 1681s-2(b) any language making one actor responsible for a different actor's actions while including such language in the FCRA's consumer report provisions "speak[s] directly to the question addressed by the common law," thus "abrogat[ing] [any contrary] common law principle" that otherwise might apply. *United States v. Texas*, 507 U.S. 529, 534 (1993); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 338 n.9 (2001) ("common-law rules [are] subject to statutory alteration"); *In re Leopold*, 964 F.3d 1121, 1130 (D.C. Cir. 2020) (when Congress "expressly directs" a rule, it "displaces the common-law" rule); *Ctr. for Nat'l Sec. Studies v. Dep't of Just.*, 331 F.3d 918, 937 (D.C. Cir. 2003) (statute "preempts any preexisting common law" rule); *United States v. Moore*, 486 F.2d 1139, 1156 (D.C. Cir. 1973) ("It is hornbook law that when the legislature has spoken, what might have been the common law is altered"). In deciding that Section 1681s-2(b) does not make one actor responsible for a different actor's actions, Congress displaced any agency principles that otherwise might make the Department responsible for Nelnet's actions.

Regardless, even under principles of agency, the Department still would not be responsible for Nelnet's alleged failure to investigate or correct the disputed information. Agency law does not make an actor responsible for an independent contractor's torts—only for the torts of a servant. *See, e.g.*, Restatement (Second) of Agency ("Restatement") § 2 cmts. a, b (1958) (explaining that the term "'servant' . . . indicate[s] the relation from which arises [ ] the liability of an employer for the physical harm caused to third persons by the tort of an employee;" that agency law "distinguish[es] a servant from an independent contractor;" and that "[s]tatements made in the

Restatement of this Subject as applicable to principals or agents are, unless otherwise stated, applicable to masters and servants");[2] *Logue v. United States*, 412 U.S. 521, 527 (1973) (citing the second Restatement, in interpreting the Federal Tort Claims Act of 1946, as authoritative on the "distinction between the servant" and an "independent contractor" in "the modern common law"); *Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.*, 758 F.3d 378, 386 (D.C. Cir. 2014) ("As a general rule, an entity is vicariously liable for the torts of an employee but not for those of an independent contractor." (cleaned up)); *Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1301 (D.C. Cir. 1985) ("The general rule in the District of Columbia is that an employer of an independent contractor is not liable for physical harm caused by the acts or omissions of the contractor.").

Nelnet is an independent contractor, not the Department's servant, so agency law principles do not make the Department responsible for its alleged failure to investigate or correct the disputed information. The term "servant" is equivalent to "employee," Restatement § 2 cmt. a, and Nelnet plainly is an independent contractor, not employee. Henkel's own pleadings make this clear, *see* Am. Compl. ¶ 4 ("Nelnet is an entity with which Defendant contracts for the servicing of certain federal student loans such as Plaintiff's."), as does the Department's contract with Nelnet, *see* Contract No. 91003123D0005 (Apr. 24, 2023), https://sam.gov/opp/89b81538c97a417db240152 0870ca365/view, which this Court may consider in resolving at the motion to dismiss stage, *see*

---

[2]    The Department cites the second Restatement, rather than the first or third version, because the second version was the most recent version at the time that Congress enacted Section 1681s-2(b). *See* Consumer Credit Reporting Reform Act of 1996, § 2413(a)(2), 110 Stat. 3009-426, 3009-448 (Tit. II, Subtit. D, Ch. 1, Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208); *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) ("It's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." (cleaned up)); *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994) ("the most relevant time for determining a statutory term's meaning" is when the statute "became law"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) ("Words must be given the meaning they had when the text was adopted.").

Fed. R. Evid. 201(b); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303 (D.C. Cir. 2023) ("we often take judicial notice of facts on the public record as a court may do upon a motion to dismiss" (cleaned up)); *Wash. Ass'n for Television & Children v. FCC* 712 F.2d 677, 683 (D.C. Cir. 1983) (a record "in the public domain" is "a proper subject of judicial notice"); *Comm'cns Satellite Corp. v. FCC*, 611 F.2d 883, 902 n.31 (D.C. Cir. 1977) ("We take judicial notice of this publicly filed document"); *Phillips v. Spencer*, 390 F. Supp. 3d 136, 149 n.7 (D.D.C. 2019) ("The Court takes judicial notice of the SeaPort Enhanced Task Order Award Report located on the Navy's website").

Unsurprisingly, courts have recognized that loan servicers are independent contractors, not servants. *See Citrus El Dorado, LLC v. Stearns Bank*, 552 F. App'x 625, 626 (9th Cir. 2014) (loan servicer is "independent contractor"); *LaSalle Bank Nat. Assoc. v. Citicorp Real Est., Inc.*, Civ. A. No. 02-7868, 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003) (same); *Wiener v. Bankers Tr. Co.*, Civ. A. No. 11-10770, 2012 WL 4088944, at *5 (E.D. Mich. Sept. 17, 2012) (emphasizing that "Freddie Mac's servicer guide defines loan servicers as independent contractors"). Indeed, the very notion of an "employee of the government" typically "does not include corporations." *Adams v. United States*, 420 F.3d 1049, 1054-55 (9th Cir. 2005) (citing 28 U.S.C. § 2671). Because Nelnet is an independent contractor, agency law does not make the Department responsible for Nelnet's alleged Section 1681s-2(b) violation. *See Chanler v. Stonich*, 156 F. App'x 945, 947 (9th Cir. 2005) ("there can be no liability under the FCRA" if the defendant has no "employer-employee-relationship with" an independent contractor that violated FCRA, as "traditional agency principles imposing vicarious liability of an employer for the torts of the employee would not apply").

Henkel's allegation that Nelnet is the Department's "agent," *see generally* Am. Compl., cannot support a plausible inference that the Department is responsible for Nelnet's alleged Section 1681s-2(b) violation, for two reasons. *First*, the bald allegation that Nelnet is the Department's

agent is a bare legal conclusion, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Slinski v. Bank of Am., N.A.*, 981 F. Supp. 2d 19, 31 (D.D.C. 2013) ("The existence of an agency relationship is a legal conclusion, which the court need not accept unless it is supported by factual allegations."); *Hanken v. TRT Holdings, Inc.*, Civ. A. No. 20-3717 (JDB), 2021 WL 6617463, at *3 (D.D.C. Mar. 18, 2021) ("if [plaintiff] wishes to allege one or more agency relationships, she must substantiate those allegations with sufficient facts to support the inference of agency, not simply list legal conclusions couched as factual allegations tracking the elements of an agency relationship" (cleaned up)); *United States v. Hudson*, 86 F.4th 806, 814 (7th Cir. 2023) ("the existence of an agency relationship" is "a legal conclusion"); *Grosz v. Cavalry Portfolio Servs., LLC*, Civ. A. No. 17-3166, 2019 WL 4888583, at *3 (E.D.N.Y. Sept. 30, 2019) ("The existence of an agency relationship is a legal conclusion and thus this allegation is not assumed to be true.").

*Second*, even assuming that Nelnet is the Department's "agent," that alone would not mean that the Department is responsible for Nelnet's alleged failure to investigate or correct the disputed information. That is because the term "agent" is not simply synonymous with "servant"—rather, it encompasses both servants and independent contractors alike. *See* Restatement § 2 cmt. b ("An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal"). Yet as explained, agency principles make an actor liable only for the torts of servant "agents," not the torts of independent contractor "agents." *Id.* cmt. a. The relevant question thus is not whether Nelnet is the Department's "agent" generically, but more specifically, whether Nelnet is the Department's servant or an independent contractor. Because Nelnet is not the Department's servant, even if it is an independent contractor "agent," agency principles do not

make the Department responsible for Nelnet's alleged Section 1681s-2(b) violation. *See Chanler*,

156 F. App'x at 947 (no FCRA liability based on actions of defendant's independent contractors).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Henkel's amended complaint.

Dated: February 5, 2025                    Respectfully submitted,

EDWARD R. MARTIN, D.C. Bar #481866
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:  _____/s/ Bradley G. Silverman_____
      BRADLEY G. SILVERMAN, D.C. Bar #1531664
      Assistant United States Attorney
      601 D Street, NW
      Washington, DC 20530
      (202) 252-2575
      bradley.silverman@usdoj.gov

*Attorneys for the United States of America*

32