UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIELLE HENKEL, | |
| Plaintiff, | |
| v. | Civil Action No. 24-1676 (SLS) |
| DEPARTMENT OF EDUCATION, | |
| Defendant. | |

## **DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... iii

ARGUMENT ............................................................................................................................ 1

I.       Henkel Does Not Plausibly Allege Standing ................................................................ 1

         A.       Henkel's "Lost Credit Opportunities" Theory Fails ........................................ 2

                  1.       Henkel Does Not Plausibly Allege Lost Credit Opportunities ................. 2

                  2.       Henkel Does Not Plausibly Allege That Any Lost Credit Opportunities
                           Are Traceable to the Department's Alleged Section 1681s-2(b)
                           Violation ................................................................................................ 3

         B.       Henkel's "Harm to Credit Reputation or Credit Score" Theory Fails ................... 6

                  1.       Henkel Does Not Plausibly Allege Dissemination of Her Credit
                           Information to a Third Party That Causes a Concrete Article III Injury .... 6

                           a.       Furnishing Credit Information to a Consumer Reporting Agency
                                    Does Not By Itself Cause a Concrete Article III Injury................. 6

                           b.       Henkel Does Not Plausibly Allege Dissemination to Another
                                    Party ............................................................................................ 12

                  2.       Henkel Does Not Plausibly Allege That Her Credit Information Was
                           Read ..................................................................................................... 14

                  3.       Henkel Does Not Plausibly Allege that Any Harm to Credit Score or
                           Credit Reputation is Traceable to the Alleged Section 1681s-2(b)
                           Violation ............................................................................................... 15

                  4.       Any Drop Credit Score or Reputation Did Not Actually Injure Henkel... 15

         C.       Henkel's "False Light" and "Invasion of Privacy" Theories Fail........................ 15

         D.       Henkel's "Waste of Time and Resources" Theory Fails ...................................... 15

         E.       Henkel's "Emotional Harm" Theory Fails ......................................................... 17

II.      Henkel Does Not Plausibly Allege Actual Damages..................................................... 17

III.     Henkel Fails to State a Claim Under Section 1681s-2(b) Against the Department.......... 19

         A.       The Department Did Not Furnish Henkel's Credit Information........................... 19

         B.       Section 1681s-2(b) Does Not Make the Department Vicariously Liable for
                  Nelnet's Alleged Failure to Investigate or Correct the Disputed Information...... 21

         C.       Henkel Does Not Plausibly Allege That Nelnet is The Department's Servant .... 23

CONCLUSION......................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
    3 F.4th 373 (D.C. Cir. 2021) ................................................................................................. 22

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) .................................................................................................. 1

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................... 1

*Astoria Fed. Sav. & Loan Ass'n. v. Solimino*,
    501 U.S. 104 (1991) ............................................................................................................. 22

*Barclift v. Keystone Credit Servs., LLC*,
    93 F.4th 136 (3d Cir. 2024) ......................................................................................... 7, 8, 10

*Beck v. Oden*,
    13 S.E.2d 468 (Ga. App. 1941) ................................................................................... 7, 8, 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................................... 1, 21

*Biener v. Credit Control Servs., Inc.*,
    Civ. A. No. 21-2809, 2023 WL 2504733 (S.D.N.Y. Mar. 14, 2023) ................................... 10

*Blecher v. Holy See*,
    631 F. Supp. 3d 163 (S.D.N.Y. 2022) ................................................................................. 22

*Cal. Ass'n of Physically Handicapped, Inc. v. FCC*,
    778 F.2d 823 (D.C. Cir. 1985) ............................................................................................... 5

*Campbell v. Portfolio Recovery Assocs., LLC*,
    Civ. A. No. 21-1322, 2022 WL 657225 (E.D.N.Y. Mar. 4, 2022) ...................................... 10

*Castro v. NewRez LLC*,
    Civ. A. No. 22-6340, 2023 WL 3391536 (E.D.N.Y. Jan. 12, 2023) .................................... 11

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ....................................................................................................... 15, 16

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
    543 U.S. 157 (2004) ............................................................................................................. 12

**Cases (cont.)**

*Dawes v. Walker*,
    239 F.3d 489 (2d Cir. 2001).................................................................. 5

*Dep't of Homeland Sec. v. MacLean*,
    574 U.S. 383 (2015)................................................................. 21, 22

*EEOC v. N. Knox S. Corp.*,
    154 F.3d 744 (7th Cir. 1998) ............................................................... 25

*Ellis v. Pa. Higher Educ. Assistance Agency*,
    Civ. A. No. 07-4498, 2008 WL 11363649 (C.D. Cal. Aug. 12, 2008)................... 23

*Ewing v. MED-1 Sols., LLC*,
    24 F. 4th 1146 (7th Cir. 2022) .............................................................. 11

*Fed. Aviation Admin. v. Cooper*,
    566 U.S. 284 (2012)............................................................. 17, 18, 19

*Feldmann v. Lakeview Loan Servicing LLC*,
    Civ. A. No. 20-0580, 2021 WL 1627048 (W.D. Wash. Apr. 27, 2021)................... 23

*Fernandez v. RentGrow, Inc.*,
    116 F.4th 288 (4th Cir. 2024) .............................................................. 14

*Haddad v. Charles Riley & Assocs., Inc.*,
    Civ. A. No. 09-12597, 2010 WL 3906955 (E.D. Mich. Apr. 12, 2010)................... 23

*Humane Soc'y of U.S. v. Babbitt*,
    46 F.3d 93 (D.C. Cir. 1995) ................................................................ 17

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
    48 F.4th 1236 (11th Cir. 2022) .................................................... 8, 9, 11, 14

*In re Sci. Applications Int'l Corp. Backup Tape Data Theft Litig.*,
    45 F. Supp. 3d 14 (D.D.C. 2014) ........................................................... 16

*Jenkins v. Ltd. Fin. Servs., L.P.*,
    Civ. A. No. 21-0407, 2022 WL 4747527 (W.D.N.C. Sept. 30, 2022) .................... 14

*Kareem v. Haspel*,
    986 F.3d 859 (D.C. Cir. 2021) ......................................................... 12, 13

*Kerns v. United States*,
    585 F.3d 187 (4th Cir. 2009) ................................................................. 1

**Cases (cont.)**

*Khimmat v. Weltman, Weinberg & Reis Co., LPA*,
    585 F. Supp. 3d 707 (E.D. Pa. 2022) ......................................................................... 8

*Konig v. TransUnion, LLC*,
    Civ. A. No. 18-7299, 2023 WL 3002396 (S.D.N.Y. Apr. 19, 2023).................................. 10, 12

*Krausz v. Equifax Info. Servs., LLC*,
    Civ. A. No. 21-7427, 2023 WL 1993886 (S.D.N.Y. Feb. 14, 2023)....................................... 11

*Lewis v. Old Navy*,
    Civ. A. No. 21-9131, 2024 WL 98293 (S.D.N.Y. Jan. 9, 2024) ............................................ 11

*Lo Shippers Action Comm. v. Interstate Com. Comm'n*,
    808 F.2d 64 (D.C. Cir. 1986) ................................................................................... 5

*Logue v. United States*,
    412 U.S. 521 (1973)..................................................................................................... 24

*Macharia v. United States*,
    334 F.3d 61 (D.C. Cir. 2003) ..................................................................................... 24

*Mack v. Delta Air Lines, Inc.*,
    639 F. App'x 582 (11th Cir. 2016) ................................................................... 7, 8, 11

*Magruder v. Capital One, N.A.*,
    540 F. Supp. 3d 1 (D.D.C. 2021) ................................................................................ 17

*McKnight v. Receivable Collection Servs., LLC*,
    Civ. A. No. 24-2840, 2024 WL 4266017 (E.D.N.Y. Sept. 23, 2024) ...................................... 11

*Miller v. Dish Network, L.L.C.*,
    326 F. Supp. 3d 51 (E.D. Va. 2018) ........................................................................... 17

*Moore v. Merchants & Med. Credit Corp., Inc.*,
    Civ. A. No. 21-1724, 2023 WL 6216713 (M.D. Pa. Sept. 25, 2023) ......................................... 8

*Mullins v. Monarch Recovery Mgmt., Inc.*,
    Civ. A. No. 21-0120, 2022 WL 11141325 (W.D.N.C. Oct. 19, 2022)....................................... 14

*Nabozny v. Optio Sols. LLC*,
    84 F.4th 731 (7th Cir. 2023) ................................................................................. 8, 11

*Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*,
    468 F.3d 826 (D.C. Cir. 2006).................................................................................... 16

**Cases (cont.)**

*Navarroli v. Medicredit*, Inc.,
   Civ. A. No. 21-6203, 2022 WL 4465840 (N.D. Ill. Sept. 26, 2022) ........................................ 8

*Petit v. Dep't of Educ.*,
   675 F.3d 769 (D.C. Cir. 2012) ..................................................................... 19

*Petzold v. Rostollan*,
   946 F.3d 242 (5th Cir. 2019) ...................................................................... 5

*Phillips v. First Credit Servs., Inc.*,
   Civ. A. No. 24-4440, 2024 WL 4635341 (S.D.N.Y. Oct. 29, 2024) ........................................ 10

*Pond v. United States*,
   69 F.4th 155 (4th Cir. 2023) ..................................................................... 22

*Powell v. U.S. Cartridge Co.*,
   339 U.S. 497 (1950) ............................................................................. 24

*Public Citizen v. Fed. Trade Comm'n*,
   869 F.2d 1541 (D.C. Cir. 1989) .................................................................... 1

*Reimer v. LexisNexis Risk Sols., Inc.*,
   Civ. A. No. 22-0153, 2022 WL 4227231 (E.D. Va. Sept. 13, 2022)......................................... 10

*Rubin v. Islamic Republic of Iran*,
   583 U.S. 202 (2018).......................................................................... 21, 22

*Russello v. United States*,
   464 U.S. 16 (1983)........................................................................... 21, 22

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007)............................................................................... 9

*Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*,
   Civ. A. No. 18-1781, 2023 WL 6290622 (S.D.N.Y. Sept. 27, 2023)....................................... 10

*Singh v. S. Asian Soc'y of George Wash. Univ.*,
   572 F. Supp. 2d 1 (D.D.C. 2008) ................................................................. 24

*Spence v. Dep't of Veterans Affs.*,
   109 F.4th 531 (D.C. Cir. 2024) ................................................................... 6

*Spence v. Dep't of Vets. Affs.*,
   Civ. A. No. 19-1947 (JEB), 2022 WL 3354726 (D.D.C. Aug. 12, 2022) ................................ 5

**Cases (cont.)**

*Spira v. Trans Union, LLC,*
   Civ. A. No. 21-2367, 2022 WL 2819469 (S.D.N.Y. July 19, 2022) ...................................... 10

*Stewart v. Healthcare Revenue Recovery Grp., LLC,*
   Civ. A. No. 20-0679, 2022 WL 200371 (M.D. Tenn. Jan. 21, 2022) ................................ 14, 15

*Stovic v. R.R. Ret. Bd.,*
   826 F.3d 500 (D.C. Cir. 2016) ....................................................................................... 23

*Thompson v. Equifax Info.* Servs., LLC,
   441 F. Supp. 3d 533 (E.D. Mich. 2020) ........................................................................... 4

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .............................................................................................. passim

*United States v. District of Columbia,*
   669 F.2d 738 (D.C. Cir. 1981) ....................................................................................... 25

*United States v. Orleans,*
   425 U.S. 807 (1976) ..................................................................................................... 24

*Wannall v. Honeywell, Inc.,*
   775 F.3d 425 (D.C. Cir. 2014) ................................................................................... 6, 13

*Whitehead v. Grant & Weber, Inc.,*
   Civ. A. No. 22-6517, 2022 WL 19762152 (E.D.N.Y. Dec. 30, 2022) ............................. 11

**Statutes**

5 U.S.C. § 552a(e)(10) .......................................................................................................... 17

15 U.S.C. § 1681 ............................................................................................................. 9, 18

15 U.S.C. § 1681s-2(b) .............................................................................................. 19, 20. 21

15 U.S.C. § 1681n(a)(1)(A) .................................................................................................. 17

15 U.S.C. § 1681o(a)(1) ....................................................................................................... 17

20 U.S.C. § 1080a ............................................................................................................... 20

**Regulations**

12 C.F.R. § 1022.41(c) .................................................................................................... 19, 20

16 C.F.R. § 660.2(c) ...................................................................................................... 19, 20

Defendant Department of Education ("Department"), by and through undersigned counsel, respectfully replies in support of its motion to dismiss, ECF No. 20.

## ARGUMENT

Henkel does not plausibly allege that she has standing or incurred actual damages, or that the Department violated Section 1681s-2(b). Accordingly, the Court should dismiss her complaint.

## I.    Henkel Does Not Plausibly Allege Standing

As an initial matter, there is no merit to Henkel's assertion that the Department's standing arguments are premature "because they involve factual matters central to both Article III standing and the merits of [her] FCRA claim: how was [she] impacted by Defendant's inaccurate reporting of duplicative student loan balances, and were those impacts caused by Defendant?" Pl.'s Resp. at 6-7. The D.C. Circuit has explained that "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (cleaned up). As such, Henkel must plead facts sufficient to support a plausible inference that she satisfies all three of the elements of standing.

Henkel's assertion that standing arguments based on "factual matters" are premature at the motion to dismiss stage, Pl.'s Resp. at 6-7, rests on case law that is outdated and/or conflicts with binding D.C. Circuit precedent. Henkel cites *Public Citizen v. Federal Trade Commission*, 869 F.2d 1541, 1549 (D.C. Cir. 1989), but the D.C. Circuit subsequently has raised the bar to plead standing, as the *Arpaio* demonstrates. Indeed, *Public Citizen* predates both *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)—cases that, the D.C. Circuit has explained, require a plaintiff to plausibly allege not only facts that support a claim to relief but also facts that establish standing. *See Arpaio*, 797 F.3d at 19. Henkel also relies on *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009), a case that both (1) failed to consider either *Iqbal* or *Twombly* and (2) conflicts with D.C. Circuit precedent, as explained above.

With these principles in mind, Henkel does not plausibly allege standing to raise a Section 1681s-2(b) claim based on a "lost credit opportunities," "harm to credit reputation or credit score," "false light" or "invasion of privacy," "waste of time and resources," or "emotional harm" theory.

### A.    Henkel's "Lost Credit Opportunities" Theory Fails

Henkel does not plausibly allege either that she lost credit opportunities or that any such loss of credit opportunities is traceable to the Department's alleged Section 1681s-2(b) violation.

#### 1.    Henkel Does Not Plausibly Allege Lost Credit Opportunities

In moving to dismiss, the Department explained that Henkel pleads no facts to support a plausible inference that she experienced any concrete injury in the form of lost credit opportunities. *See* Def.'s Mem. at 10-11. Henkel responds by attacking a strawman, insisting that "detailed facts" are unnecessary at "the pleading stage." Pl.'s Resp. at 15. Perhaps so, but as explained above, a plaintiff still bears the burden at the motion to dismiss stage to plead facts that suffice to support a plausible inference of concrete injury, as Article III standing requires. *See supra* § I. The problem with Henkel's pleadings is not simply a lack of detail—it is her failure to plead facts that support a plausible inference that she lost credit opportunities. The Department does not argue, as Henkel inaccurately puts it, "that in order to plead Article III injury in the form of reduced credit score and lost credit opportunities, [she] must specifically plead 'the pertinent loan terms' of particular credit applications, and whether she received credit on other terms." Pl.'s Resp. at 15. Rather, it cited her failure to specify pertinent loan terms simply as an illustration of her failure to plead any facts that support a plausible inference of lost credit opportunities. *See* Def.'s Mem. at 10.

Unsurprisingly, Henkel attempts to minimize the extensive body of case law holding that conclusory allegations of lost credit opportunities are insufficient to support a plausible inference of standing. *See* Def.'s Mem. at 10-11. Henkel seizes upon trivial, immaterial factual distinctions between those cases and this case, *see* Pl.'s Resp. at 15-16, but her criticism misses the forest for

the trees. As the cited cases make clear, a wholly conclusory allegation of lost credit opportunities is insufficient to support a plausible inference of concrete Article III injury under any set of facts.

2.    Henkel Does Not Plausibly Allege That Any Lost Credit Opportunities Are Traceable to the Department's Alleged Section 1681s-2(b) Violation

Henkel does not plausibly allege that any of her lost credit opportunity is traceable to the Department's alleged failure to investigate or correct the inaccurate credit information. That is so for three reasons: she does not plausibly allege that any loss of credit opportunities (1) is traceable to the Department's behavior at all, (2) is traceable specifically to the Department's failure to investigate or correct the inaccurate credit information as opposed to the initial furnishing of this information, or (3) occurred after, rather than before, the alleged Section 1681s-2(b) violation.

*First*, Henkel does not plausibly allege that any loss of credit opportunities is traceable to any behavior of the Department at all. *See* Def.'s Mem. at 12. Nothing in her pleadings supports a plausible inference that any loss of credit opportunity is because of anything the Department did. She offers only conclusory assertions to that effect, not facts that make such an inference plausible.

*Second*, even assuming that Henkel lost credit opportunities because of the Department's behavior, she does not plausibly allege that her loss of credit opportunities was due to the failure to investigate or correct the inaccurate credit information as opposed to the original furnishing of this information. Henkel's traceability argument rests on a conflation of two distinct behaviors: (1) the original furnishing of inaccurate credit information and (2) the subsequent failure to investigate or correct this information. The Department explained, and Henkel does not dispute, that the FCRA does not provide a private right of action to challenge the initial furnishing of inaccurate credit information to a consumer reporting agency. *See* Def.'s Mem. at 12-13, ECF No. 23-1. Indeed, Henkel does not challenge the original furnishing of information—rather, she challenges only the failure to investigate or correct the furnished information after she had disputed it. *See* Am. Compl.

3

¶¶ 119-21 (claim). Any harm that is traceable to the original furnishing of information—as opposed to traceable to the failure to investigate or correct that information once she challenged it—thus is immaterial to traceability analysis. *See Thompson v. Equifax Info. Servs., LLC*, 441 F. Supp. 3d 533, 544 (E.D. Mich. 2020) (no standing as plaintiff failed to show that injury "is fairly traceable to [the] allegedly inadequate investigation" rather than to the initial furnishing of the information).

This is where Henkel's traceability analysis flounders. She does not plausibly allege that any harm she experienced is traceable to the failure to investigate or correct the credit information already furnished to the consumer reporting agencies. Rather, each harm she alleges is traceable only to the furnishing of inaccurate credit information, not the subsequent failure to investigate or correct the information. Indeed, she concedes as much by arguing that the Department "published inaccurate information even after she put Defendant on notice of the inaccuracies through her FCRA section 1681s-2(b) disputes; each such publication was a new injury that would not exist if Defendant had complied with its FCRA obligations." Pl.'s Resp. at 18. But again, the FCRA offers no private right of action to challenge the initial furnishing of inaccurate credit information, *see* Def.'s Mem. at 12-13, and Henkel does not purport to raise such a claim, *see* Am. Comp. ¶¶ 119-21. Her response only confirms that her alleged harms are not traceable to the only behavior that she challenges (and can challenge)—the failure to investigate or correct the inaccurate information. Henkel's allegation that her alleged harms are traceable to the failure to investigate or correct the inaccurate credit information is wholly conclusory, and thus insufficient to establish traceability.

The only conceivable argument for traceability that Henkel could assert under these facts is one that the D.C. Circuit repeatedly has rejected. In theory, she could argue that her injuries are traceable to the failure to investigate or correct the inaccurate credit information because correcting the inaccurate information would have stopped the inaccurate information from continuing to harm

her going forward. But the D.C. Circuit holds that traceability is absent when a plaintiff challenges the mere failure to eliminate an existing source of harm rather than the creation of harm in the first place. *See Lo Shippers Action Comm. v. Interstate Com. Comm'n*, 808 F.2d 64, 65 (D.C. Cir. 1986) ("[Plaintiff] complaint is that the challenged action did not go far enough in abating a pre-existing injury. This will not suffice to confer standing."); *Cal. Ass'n of Physically Handicapped, Inc. v. FCC*, 778 F.2d 823, 825 (D.C. Cir. 1985) (The 'standing' requirement is that the challenged action *cause* the injury. [plaintiff], however, cannot fairly trace its ongoing injury—either in origin or in endurance—to the [challenged action]. Instead, [plaintiff's] real plea is that [the challenged action] will furnish no cure—it will not cause the injury to abate. This will not suffice."). Henkel attempts to minimize these cases as limited only to situations "where Plaintiff seeks redress for failure to halt harms caused by another bad actor not before the court," Pl.'s Resp. at 18, but these cases are not so limited. Rather, they stand for the general principle that traceability is absent when a plaintiff challenges not the source of its harm but only a failure to abate that harm. That precludes Henkel from arguing that her harm is traceable to the failure to correct the inaccurate credit information.

*Third*, Henkel fails to specify when she ostensibly lost credit opportunities, thus precluding any inference of a causal link between the Department's conduct and any loss of credit opportunity. *See Spence v. Dep't of Veterans Affs.*, Civ. A. No. 19-1947 (JEB), 2022 WL 3354726, at *9 (D.D.C. Aug. 12, 2022), *aff'd*, No. 22-5273, 2024 WL 3504410 (D.C. Cir. July 23, 2024) ("Without knowing the precise dates," a court "cannot possibly make an inference of causation"); *Petzold v. Rostollan*, 946 F.3d 242, 252 (5th Cir. 2019) (plaintiff "must at least establish a chronology of events from which [causation] may be plausibly inferred"); *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) ("failure to set forth a time frame for the alleged events . . . precludes inference of a causal relationship"). She does not allege that she lost credit opportunities within

"three to four months" of the failure to correct the inaccurate information, typically the maximum time gap that can support a plausible inference of causation. *Spence v. Dep't of Veterans Affs.*, 109 F.4th 531, 540 (D.C. Cir. 2024). Indeed, she does not even allege that any loss of credit opportunity occurred after—not before—the failure to correct the inaccurate credit information, which also precludes a traceability inference. *See* Def.'s Mem. at 13-14 (citing cases). Tellingly, she ignores this point entirely in her response, and thus concedes it. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded").

**B.    Henkel's "Harm to Credit Reputation or Credit Score" Theory Fails**

Henkel's "harm to credit reputation or credit score" theory of standing fails for two reasons: she does not plausibly allege (1) dissemination of her credit information to a third party that causes a concrete Article III injury or (2) that her credit information was read and not merely processed.

1. Henkel Does Not Plausibly Allege Dissemination of Her Credit Information to a Third Party That Causes a Concrete Article III Injury

Henkel does not plausibly allege dissemination of her credit information to a third party that causes concrete injury. Furnishing credit information to a consumer reporting agency does not by itself cause a concrete injury, and she does not plausibly allege dissemination to another entity.

*a.    Furnishing Credit Information to a Consumer Reporting Agency Does Not By Itself Cause a Concrete Article III Injury*

Nelnet's mere furnishing of Henkel's credit information to the consumer reporting agencies does not itself constitute injury in fact for standing purposes. The Supreme Court has squarely held that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 434 (2021). Even if Nelnet furnished Henkel's credit information to the consumer reporting agencies, then, no concrete injury occurs unless the consumer reporting agencies transmit the information to a third party.

Resisting this conclusion, Henkel argues that furnishing credit information to a consumer reporting agency itself constitutes "publication causing a defamatory injury giving rise to Article III standing," Pl.'s Resp. at 11-12, but *TransUnion* precludes this theory. That is because mere disclosure to a consumer reporting agency alone is not sufficiently analogous to defamation to give rise to a concrete Article III injury. "Publication is essential to liability in a suit for defamation." *TransUnion*, 594 U.S. at 434 (quotation marks omitted); *see also id.* at n.6 ("publication" is "a fundamental requirement of an ordinary defamation claim"). And for purposes of defamation—and therefore, for purposes of concrete Article III injury—"disclosures to printing vendors" do not constitute "actionable publications." *TransUnion*, 594 U.S. at 434 n.6. A mere disclosure to a printing vendor thus "does not bear a sufficiently close relationship to the traditional defamation tort to qualify for Article III standing." *Id.* That is the case for three reasons.

*First*, "the weight of modern authority" holds that no defamatory publication occurs "where the communication is made to a servant or business associate in the ordinary or natural course of business." *Beck v. Oden*, 13 S.E.2d 468, 471 (Ga. App. 1941). The Eleventh Circuit cited *Beck* in *Mack v. Delta Air Lines, Inc.*, 639 F. App'x 582, 586 (11th Cir. 2016), for the proposition that a mere "communication to a third-party printer" does not constitute "'publication' for purposes of stating a claim for libel." *TransUnion*, 594 U.S. at 413 n.6, in turn, cited *Mack* for the proposition that "disclosures to printing vendors" are not "actionable publications" for purposes of establishing injury in fact based on an analogy to defamation. *TransUnion*, 594 U.S. at 413 n.6; *see also Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 147 n.5 (3d Cir. 2024) (collecting cases for idea that "numerous early twentieth century courts held that communications to an associate in the ordinary course of business did not support an action at common law" in context of applying *TransUnion*'s rule that "disclosures to printing vendors [are not] actionable publications" for injury in fact). By

relying on *Mack*, *TransUnion* thus indirectly cited, and endorsed, *Beck*'s reasoning for why a mere disclosure to a printing vendor does not constitute publication for purposes of defamation liability.

*Second*, a printing vendor is a mere "intermediary" that simply "passe[s] the information" on to its ultimate recipient—it is not the ultimate intended recipient of the information. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1248 (11th Cir. 2022) (en banc); *see also Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 736 (7th Cir. 2023) (a printing vendor is a mere "ministerial intermediary"); *Barclift*, 93 F.4th at 146 (same); *Moore v. Merchants & Med. Credit Corp., Inc.*, Civ. A. No. 21-1724, 2023 WL 6216713, at *3 (M.D. Pa. Sept. 25, 2023) (mailing vendor is a mere "intermediary"); *Navarroli v. Medicredit*, Inc., Civ. A. No. 21-6203, 2022 WL 4465840, at *5 (N.D. Ill. Sept. 26, 2022) (same); *Khimmat v. Weltman, Weinberg & Reis Co., LPA*, 585 F. Supp. 3d 707, 711 (E.D. Pa. 2022) (same). Disclosure of information to a mere intermediary that never passes the information on to a third party does not "subject [the plaintiff] to [the] hatred, contempt, or ridicule" that constitutes the essence of defamation. *TransUnion*, 594 U.S. at 432. Rather, it "is roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer," which "does not harm anyone, no matter how insulting." *Id.* at 434.

A consumer reporting agency is analogous to a printing vendor in every way that is relevant to Article III standing, so disclosure to a consumer reporting agency, like a disclosure to a printing vendor, is not a concrete injury for standing purposes. Nelnet furnishes credit information to the consumer reporting agencies on a regular and ongoing basis. *See* Am. Compl. ¶¶ 3-6, 39-44. The consumer reporting agencies, much like printing vendors, thus are Nelnet's "business associates" to which Nelnet furnishes credit information "in the ordinary or natural course of business." *Beck*, 13 S.E.2d at 471; *see also Mack*, 639 F. App'x at 586; *TransUnion*, 594 U.S. at 413 n.6. And like a printing vendor, a consumer reporting agency is a "ministerial intermediary," *Nabozny*, 84 F.4th

at 736, that just "passe[s] the information" on to its ultimate recipient, *Hunstein*, 48 F.4th at 1248,

i.e., the entity that purchases a credit report, not the information's ultimate intended recipient itself.

Accordingly, the reasoning that underlies the rule that mere disclosure to a printing vendor

is not a publication giving rise to concrete injury for standing purposes, *see TransUnion*, 594 U.S.

at 434 n.6, applies with equal force to a mere disclosure to a consumer reporting agency. That is a

sensible and intuitive rule. *TransUnion* held, after all, that "[t]he mere presence of an inaccuracy

in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 434.

Disclosing inaccurate credit information to a consumer reporting agency that merely maintains the

information in an internal credit file without disclosing it further likewise causes no concrete harm.

Last, "Congress's views" on the harms that the FCRA remedies, which are "instructive" in

"determining whether a harm is sufficiently concrete to qualify as an injury in fact," *TransUnion*,

594 U.S. at 425, reinforce that disclosure to a consumer reporting agency is not a concrete injury.

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency

in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S.

47, 52 (2007); *accord* 15 U.S.C. § 1681(b) (the FCRA's "purpose" is "to require that consumer

reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer

credit, personnel, insurance, and other information in a manner which is fair and equitable to the

consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such

information"); S. Rep. No. 517, 91st Cong., 1st Sess. 1 (1969) (FCRA meant "to protect consumers

from being unjustly damaged because of inaccurate or arbitrary information in a credit report").

The type of harm that Congress intended the FCRA to ameliorate thus occur only when a

consumer reporting agency transmits the "allegedly inaccurate or misleading information" to a

third party. *TransUnion*, 594 U.S. at 434. No harm of the sort that Congress intended to redress

occurs when a consumer reporting agency does not transmit the information to a third party, such that the information just "sits in a company database." *Id.* Congress's judgment thus reinforces that mere disclosure to a consumer reporting agency does not constitute concrete Article III injury. *See Barclift*, 93 F.4th at 147 n.6 ("Our view [that challenged disclosure is not a publication giving rise to concrete injury under *TransUnion*] aligns with Congress's intent in enacting the [Fair Debt Collection Practices Act]," as such disclosure "is not a practice the statute was meant to prohibit").

Unsurprisingly, most courts to address the issue have concluded that under *TransUnion*, a mere disclosure to a consumer reporting agency that does not further disseminate the information is not concrete injury under Article III. *See Campbell v. Portfolio Recovery Assocs., LLC*, Civ. A. No. 21-1322, 2022 WL 657225, at *2 (E.D.N.Y. Mar. 4, 2022) ("[T]he distribution of inaccurate information to a credit reporting agency, as opposed to a potential creditor, [ ] does not constitute or cause concrete injury for standing purposes. Unlike the disclosures at issue in *TransUnion*, the distribution alleged here lacks a 'close relationship' to the harm associated with defamation"); *Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*, Civ. A. No. 18-1781, 2023 WL 6290622, at *20 (S.D.N.Y. Sept. 27, 2023) (same); *Phillips v. First Credit Servs., Inc.*, Civ. A. No. 24-4440, 2024 WL 4635341, at *2 (S.D.N.Y. Oct. 29, 2024) (same); *Biener v. Credit Control Servs., Inc.*, Civ. A. No. 21-2809, 2023 WL 2504733, at *7 (S.D.N.Y. Mar. 14, 2023) ("reporting . . . to the three major credit reporting agencies on its own cannot establish a concrete injury"); *Spira v. Trans Union, LLC*, Civ. A. No. 21-2367, 2022 WL 2819469, at *5 (S.D.N.Y. July 19, 2022) ("credit reporting agencies . . . are not the type of third parties contemplated by the Supreme Court in *TransUnion*; rather, the Supreme Court clearly contemplated potential creditors"); *Konig v. TransUnion, LLC*, Civ. A. No. 18-7299, 2023 WL 3002396, at *8 (S.D.N.Y. Apr. 19, 2023) (same); *Reimer v. LexisNexis Risk Sols., Inc.*, Civ. A. No. 22-0153, 2022 WL 4227231, at *10

(E.D. Va. Sept. 13, 2022) (same); *Lewis v. Old Navy*, Civ. A. No. 21-9131, 2024 WL 98293, at *3 (S.D.N.Y. Jan. 9, 2024) (same); *McKnight v. Receivable Collection Servs., LLC*, Civ. A. No. 24-2840, 2024 WL 4266017, at *2 (E.D.N.Y. Sept. 23, 2024) (same); *Krausz v. Equifax Info. Servs., LLC*, Civ. A. No. 21-7427, 2023 WL 1993886, at *9 (S.D.N.Y. Feb. 14, 2023) (same); *Whitehead v. Grant & Weber, Inc.*, Civ. A. No. 22-6517, 2022 WL 19762152, at *2 (E.D.N.Y. Dec. 30, 2022), *R. & R. adopted*, 2023 WL 3260029 (E.D.N.Y. May 4, 2023) (same); *Castro v. NewRez LLC*, Civ. A. No. 22-6340, 2023 WL 3391536, at *2 (E.D.N.Y. Jan. 12, 2023), *R. & R. adopted in relevant part & rejected in unrelated part*, 2023 WL 2986827 (E.D.N.Y. Apr. 18, 2023) (same).

The outlier case that Henkel cites, *Ewing v. MED-1 Sols., LLC*, 24 F. 4th 1146, 1153 (7th Cir. 2022), is unpersuasive, as it misapplied *TransUnion*, so this Court should not follow it. While *Ewing* recited *TransUnion*'s admonition that "disclosures to printing vendors" are not "actionable publications," it failed to consider that a consumer reporting agency is analogous to a printing vendor in all ways that are relevant to Article III's concrete injury analysis. *Id.* (citing *TransUnion*, 594 U.S. at 434 n.6). *Ewing* did not consider that a furnisher's transmission of credit information to a consumer reporting agency is a "communication [that] is made to a . . . business associate in the ordinary or natural course of business." *Beck*, 13 S.E.2d at 471; *see also Mack*, 639 F. App'x at 586; *TransUnion*, 594 U.S. at 413 n.6. Nor did *Ewing* consider that a consumer reporting agency, much like a printing vendor, is a "ministerial intermediary," *Nabozny*, 84 F.4th at 736, that merely "passe[s] the information" on to its ultimate intended recipient, *Hunstein*, 48 F.4th at 1248—i.e., the entity that purchases the credit report—not the information's ultimate intended recipient itself. Put simply, *Ewing*, 24 F. 4th at 1153, ignored the similarity between consumer reporting agencies and printing vendors, and thus failed to realize that *TransUnion*'s admonition that disclosure to a printing vendor is not a publication giving rise to concrete Article III injury applies with full force

to consumer reporting agencies too. *Ewing* thus is unpersuasive. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). Unsurprisingly, at least one federal district court has expressly rejected *Ewing*'s reasoning as inconsistent with *TransUnion*. *See Konig*, 2023 WL 3002396, at *8 n.8. For the same reasons, the cases Henkel cites that rely on *Ewing*, Pl.'s Resp. at 12-13, are unpersuasive.

       *b.*     *Henkel Does Not Plausibly Allege Dissemination to Another Party*

Henkel also alleges that "[u]pon information and belief," one or more consumer reporting agency disseminated her credit information to prospective creditors, Am. Compl. ¶¶ 96-99, but such bare "information and belief" allegations are not entitled to a presumption of truth. The D.C. Circuit "require[s] that [all] allegations based on information and belief be accompanied by a statement of the facts upon which the allegations are based." *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (quotation marks omitted). But Henkel pleads no facts to support her allegation that a consumer reporting agency actually disseminated her credit information to a third party.

Henkel's counterarguments are unavailing. First, she argues "that pleadings on information and belief are permitted when the necessary information lies within defendants' control," Pl.'s Resp. at 10 (quoting *Kareem*, 986 F.3d at 866), but offers no reason to think that the information at issue lies within the Department's control. To the contrary, there is no reason to think that the Department would know whether a third party consumer reporting agency disseminated her credit information to a third party prospective creditor. Regardless, under *Kareem*, 986 F.3d at 866, it is not enough simply to show "that the necessary information lies within defendants' control;" rather, the plaintiff must go even further and specify "the facts upon which the allegations are based." This means that when a plaintiff relies on "information and belief" allegations to establish injury in fact, "whether [the plaintiff] has alleged sufficient facts to establish standing turns on whether

the complaint's allegations create a plausible inference that" she satisfies the elements of standing. *Id.* In other words, information and belief allegations cannot relieve a plaintiff of the obligation to plausibly allege the elements of standing. *Id.* But Henkel specifies no facts upon which she rests her bare, conclusory allegations that one or more consumer reporting agency disseminated her credit information to a third party. Accordingly, Henkel's assertion that "the necessary information lies within [the Department's] control," Pl.'s Resp. at 10, does not excuse her failure to support her threadbare information and belief allegations with facts that make those allegations plausible.

Second, Henkel insists that her pleadings "identif[y] by name the third parties that regularly accessed [her] credit reports and thus have received the inaccurate duplicative loan information, businesses such as Rocket Mortgage, Factual Data and Apple Crad GS bank," Pl.'s Resp. at 11, but these allegations rest on information and belief alone, *see* Am. Compl. ¶¶ 97, 99, which is insufficient for the reasons explained, *see Kareem*, 986 F.3d at 866. In other words, Henkel pleads no facts to support a plausible inference that any of these third parties accessed her credit reports.

Third, Henkel argues that her "pleading provides sufficient facts making clear [that the Department] is the cause of the duplicative reporting, and that it continued into 2024 despite [her] repeated disputes," Pl.'s Resp. at 10, but that had nothing to do with whether a consumer reporting agency disseminated her credit information to any third party—these things are logically unrelated. And she ignores the Department's observation that "[d]isseminating [her] credit information to her existing creditors could not affect the credit terms that they already had extended her, and thus could not injure her," Def.'s Mem. at 17, thus conceding the point. *See Wannall*, 775 F.3d at 428.

Fourth, and finally, Henkel puzzlingly asserts that "[e]ven [the Department's] own cited cases on standing in this context have found that where a complaint specifically identifies hard and soft inquiries on credit reports following a dispute, this is sufficient to demonstrate publication and

13

confer standing at the pleading stage." Pl.'s Resp. at 9-10. But Henkel's amended complaint does

not actually allege that there were any inquiries, whether hard or soft, on her credit reports, much

less following a dispute, *see generally* Am. Compl., so she cannot establish standing on that basis.

 2. Henkel Does Not Plausibly Allege That Her Credit Information Was Read

A defamatory document causes concrete injury only if it "was actually read and not merely

processed." *TransUnion*, 594 U.S. at 434 n.6. "Without a third party reading and comprehending

the accusation . . . there can be no reputational harm." *Fernandez v. RentGrow, Inc.*, 116 F.4th

288, 296 (4th Cir. 2024). But Henkel "did not even allege that a single employee ever read or

understood the information about [her] debt." *Hunstein*, 48 F.4th at 1248. "Under even the most

generous reading of [her] complaint, one company sent [her] information to another" without any

person reading or understanding it, which "is simply not enough." *Id.* She "has only alleged that

she has . . . suffered [harm] based on [the Department's] computers communicating with [ ] third

party [entities'] computers," not "that anyone read her private information." *Mullins v. Monarch

Recovery Mgmt., Inc.*, Civ. A. No. 21-0120, 2022 WL 11141325, at *2 (W.D.N.C. Oct. 19, 2022).

Henkel's failure to plausibly allege that her credit information "was actually read and not

merely processed," *TransUnion*, 594 U.S. at 434 n.6, is yet another reason why her allegations that

the Department disseminated her credit information to consumer reporting agencies or prospective

creditors does not create a plausible inference of concrete injury. *See Mullins*, 2022 WL 11141325,

at *2 ("the absence of an allegation that Plaintiff's information was actually read and not merely

processed is significant" (cleaned up)); *Jenkins v. Ltd. Fin. Servs., L.P.*, Civ. A. No. 21-0407, 2022

WL 4747527, at *2 (W.D.N.C. Sept. 30, 2022) (no standing as plaintiff did "not allege that the

information was actually read and not merely processed" (quotation marks omitted)); *Stewart v.

Healthcare Revenue Recovery Grp., LLC*, Civ. A. No. 20-0679, 2022 WL 200371, at *15 (M.D.

Tenn. Jan. 21, 2022) (no standing as "the plaintiff does not allege" that recipient of information "actually read and not merely processed that information" (quotation marks omitted)).

### 3. Henkel Does Not Plausibly Allege that Any Harm to Credit Score or Credit Reputation is Traceable to the Alleged Section 1681s-2(b) Violation

Even if Henkel experienced concrete injury in the form of harm to her credit score or credit reputation, she does not plausibly allege that such injury is traceable to the Department's conduct for essentially the same reason that she fails to show traceability with respect to her ostensible lost credit opportunities. *See supra* § I.A.2. These asserted injuries are traceable at most only to the initial furnishing of the disputed information, which she does not challenge, not the Department's alleged failure to investigate or correct the disputed information, which is all she challenges. *Id.*

### 4. Any Drop Credit Score or Reputation Did Not Actually Injure Henkel

Finally, Henkel's "harm to credit score or credit reputation" theory fails because even if the Department's conduct caused her credit score or reputation to fall, she does not plausibly allege that this prevented her from obtaining credit, as she does not plausibly allege that she tried to obtain credit during or was unable to do so due to the Department's conduct. *See supra* §§ I.A.1-2.

## C.    Henkel's "False Light" and "Invasion of Privacy" Theories Fail

Henkel's "false light" and "invasion of privacy" theories of concrete injury are similar to her "defamation" theory, as she concedes, *see* Pl.'s Resp. at 10 n.2, and so fail for the same reasons.

## D.    Henkel's "Waste of Time and Resources" Theory Fails

A plaintiff does not show standing by "incur[ing] certain costs as a reasonable reaction to a risk of harm" unless she independently shows that "the harm [she] seek[s] to avoid" is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). "In other words, [a plaintiff] cannot manufacture standing merely by inflicting harm on [herself] based on [her own] fears of hypothetical future harm that is not certainly impending," i.e., she cannot "bring [an] action based

on costs [she] incurred in response to a speculative threat." *Id.* Generally, then, "self-inflicted harm doesn't satisfy the basic requirements for standing," as "[s]uch harm does not amount to an 'injury' cognizable under Article III" and is not "fairly traceable to the defendant's challenged conduct." *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).

Henkel does not dispute any of these principles, arguing only that they do not apply here. But they do apply here. Henkel alleges that the Department's failure to investigate or correct the disputed information made her "waste time and resources lodging futile disputes and trying to correct [its] false credit reporting." Am. Compl. ¶ 14. But she chose to engage in these activities—the Department did not make her do it, and she did not need to do it. Accordingly, any harm that this "waste" of time and resources caused her, *id.*, was "self-inflicted." *Gonzales*, 468 F.3d at 831. And while such an expenditure of time and resources may well give rise to a concrete Article III injury if it is "a reasonable reaction to a risk of harm" that is "certainly impending," *Clapper*, 568 U.S. at 416, Henkel does not plausibly allege a that she faced certainly impending harm for all the reasons that the Department explained in moving to dismiss, *see* Def.'s Mem. at 19-21. Indeed, Henkel undertook these corrective measures for the obvious purpose of preventing the inaccurate credit information from causing her harm or else mitigating such harm, yet ignores the plethora of cases holding that "the cost involved in preventing future harm" is not "enough to confer standing" unless the harm is certainly impending. *In re Sci. Applications Int'l Corp. Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 26 (D.D.C. 2014); *see also* Defs.' Mem. at 20-21 (citing other cases). Because the time and resources that Henkel chose to spend trying to correct the inaccurate credit information was a self-inflicted harm, and because it was an effort to prevent the inaccurate credit information from harming her in ways that were not certainly impending, it is not concrete injury.

16

### E.     Henkel's "Emotional Harm" Theory Fails

Last, Henkel's theory of concrete injury based on emotional harm, *see* Am. Compl. ¶¶ 102-104, fails because "general emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." *Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995). Henkel describes this direct quote from a binding D.C. Circuit decision as "a blatant misstatement of the law," Pl.'s Resp. at 19, citing two district court cases for a contrary view. But *Magruder v. Capital One, N.A.*, 540 F. Supp. 3d 1, 8-9 (D.D.C. 2021), recognized that "emotional injury" alone is not concrete injury—the plaintiff there had standing only because he plausibly alleged a concrete economic injury. *Miller v. Dish Network, L.L.C.*, 326 F. Supp. 3d 51, 61 (E.D. Va. 2018), in turn, relied on out-of-Circuit authority that conflicts with the D.C. Circuit's ruling in *Humane Society*.

## II.     Henkel Does Not Plausibly Allege Actual Damages

The FCRA entitles a plaintiff to "any actual damages sustained by the consumer as a result of the failure" to comply with the FCRA. 15 U.S.C. §§ 1681n(a)(1)(A), 1681o(a)(1). *Federal Aviation Administration v. Cooper*, 566 U.S. 284, 299 (2012), construed the term "actual damages" in the Privacy Act to be "limited to proven pecuniary or economic harm." *Cooper* recognized that "the term 'actual damages' has [a] chameleon-like quality," meaning that a court "cannot rely on any all-purpose definition but must consider the particular context in which the term appears." *Id.* at 294. The Privacy Act, *Cooper* observed, protects the confidentiality of records "which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." *Id.* at 294-95 (quoting 5 U.S.C. § 552a(e)(10)). "Because the [Privacy] Act serves interests similar to those protected by defamation and privacy torts," *Cooper* reasoned, "there is good reason to infer that Congress relied upon those torts in drafting the Act." *Id.* at 295.

The Court noted "that the Privacy Act's remedial provision authorizes plaintiffs to recover a guaranteed minimum award of $1,000 for violations of the Act, but only if they prove at least

some 'actual damages.'" *Cooper*, 566 U.S at 295. (quoting 5 U.S.C. § 552a(g)(4)(A)). It "observed that [this] provision parallels the remedial scheme for the common-law torts of libel per quod and slander, under which plaintiffs can recover 'general damages,' but only if they prove 'special harm' (also known as 'special damages')." *Id.* (citation omitted). "'Special damages" are limited to actual pecuniary loss" but "general damages" are not. *Id.* "This parallel between the Privacy Act and the common-law torts of libel per quod and slander," *Cooper* held, shows that "Congress intended the term 'actual damages' in the Act to mean special damages," i.e., "pecuniary harm." *Id.* at 296.

*Cooper*'s reasoning applies with equal force under the FCRA. The FCRA, like the Privacy Act, protects the confidentiality of records that "could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." *Cooper*, 566 U.S. at 294-95. It thus "serves interests similar to those protected by defamation and privacy torts," so "there is good reason to infer that Congress relied upon those torts in drafting the Act." *Id.* at 295. Indeed, Henkel herself characterizes her alleged injuries as harms to "privacy," Am. Compl. ¶ 110, and in the nature of "defamation," Pl.'s Resp. at 9, 12-13. And the FCRA allows plaintiffs to recover a minimum statutory sum ($100) for willful noncompliance, 15 U.S.C. § 1681a(1)(1)(A), "but only if they prove at least some 'actual damages,'" which "parallels the remedial scheme for . . . libel per quod and slander," *Cooper*, 566 U.S. at 295. These considerations led *Cooper* to read the term "actual damages" in the Privacy Act as limited to pecuniary harm, *id.* at 296, and compel the same conclusion here—"actual damages" under the FCRA are limited to pecuniary harms.[1]

*Cooper* did not, as Henkel inaccurately claims, say that the FCRA's use of the term "actual damages" is "properly" construed to cover non-pecuniary harms. Pl.'s Resp. at 20. Rather, *Cooper*

---

[1]     This reasoning does not depend on the sovereign immunity canon. The Department agrees with Henkel that the sovereign immunity canon does not apply here and withdraws reliance on it.

merely noted that some lower courts have construed the FCRA to cover non-pecuniary harms, but expressly declined to endorse these courts' reasoning, instead simply "[a]ssuming for the sake of argument that these lower court decisions are correct." *Cooper*, 566 U.S. at 301. And as explained, the reasoning that *Cooper* employed to conclude that the term "actual damages" as used in the Privacy Act does not cover non-pecuniary harms applies with full force under the FCRA.

Because "actual damages" under the FCRA are limited to pecuniary harms, Henkel does not plausibly allege actual damages. Her alleged non-pecuniary harms do not count, and she does not plausibly allege pecuniary harms for the reasons the Department has explained. *See supra* § I.

## III.    Henkel Fails to State a Claim Under Section 1681s-2(b) Against the Department

The Department did not furnish Henkel's credit information to the consumer reporting agencies, and Section 1681s-2(b) does not make the Department vicariously liable for Nelnet's behavior. Even if agency principles applied, the Department still would not be vicariously liable for Nelnet's behavior as Henkel does not plausibly allege that Nelnet is the Department's servant.

### A.    The Department Did Not Furnish Henkel's Credit Information

Henkel pleads no facts to support a plausible inference that the Department furnished her credit information to the consumer reporting agencies "in its own capacity." Pl.'s Resp. at 24. Section 1681s-2(b) applies only to a "person" who has "provided" "information" "to a consumer reporting agency." 15 U.S.C. § 1681s-2(b)(1). The word "furnisher" does not appear in Section 1681-2(b)'s operative text—only in the subsection's heading. *See Petit v. Dep't of Educ.*, 675 F.3d 769, 784 (D.C. Cir. 2012) ("headings of a statute are of use only when they shed light on some ambiguous word or phrase" (quotation marks omitted)). Regardless, regulations define "furnisher" as "an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 12 C.F.R. § 1022.41(c); 16 C.F.R. § 660.2(c).

19

Henkel does not plausibly allege that the Department furnished her credit information to a consumer reporting agency "in its own capacity." Pl.'s Resp. at 24. She pleads no facts to support a plausible inference that the Department "provided" her "information" "to a consumer reporting agency," 15 U.S.C. § 1681s-2(b)(1), in its own capacity, rather than through Nelnet. She likewise pleads no facts to support a plausible inference that the Department itself "furnish[ed] information relating to [her] to one or more consumer reporting agencies for inclusion in a consumer report," rather than acting only through Nelnet. 12 C.F.R. § 1022.41(c); 16 C.F.R. § 660.2(c).

Henkel's counterarguments are unpersuasive. It does not matter that the Department is "the provider of the information," and her claim that "the salient feature of a furnisher is its role as the source of the data for credit reports" is incorrect. Pl.'s Resp. at 25. Both the statute and regulations make clear that what matters under Section 1681s-2(b) is whether an entity actually provides credit information to a consumer reporting agency, not whether it is just the source of that information. Nor does it matter that a trade association "lists" the Department "as a 'reporter of federal student loan information.'" Pl.'s Resp. at 25 (quoting Am. Compl. ¶ 8). The Department does not itself provide credit information to consumer reporting agencies, so any label that a third party uses to describe it is immaterial. The fact that a statute requires the Department to "enter into an agreement with each consumer reporting agency to exchange information concerning student borrowers," 20 U.S.C. §§ 1080a(a)(2), (a)(3), (c)(1), does not mean the Department itself provided the information to consumer reporting agencies. Rather, the statute allows the Department to contract with Nelnet to provide this information. *Id.* Finally, the statement in the promissory note that the Department is "required to provide the agency with a prompt response" and "respond[s] to consumer reporting agencies using the methods established by those agencies," Am. Compl. ¶ 61, does not suggest that the Department does these things itself, i.e., "in its own capacity." Pl.'s Resp. at 24, rather

than through Nelnet. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("allegations" that are "merely consistent with" plaintiff's theory are not enough to "plausibly" plead claim to relief).

### B.    Section 1681s-2(b) Does Not Make the Department Vicariously Liable for Nelnet's Alleged Failure to Investigate or Correct the Disputed Information

Section 1681s-2(b) imposes a duty to investigate and correct disputed credit information only on the entity that actually furnished such information to a consumer reporting agency. *See* 15 U.S.C. § 1681s-2(b) It does not makes an actor vicariously liable for another actor's failure to investigate or correct such information. *Id.* Other provisions of the FCRA, in contrast, contain such language. *See* 15 U.S.C. §§ 1681b(b)(2)(A)(i), (b)(2)(B), 1681d(a), (b); Def.'s Mem. at 26-27. The omission of such language from Section 1681s-2(b) is significant. Courts presume Congress acts intentionally when it "includes particular language in one section of a statute but omits it in another section." *Russello v. United States*, 464 U.S. 16, 23 (1983); *accord Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."). "Had Congress likewise intended" Section 1681s-2(b) to make an actor vicariously liable for a different actor's actions, "it knew how to say so." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 216 (2018). Section 1681s-2(b) thus imposed a duty only on Nelnet, and does not make the Department vicariously liable as to Nelnet.

Henkel's counterarguments are unpersuasive. She argues that (1) Section 1681s-2(b) does not displace common law principles of vicarious liability with sufficient clarity, (2) Sections 1681b and 1681d serve different purposes than Section 1681s-2(b), so their use of different language says nothing about what Section 1681s-2(b) means, (3) the Department's reading yields absurd results, and (4) courts have applied vicarious liability in furnishing cases. These arguments are meritless.

*First*, Section 1681s-2(b) speaks with sufficient clarity to displace common law vicarious liability principles. The presumption that a statute carries its common law meaning "is not . . . one

that entails a requirement of clear statement, to the effect that Congress must state precisely any intention to overcome the presumption's application to a given statutory scheme." *Astoria Fed. Sav. & Loan Ass'n. v. Solimino*, 501 U.S. 104, 108 (1991). Rather, it is a "default" that is overcome where Congress "evince[s]" a contrary "intention on the issue"—either "expressly or impliedly," i.e., by "implication." *Id.* at 110; *see also Pond v. United States*, 69 F.4th 155, 164 (4th Cir. 2023) ("Congress need not attach an express disclaimer to a statute that 'this statute hereby abrogates the common law.'"). As explained above, when Congress uses words in one part of a statute but omits them from another part of the statute, courts assume that this difference is intentional. *See Russello*, 464 U.S. at 23; *MacLean*, 574 U.S. at 391. That is clear enough to show that a statute displaces common law vicarious liability rules. *See Blecher v. Holy See*, 631 F. Supp. 3d 163, 170 (S.D.N.Y. 2022) (rejecting argument "that common law agency principles should apply" because statute used the term "agent" in other sections but "intentionally omitted 'agent' from the section of the statute" at issue). The omission from Section 1681-2(b) of language imposing vicarious liability, even as other parts of the FCRA include such language, thus shows that Section 1681-2(b) does not do so.

*Second*, Henkel offers a convoluted and speculative theory about why Congress might have chosen to codify vicarious liability under Sections 1681b and 1681d, but this supposition does not help, and indeed undermines, her position. As the Department reads her argument, Henkel guesses that Congress might have felt that codifying vicarious liability was necessary to achieve Sections 1681b and 1681d's purposes, but not Section 1681s-2(b)'s purpose. But she offers no support for this conjecture—just sheer guesswork. Yet "legislative history" can never trump "statutory text," and certainly not when it is so "ambiguous." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 383 (D.C. Cir. 2021). If anything, Henkel's supposition only confirms that had Congress intended Section 1681s-2(b) to adopt vicarious liability, "it knew how to say so." *Rubin*, 583 U.S. at 216.

*Third*, reading Section 1681s-2(b) to not incorporate vicarious liability would not produce absurd results, as Henkel claims. A plaintiff could still sue the actual furnisher (here, Nelnet), and thus would have a meaningful statutory remedy. The furnisher, in turn, could contract in advance for indemnification from the original source of the disputed information (here, the Department). "[A]bsurdity is a high bar" that requires "an outcome so bizarre, illogical, or glaringly unjust that Congress could not plausibly have intended" it. *Stovic v. R.R. Ret. Bd.*, 826 F.3d 500, 505 (D.C. Cir. 2016) (quotation marks omitted). Henkel does not come close to satisfying that bar here.

*Fourth*, Henkel says that "[c]ourts have held that vicarious liability may apply to furnisher liability," Pl.'s Resp. at 29, but the cases she cites are unpersuasive. These cases failed to consider that Sections 1681b and 1681d expressly codify vicarious liability while Section 1681s-2(b) does not, an omission that courts presume to be intentional. *See Feldmann v. Lakeview Loan Servicing LLC*, Civ. A. No. 20-0580, 2021 WL 1627048, at *4 (W.D. Wash. Apr. 27, 2021); *Haddad v. Charles Riley & Assocs., Inc.*, Civ. A. No. 09-12597, 2010 WL 3906955, at *12 (E.D. Mich. Apr. 12, 2010); *Ellis v. Pa. Higher Educ. Assistance Agency*, Civ. A. No. 07-4498, 2008 WL 11363649, at *7 (C.D. Cal. Aug. 12, 2008). Two of the cases also rested on the idea that vicarious liability is necessary to ensure a remedy for consumers, *see Haddad*, 2010 WL 3906955, at *12; *Ellis*, 2008 WL 11363649, at *7, overlooking that a plaintiff could still sue the furnisher, as explained above.

## C.    Henkel Does Not Plausibly Allege That Nelnet is The Department's Servant

Finally, even if agency principles applied, Henkel still does not plausibly allege that the Department is vicariously liable for Nelnet's behavior. Henkel acknowledges that an entity can be vicariously liable only for the behavior of its servant, not its independent contractor. *See* Pl.'s Resp. at 31. She points to various facts that she contends give rise to vicarious liability, but none of them, individually or collectively, support a plausible inference that Nelnet is the Department's servant.

*First*, Henkel alleges that the Department "owns and controls all of the credit information that appears on borrowers' credit reports," Pl.'s Resp. at 31, but that is virtually irrelevant. Whether an entity is a servant or independent contractor turns primarily on the principal's degree of control over the "physical conduct in the performance of the" work being done, *Restatement (Second) of Agency* ("*Restatement*") § 2(2)-(3), to which ownership of the underlying information is irrelevant. The fact that the "materials" being used are "supplied largely by the Government" thus is entirely consistent with independent contractor status. *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 507 (1950). Indeed, when a lender that contracts with a loan servicer to service the loans it made, it by definition owns the underlying credit information that the loan servicers use, yet courts recognize that loan servicers are independent contractors, not servants. *See* Def.'s Mem. at 30 (citing cases).

*Second*, Henkel alleges that the Department "dictates to servicers the format for credit reporting and how to report specific scenarios" and "provides detailed prescriptions for how Nelnet must handle payments, data, correspondence, and a host of other responsibilities," and that "Nelnet has no discretion whatsoever in how or what to report, and requires approval from Defendant to make any changes to credit reporting," Pl.'s Resp. at 31-32, but independent contractor status is fully consistent with such specifications, especially as the government is the principal. *See United States v. Orleans*, 425 U.S. 807, 816 (1976) ("by contract, the Government may fix specific and precise conditions to implement federal objectives" and still have an independent contractor, not servant, relationship); *Macharia v. United States*, 334 F.3d 61, 68-69 (D.C. Cir. 2003) (same); *Logue v. United States*, 412 U.S. 521, 530 (1973) (government can require independent contractor to adhere to detailed "standards of treatment" without making it servant); *Powell*, 339 U.S. at 507 (government can require independent contractor to follow "specifications and standards" without creating servant relationship); *Singh v. S. Asian Soc'y of George Wash. Univ.*, 572 F. Supp. 2d 1,

10 (D.D.C. 2008) ("Requirements that a contractor comply with certain regulations, specifications, or standards in performing its work do not" preclude independent contractor status); *EEOC v. N. Knox S. Corp.*, 154 F.3d 744, 749 (7th Cir. 1998) ("The precise specifications do not make the contractor an employee of the government."). Otherwise, many or most federal contractors would be servants, as federal agencies frequently require contractors to follow detailed specifications.

*Third*, Henkel insists that Nelnet had "at least apparent authority" to act for the Department, Pl.'s Resp. at 32, but "the doctrine of apparent authority generally does not apply to dealings with the Government." *United States v. District of Columbia*, 669 F.2d 738, 747 n.13 (D.C. Cir. 1981). Regardless, Nelnet's authority to act for the Department does not make it a servant because both a servant and an independent contractor alike has the authority to act for a principal. *See Restatement* § 14N ("One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor.").

## CONCLUSION

For the foregoing reasons and those in the Department's memorandum, the Court should dismiss Henkel's amended complaint.

Dated: April 17, 2025

Respectfully submitted,

EDWARD R. MARTIN, D.C. Bar #481866
United States Attorney

By: _____*/s/ Bradley G. Silverman*_____
      BRADLEY G. SILVERMAN, D.C. Bar #1531664
      Assistant United States Attorney
      601 D Street, NW
      Washington, DC 20530
      (202) 252-2575
      bradley.silverman@usdoj.gov

      *Attorneys for the United States of America*