**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DANIELLE HENKEL, | |
| *Plaintiff*, | Civil Action No. 24-1676 (SLS) |
| v. | Judge Sparkle L. Sooknanan |
| U.S. DEPARTMENT OF EDUCATION, | |
| *Defendant*. | |

<u>**MEMORANDUM OPINION**</u>

Danielle Henkel, like so many others, took out federal student loans to finance her education. By late 2021, she had paid off some of her loan balances and consolidated the others into two loans issued by the Department of Education and serviced by Nelnet, an agent of the Department. By early 2023, Ms. Henkel's outstanding balances on the loans totaled approximately $68,000. In the spring of 2023, the Department decided to transfer her loans from Nelnet to another loan servicer. This is when things took a turn. Although the Department transferred her loans and closed her account with Nelnet, her credit reports say otherwise. Rather than reporting a cleared balance with Nelnet and a new balance with the new servicer, they show two duplicative balances, one for each servicer. Thus, instead of showing approximately $68,000 in student debt, Ms. Henkel's credit reports say that she owes more than $137,000. Ms. Henkel, understandably upset by this development, set out to correct her credit reports. She took the necessary steps to dispute the incorrect information with the various consumer reporting agencies—obtaining credit reports, writing dispute letters, gathering supporting documentation, and mailing various documents. Although the consumer reporting agencies notified the Department of Education of Ms. Henkel's dispute, to date, it has not corrected the credit reporting error.

Ms. Henkel thus sued the Department, alleging a violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), which requires those who furnish information to consumer reporting agencies to investigate consumer complaints and to correct erroneous information. She alleges that this failure to correct the error in her file has caused her substantial harm, including lost credit opportunities, waste of time and resources lodging futile disputes trying to correct the Department's false credit reporting, harm to her credit reputation and credit score, and emotional distress. And she seeks to certify two classes of federal student loan borrowers who have been similarly harmed. The Department moves to dismiss this case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim. Because the Court finds that Ms. Henkel has sufficiently alleged standing and the necessary facts for a claim under Subsection 1681s-2(b), it denies the motion.

## BACKGROUND

### A.    Statutory Background

In 1970, Congress enacted the Fair Credit Reporting Act (FCRA) "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681). Under the FCRA, "if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly," the agency must take certain steps. 15 U.S.C. § 1681i(a)(1)(A). For example, within five business days of receiving notice of the dispute, "the agency shall provide notification of the dispute to any person who provided any item of information in dispute[.]" *Id.* § 1681i(2)(A).

This notification triggers certain obligations for the person who provided the information. *See id.* § 1681s-2(b). As relevant in this case, "[a]fter receiving notice . . . of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting

agency, the person shall . . . (A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the consumer reporting agency . . . ; [and] (C) report the results of the investigation to the consumer reporting agency," among other things. *Id.* "If an item of information disputed by the consumer is found to be inaccurate or incomplete or cannot be verified . . . [the person shall] promptly . . . (i) modify that item of information; (ii) delete that item of information; or (iii) permanently block the reporting of that item of information." *Id.* § 1681s-2(b)(1)(E).

"In §§ 1681n and 1681o, the Act authorizes consumer suits for money damages against "[a]ny person' who willfully or negligently fails to comply" with the requirements in Subsection 1681s-2(b). *Dep't of Agriculture Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 50 (2024). This includes "any . . . governmental . . . agency." *Id.* (quoting 15 U.S.C. § 1681a(b)); *see also id.* at 51 (holding Congress waived sovereign immunity).

### B.    Factual Background

The Court draws the facts, accepted as true, from the Plaintiff's Amended Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

Years ago, Ms. Henkel "obtained federal student loans to finance her education." Am. Compl. ¶ 63, ECF No. 20. And by 2021, she had consolidated all outstanding loans "into two direct consolidation loans" from the Department of Education totaling $28,772.91 and $29,733.97, respectively. *Id.* Until about June 2023, Nelnet, an agent of the Department, serviced Ms. Henkel's two loans from the Department. *Id.* ¶ 64.

In early 2023, Ms. Henkel applied for forgiveness of her loans through the Public Service Loan Forgiveness program. *Id.* ¶ 67. The Department then transferred her loan servicing from Nelnet to the Missouri Higher Education Loan Authority (MOHELA). *Id.* ¶ 70. At that point,

her outstanding principal balance was approximately $68,500. *Id.* ¶ 68. After the transfer, her "Department of Education/Nelnet account was closed and MOHELA opened a new Department of Education account for [her] with a new loan number." *Id.* ¶ 72. Thus, the Department should have either directly or indirectly reported to the consumer reporting agencies (CRAs) that the balance on Ms. Henkel's Nelnet account was now $0. *Id.* ¶ 73. Instead, the Department "directly and/or indirectly through its agents" continued to falsely report to the CRAs that Ms. Henkel still owed $68,505 on her account with Nelnet. *Id.* ¶ 74.

In January 2024, Ms. Henkel noticed that her credit reports still showed a balance of $68,505 on her Nelnet account. *Id.* ¶ 75. And at the same time, the reports showed an additional balance of $68,548 on her MOHELA account. *Id.* ¶ 76. The Department thus "directly and/or indirectly through its agents furnished information to the CRAs, including Experian, Equifax, and TransUnion, that [she] owed it more than $137,000 in total." *Id.* ¶ 77. "This was false." *Id.* ¶ 78.

Ms. Henkel was "sufficiently upset" by this false credit reporting that portrayed her "as being burdened by tens of thousands of dollars of student loan indebtedness that she did not owe[.]" *Id.* ¶ 104. She thus took steps to dispute the incorrect balance through the various CRAs throughout 2023 and 2024. *Id.* ¶ 81. Pursuant to their statutory obligations, the CRAs notified the Department of the dispute "directly and/or indirectly through its agents." *Id.* ¶ 82. But the Department "repeatedly failed to correct or reduce the duplicative balance to $0 and to fulfill its other statutory obligations under FCRA [S]ection 1681s-2(b)." *Id.* ¶ 83. It instead "continued to verify, directly and/or indirectly through its agents, that [she] owed it more than $137,000 in federal student loans, including approximately $68,505 through Nelnet." *Id.*

Ms. Henkel sent complaints to the Better Business Bureau and the Federal Student Aid Ombudsman Group in January of 2024. *Id.* ¶ 84. Nelnet responded to her on January 25, 2024,

explaining that the Department had directed it to add a "suppression" to her account because of the transfer to another servicer. *Id.* ¶ 85. It repeated this explanation on January 26, 2024, January 30, 2024, and February 1, 2024. *Id.* ¶ 86. And although she repeatedly requested information about the "suppression" the Department had added to her account, Nelnet never provided it. *Id.* ¶ 87.

As a result of these events, Ms. Henkel "suffered injury and damages in the form of lost credit opportunities, harm to credit reputation and credit score, and waste of time and resources." *Id.* ¶ 90. She alleges "[u]pon information and belief" that "one or more CRAs" published the inaccurate information by selling her consumer report to her "existing and prospective creditors." *Id.* ¶ 96; *see also id.* ¶¶ 97 (alleging "[u]pon information and belief" that TransUnion published the Department's inaccurate information "to her prospective creditors, including to Rocket Mortgage LLC via Factual Data on November 30, 2023 and several times in January 2024"), 99 (alleging "[u]pon information and belief" that TransUnion published the Department's inaccurate information "to several other entities, including her existing creditors such as Apple Card GS Bank several times between October 2023 and February 2024").

This left Ms. Henkel "distraught, dismayed, and distressed." *Id.* ¶ 102. And she had to waste time and resources to navigate the dispute process. *Id.* ¶ 105; *see also id.* ¶ 14 (identifying a "waste of time and resources lodging futile disputes and trying to correct Defendant's false credit reporting"). She specifically "spent time writing a dispute letter with several exhibits and spent money to send it to one or more CRAs by certified mail." *Id.* ¶ 108.

## C.    Procedural Background

Ms. Henkel filed the operative Amended Complaint on November 21, 2024, suing the Department of Education for violating 15 U.S.C. § 1681s-2(b). *See id.* ¶¶ 119–21. She also seeks to represent two different classes in this litigation, *see id.*, although she has not yet moved for class

certification. On February 5, 2025, the Department moved to dismiss this case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Mot. Dismiss, ECF No. 23. This motion is fully briefed and ripe for review. *See* Opp'n, ECF No. 25; Reply, ECF No. 27.

## LEGAL STANDARD

"A motion under Rule 12(b)(1) presents a threshold challenge to a court's jurisdiction." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 69 (D.D.C. 2022) (cleaned up). The plaintiff "bears the burden of proving by a preponderance of the evidence that the Court has subject-matter jurisdiction over her claims." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 69 (D.D.C. 2011) (citation omitted). When evaluating a motion under Rule 12(b)(1), "the court may consider documents outside the pleadings to assure itself that it has jurisdiction." *Sandoval v. U.S. Dep't of Justice*, 322 F. Supp. 3d 101, 104 (D.D.C. 2018).

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has properly stated a claim upon which relief may be granted." *Kursar v. Transp. Sec. Admin.*, 751 F. Supp. 2d 154, 163 (D.D.C. 2010). When deciding a Rule 12(b)(6) motion, the court must "treat the complaint's factual allegations as true" and "must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up). But the Court need not accept the plaintiff's "legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (cleaned up). And the court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [it] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## DISCUSSION

The Department argues that the Court should dismiss this case for lack of standing and for failure to state a claim upon which relief may be granted. *See* Mot. Dismiss. The Court disagrees on both points. Ms. Henkel has standing because she has suffered from wasted time and resources, injury to her reputation and credit score, and emotional distress. And she has plausibly alleged a violation of 15 U.S.C. § 1681s-2(b), both directly and because of vicarious liability.

### A.    Standing

The Court first finds that Ms. Henkel has plausibly alleged standing to pursue her claim, thereby denying the Defendant's Rule 12(b)(1) motion. *See Conf. of State Bank Supervisors v. Off. of the Comptroller of the Currency*, 313 F. Supp. 3d 285, 294 (D.D.C. 2018) ("A motion to dismiss for lack of standing proceeds under Rule 12(b)(1) because 'the defect of standing is a defect in subject matter jurisdiction.'" (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987))).

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (cleaned up). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

A plaintiff bears the burden of demonstrating standing. *TransUnion*, 594 U.S. at 430–31 (citation omitted). "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence

required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted). This means that "at the pleading stage," "plaintiffs are required only to state a *plausible* claim that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (emphasis in original) (cleaned up).

### 1.      Injury-in-Fact

"First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). "It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the rights to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997). "Thus, to establish standing, a plaintiff must show 'a concrete injury even in the context of a statutory violation.'" *Benjamin v. Rosenberg & Assocs., LLC*, No. 19-cv-3012, 2021 U.S. Dist. LEXIS 161302, at *16 (D.D.C. Aug. 26, 2021) (quoting *Spokeo*, 578 U.S. at 341).

"Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts[.]" *TransUnion*, 594 U.S. at 417 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)). "[C]ertain harms readily qualify as concrete injuries under Article III." *Id.* at 425. "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* But "[v]arious intangible harms can also be concrete." *Id.* "'Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts,' including but not limited to 'reputational harms, disclosure of private information, and intrusion upon seclusion.'" *Benjamin*, 2021 U.S. Dist. LEXIS 161302, at *16 (quoting *TransUnion*, 594 U.S. at 425).

Ms. Henkel alleges that she suffered both tangible and intangible harms. In the tangible category, she claims that she "lost credit opportunities" and had to waste "time and resources." Am. Compl. ¶ 90. And in the intangible category, she alleges that she suffered from harm to her "credit reputation and credit score," *id.*, and that she became "distraught, dismayed, and distressed" because of the false credit reporting, *id.* at 102. She argues that her reputational harm is closely related to the torts of defamation and false light. *See* Opp'n at 9–13, 10 n.2. And she argues that her emotional harm is sufficiently concrete in this statutory context. The Court will analyze her tangible and intangible harms in turn.

### a.  Tangible Harms

#### i.    Lost Credit Opportunities

Ms. Henkel first claims that she "lost credit opportunities" because of the Department's conduct. Am. Compl. ¶ 90; *see also id.* ¶ 14 (same). But without more, this allegation is too conclusory to survive a motion to dismiss. *See, e.g.*, *Rosenberg v. LoanDepot, Inc.*, No. 21-cv-8719, 2023 WL 1866871, at *5 (S.D.N.Y. Feb. 9, 2023) (finding plaintiff did not plausibly allege a concrete injury because the allegation of "loss of credit" was "entirely conclusory and insufficient to establish standing" where the plaintiff "failed to identify either a single lender that reacted adversely to the information on her Credit Report or a single loan that she was denied"); *Grauman v. Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 292 (E.D.N.Y. 2021) (Vitaliano, J.) (finding plaintiff did not plausibly allege a concrete injury because the allegation of harm to his "ability to acquire additional credit" was a "generalized allegation" where "[h]e ma[de] no claim that he tried or was imminently planning to try to use his credit report to procure credit"); *see also Gross v. TransUnion*, 607 F. Supp. 3d 269, 273 (E.D.N.Y. 2022) (finding plaintiff did not plausibly allege

a concrete injury because the allegation of "increased difficulty obtaining credit" was "conclusory" without "any specific lost credit opportunity").

Ms. Henkel provides no good counterargument. She first argues that she need not "specifically plead 'the pertinent loan terms' of particular credit applications" or "whether she received credit on other terms." Opp'n at 15 (quoting Mot. Dismiss at 10). But the Court does not adopt such a bright-line rule. It says only that her conclusory allegation that she "lost credit opportunities," Am. Compl. ¶ 90, is insufficient.

She next argues that "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage. Opp'n at 15 (quoting *Magruder v. Cap. One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 6–7 (D.D.C. 2021) (cleaned up)). But even at the motion-to-dismiss stage, a plaintiff must plead an injury that is concrete and particularized. *See Lujan*, 504 U.S. at 560. Indeed, Ms. Henkel ignores that two of the above cases—cited by the Department, *see* Mot. Dismiss at 11—were decided on a motion to dismiss. *See, e.g.*, *Rosenberg*, 2023 WL 1866871, at *5; *Grauman*, 549 F. Supp. 3d at 292. And the very case she cites, which was also decided at the motion-to-dismiss stage, said that an allegation of "loss of credit" was "largely devoid of supporting factual allegations" and ultimately found no tangible injury where the plaintiff "merely allege[d]" that he suffered "loss of credit opportunity." *Magruder*, 540 F. Supp. 3d at 8–9. Ms. Henkel urges the Court to disregard the Defendant's cases as inapposite largely because they "involv[ed] information that was never published to a third party." Opp'n at 15–16 (collecting cases). But she cites no authority for the proposition that alleging publication is a cure-all for an otherwise conclusory allegation of lost credit opportunities; if anything, the question of dissemination seems more tied to the intangible reputational harm discussed below, *see infra*, at 15–22.

Finally, she points to the fact that she specifically alleged that the negative credit reporting made it "appear that she had double the amount of student debt, a criterion that is 'highly influential' in the calculation of credit scores[.]" Opp'n at 17 (quoting Am. Compl. ¶¶ 90–93). But none of those details identify "any specific lost credit opportunity," which is fatal to her attempt to establish standing on this basis. *Gross*, 607 F. Supp. 3d at 273.

### ii.    Waste of Time and Resources

Ms. Henkel next claims that she suffered from a "waste of time and resources lodging futile disputes and trying to correct [the Department's] false credit reporting." Am. Compl. ¶ 14; *see also id.* ¶ 90. And here, she is on surer footing. "Courts have routinely found that wasted time resulting from a defendant's FCRA violation is a sufficiently concrete and particularized injury to establish standing." *Healy v. Milliman, Inc.*, No. 20-cv-1473, 2022 WL 1061921, *3 (W.D. Wash. Apr. 8, 2022) (collecting cases); *Losch v. Nationstar Mortgage LLC*, 995 F.3d 937, 943 (11th Cir. 2021) (finding plaintiff bringing a FCRA claim "has shown a concrete injury in the form of the . . . time he spent contesting the inaccurate information" "[b]ecause there is no question that wasted time is a concrete harm" (citation omitted)); *Norman v. Trans Union, LLC*, 669 F. Supp. 3d 351, 372–73 (E.D. Pa. 2023) (finding plaintiff bringing a FCRA claim "sufficiently establish[ed] injury-in-fact" "[b]ecause wasted time an expense are concrete harms" (citations omitted)); *Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701, 2022 WL 2841909, at *8 (E.D.N.Y. July 16, 2022) ("This wasted time and expense is a traditional monetary harm that is fairly traceable to Equifax's policy of summarily categorizing and handling such disputes without a thorough investigation[.]"), *R. & R. adopted as modified*, No. 19-cv-6701, 2024 WL 4132333 (E.D.N.Y. Sept. 10, 2024).

And Ms. Henkel alleges her wasted time and resources in sufficient detail. *See* Am. Compl. ¶¶ 81 ("Plaintiff disputed Defendant's false, duplicative balance reporting through the CRAs,

including Experian, Equifax, and TransUnion throughout 2023 and 2024"), 84 ("Plaintiff also sent complaints about Defendant's duplicative credit reporting to the Better Business Bureau and the Federal Student Aid Ombudsman Group in January 2024 to which Nelnet responded on Defendant's behalf"), 87 ("Plaintiff repeatedly requested an explanation of the 'suppression' Defendant added to her account[.]"). She describes the multi-step process of disputing inaccurate credit information:

> First, consumers must obtain a copy of their credit report and carefully review it to locate the inaccurate information. Second, they must prepare a letter identifying the information and explaining why it is inaccurate. Third, consumers must print their letters and any supporting documents, such as identification documents or correspondence from a third party, which consumes paper and printing resources. Finally, consumers must properly address their letters, place them in an envelope, and pay for postage, often including additional fees for delivery confirmation and return receipts.

*Id.* ¶ 107. And she claims that she "spent time writing a dispute letter with several exhibits and spent money to send it to one or more CRAs by certified mail." *Id.* ¶ 108. Ms. Henkel's wasted time and resources are sufficiently concrete to confer Article III standing.

The Department responds by citing several non-FCRA cases for the uncontroversial proposition that the Plaintiff "'cannot manufacture standing merely by inflicting harm on [herself] based on [her] fears of hypothetical future harm that is not certainly impending,' i.e., she cannot 'bring [an] action based on costs [she] incurred in response to a speculative threat.'" Mot. Dismiss at 19 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)); *see, e.g.*, *Murthy v. Missouri*, 603 U.S. 43 (2024) (First Amendment); *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826 (D.C. Cir. 2006) (First Amendment); *Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) (reversing lower court decision involving a data breach allegedly violating "a host of state laws and legal duties," *Attias v. CareFirst, Inc.*, 199 F. Supp. 3d 193, 197 (D.D.C. 2016)); *In re Science Apps. Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp.

3d 14, 19 (D.D.C. 2014) (data breach leading to "various causes of action—ranging from state tort law to the federal Privacy Act of 1974"); *Welborn v. IRS*, 218 F. Supp. 3d 64, 72 (D.D.C. 2016) (data breach leading to claims under the Privacy Act, the APA, and the Internal Revenue Code); *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 566–67 (D. Md. 2016) (data breach leading to "various tort, negligence, and statutory claims arising under Maryland law"); *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1205, 1210, 1223, 1227–28 (N.D. Cal. 2014) (data breach leading to claims under California statutes and the Declaratory Judgment Act); *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 148–49 (APA and First Amendment).

But it makes a category error by invoking that proposition. *Clapper* rejected two different harm theories on two different grounds. *See* 568 U.S. at 410, 415–18. It first decided that the respondents' assertion that their communications might be intercepted at some point in the future failed to satisfy the injury-in-fact requirement because it was too speculative. *See id.* at 410 ("[R]espondents' theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." (citations omitted)); *see also Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 21 (D.D.C. 2018) (citing *Clapper* for the proposition that "[a]llegations of *possible* future injury premised on attenuated chain[s] of inferences will not suffice" when it comes to "the injury-in-fact requirement" (emphasis in original) (cleaned up)). It then rejected the respondents' alternative argument that they were suffering ongoing injuries because they had taken "costly and burdensome measures to protect the confidentiality of their communications." *Clapper*, 568 U.S. at 415–18. But this time it pointed to the traceability element of standing. *See id.* at 418 ("For the reasons discussed above, respondents' self-inflicted injuries are not fairly traceable to the Government's

purported activities under § 1881a, and their subjective fear of surveillance does not give rise to standing."); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("In *Clapper*, the Supreme Court explained that plaintiffs cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending because such injuries are not fairly traceable to the conduct creating that fear." (cleaned up)); *Flyers Rights Educ. Fund, Inc. v. FAA*, No. 20-cv-1486, 2021 U.S. App. LEXIS 6712, at *2 (D.C. Cir. Mar. 8, 2021) (same); *Taylor v. FAA*, 351 F. Supp. 3d 97, 106 (D.D.C. 2018) (saying a plaintiff cannot satisfy causation by "manufactur[ing] standing merely by inflicting harm on [himself]" (cleaned up)); *Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*, 34 F. Supp. 3d 50, 58 (D.D.C. 2014) (finding plaintiffs failed "to show that the injury is fairly traceable" because they "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is certainly not impending" (cleaned up)).

All of the above cases cited by the Department involved situations where plaintiffs took steps to protect themselves from some speculative future harm. But Ms. Henkel does not raise such an argument. *See* Opp'n at 14. She instead argues that she had to waste time and resources remedying an ongoing legal wrong—the Department's "own steadfast refusal to reasonably investigate and correct its own inaccurate credit reporting." *Id.*; *see also* Am. Compl. ¶ 83 ("Nevertheless, in its responses to Plaintiff's disputes through the CRAs, Defendant, directly and/or indirectly through its agents, repeatedly failed to correct or reduce the duplicative balance to $0 and to fulfill its other obligations under FCRA [S]ection 1681s-2(b)."). And for reasons expanded on below, there is no traceability problem with this argument. *See infra*, at 23–28; *see also* Opp'n at 15 ("The wasted time and resources following her first unsuccessful dispute are

surely a result of and stem directly from Defendant's failure to correct its false credit reporting in the first instance, as required by FCRA [S]ection 1681s-2(b)[.]").

The Department's remaining cases do not alter this analysis. That is because they all deal with the damages element of a claim rather than Article III standing. *See, e.g.*, *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995) ("Appellant's expenses incurred merely to notify appellees of inaccurate credit information, and not to force their compliance with any specific provision of the statute, cannot be compensable as 'actual damages' for a violation of the FCRA."); *Shafran v. Harley-Davidson, Inc.*, No. 07-cv-1365, 2008 WL 763177 (S.D.N.Y. Mar. 20, 2008) (dismissing under Rule 12(b)(6) and 9(b) because the plaintiff "has failed to show an actual resulting injury that might support a claim for damages" where "damages are an essential element of each of plaintiff's claims"); *Hammond v. Bank of N.Y. Mellon Corp.*, No. 08-cv-6060, 2010 WL 2643307, at *9 (S.D.N.Y. June 25, 2010) (assuming the plaintiffs had standing and finding that the "alleged increased risk of identity theft is insufficient to support Plaintiffs' substantive claims" (cleaned up)).

### b.  Intangible Harms

#### i.    Credit Reputation and Score

Turning to intangible harm, Ms. Henkel first claims that she suffered "harm to [her] credit reputation and credit score" because she "appeared on [her] credit report[] to owe to [the] Defendant far more in federal student loans than [she] actually did[.]" Am. Compl. ¶ 90. She invokes *TransUnion* to argue that "this type of injury is 'closely related' to defamation and is th[u]s sufficient to give rise to standing." Opp'n at 9. She also argues that "this inaccurate reporting portrayed [her] in a false light, a traditionally recognized reputational injury." *Id.* at 10 n.2 (citing

*Gerena v. Freedom Mortg. Corp.*, No. 23-cv-78, 2024 WL 1023033, at *10 (E.D. Va. Mar. 8, 2024)). The false light argument fails, but the defamation argument works.

Ms. Henkel argues that her reputational harm is closely related to the harm underlying the tort of false light. *See* Opp'n at 10 n.2. "But the false light version of the tort of invasion of privacy requires publicity, which 'means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Ackerman v. Maximus Educ., LLC*, No. 24-cv-975, 2025 WL 51476, at *6 (E.D. Va. Jan. 8, 2025) (quoting Restatement (Second) of Torts § 652D (1977)). And Ms. Henkel has not alleged such widespread publication of her allegedly incorrect credit report. Nor does she argue that the publicity requirement should be softened the way the falsity requirement was watered down in *TransUnion*, 594 U.S. at 433 ("In other words, the harm from a misleading statement of this kind bears a sufficiently close relationship to the harm from a false and defamatory statement.")—an argument the Eleventh Circuit has rejected, *see Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245–46 (11th Cir. 2022) ("Unlike the near-falsity that was sufficiently close to defamation in *TransUnion*—because it gave rise to a similar reputational harm—communications that are private rather than public do not engender a closely analogous invasion of privacy." (citation omitted)). So she cannot rely on this historical analogue. *See TransUnion*, 594 U.S. at 424 (stating the inquiry of whether an injury has a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts" "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury" (cleaned up)).

But she is right to invoke defamation. *TransUnion* said that "[u]nder longstanding American law, a person is injured when a defamatory statement 'that would subject him to hatred,

contempt, or ridicule' is published to a third party." *Id.* at 432 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990) (cleaned up)) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974); Restatement of Torts § 559 (1938)). It therefore distinguished between FCRA plaintiffs whose credit reports "were disseminated to third-party businesses" and those whose credit information was never provided "to any potential creditors." *Id.* at 432–33. The former had suffered a concrete injury, *id.* at 432, while the latter had not, *id.* at 439. "The standing inquiry . . . thus distinguishes between (i) credit files that consumer reporting agencies maintain internally and (ii) the consumer credit reports that consumer reporting agencies disseminate to third-party creditors." *Id.* at 434.

Ms. Henkel argues that the Department "repeatedly published the inaccurate information to the Big Three CRAs Equifax, Experian, and Trans Union—themselves third parties for purposes of publication." Opp'n at 11; *see also* Am. Compl. ¶¶ 74–81, 91. And she points to cases adopting *TransUnion*'s reasoning in this context and finding standing where inaccurate information is distributed to a consumer reporting agency. *See* Opp'n at 11–13 (citations omitted); *see, e.g.*, *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1152–53 (7th Cir. 2022) (rejecting the argument that "dissemination of false information to a credit reporting agency" is insufficient); *Figueroa v. Cap. One, N.A.*, No. 23-cv-482, 2024 WL 209058, at *3 (D.N.J. Jan 19, 2024) ("This Court agrees with the *Ewing* Court's analysis and joins the number of district courts that have recognized instances where dissemination to a credit reporting agency suffices to establish defamatory publication for standing purposes." (collecting cases)); *cf., e.g.*, *Morgan v. LVNV Funding, LLC*, No. 21-cv-12967, 2023 WL 5808365, at *5 (E.D. Mich. Sept. 7, 2023) ("This Court sees no reason why publication in this context would require showing publication to creditors." (citing *Ewing*, 24 F.4th at 1153)); *Pharms v. Nat'l Credit Sys., Inc.*, No. 619-cv-60, 2022 WL 2346623, at *7 (S.D. Ga. June 29,

2022) (finding "a reasonable jury could conclude that Defendant provided incorrect information about Plaintiff's debt to a third party (TransUnion)."); *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279–80 (11th Cir. 2017) ("Pedro alleged a concrete injury because the harm caused by the alleged violation of the Act—the reporting of inaccurate information about Pedro's credit to a credit monitoring service—has a close relationship to the harm caused by the publication of defamatory information[.]").

On the other side, plenty of courts have required dissemination to creditors instead of consumer reporting agencies. *See, e.g.*, *Campbell v. Portfolio Recovery Assocs., LLC*, No. 21-cv-1322, 2022 WL 657225, at *2 (E.D.N.Y. Mar. 4, 2022) ("[T]he distribution of inaccurate information to a credit reporting agency, as opposed to a particular creditor, . . . does not constitute or cause concrete injury for standing purposes."); *Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*, No. 18-cv-1781, 2023 WL 6290622, at *20 (S.D.N.Y. Sept. 27, 2023) (same); *Phillips v. First Credit Servs., Inc.*, No. 24-cv-4440, 2024 WL 4635341, at *2 (S.D.N.Y. Oct. 29, 2024) (same); *Biener v. Credit Control Servs., Inc.*, No. 21-cv-2809, 2023 WL 2504733, at *7 (S.D.N.Y. Mar. 14, 2023) ("Defendant's reporting of the debt to the three major credit reporting agencies on its own cannot establish concrete injury."); *Spira v. Trans Union, LLC*, No. 21-cv-2367, 2022 WL 2819469, at *5 (S.D.N.Y. July 19, 2022) ("But credit reporting agencies like Equifax are not the type of third parties contemplated by the Supreme Court in *TransUnion*; rather, the Supreme Court clearly contemplated potential creditors[.]"); *Konig v. TransUnion, LLC*, No. 18-cv-7299, 2023 WL 3002396, at *8 (S.D.N.Y. Apr. 19, 2023) (same); *Reimer v. LexisNexis Risk Sols., Inc.*, No. 22-cv-153, 2022 WL 4227231, at *10 (E.D. Va. Sept. 13, 2022) (same); *Krausz v. Equifax Info. Servs., LLC*, No. 21-cv-7427, 2023 WL 1993886, at *9 (S.D.N.Y. Feb. 14, 2023) (same); *Whitehead v. Grant & Weber, Inc.*, No. 22-cv-6517, 2022 WL 19762152, at *2 (E.D.N.Y.

Dec. 30, 2022) (same), *R. & R. adopted*, 2023 WL 3260029 (E.D.N.Y. May 4, 2023); *Lewis v. Old Navy*, No 21-cv-9131, 2024 WL 98293, at *3 (S.D.N.Y. Jan. 9, 2024) (similar); *McKnight v. Receivable Collection Servs., LLC*, No. 24-cv-2840, 2024 WL 4266017, at *2 (E.D.N.Y. Sept. 23, 2024) (similar).

The Court is ultimately persuaded that there are circumstances where dissemination to consumer reporting agencies is sufficient to confer standing. The Seventh Circuit in *Ewing* developed this idea quite robustly. *See* 24 F.4th at 1152–54. There, it acknowledged dicta from *TransUnion* stating that disclosures to printing vendors were not traditionally actionable as publications for the tort of defamation. *Ewing*, 24 F.4th at 1153 (citing *TransUnion*, 594 U.S. at 434 n.6). But it read that language to imply that such a disclosure would be sufficient if a plaintiff could "present evidence that the defendant had 'brought an idea to the perception of another.'" *Id.* (quoting *TransUnion*, 594 U.S. at 434 n.6). "The essential point, one that has always been necessary to prove publication, is this: the third party must understand the defamatory nature of the communication." *Id.* at 1154 (citing Restatement (Second) of Torts § 577 cmt. c.); *see also Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 297–98 (4th Cir. 2024) (discussing *Ewing* favorably). It concluded that courts must therefore ask whether consumer reporting agencies "understood the defamatory significance of the [incorrect] reports." *Ewing*, 24 F.4th at 1154.

The Department argues that *Ewing* is not persuasive in part because it never considered "that a consumer reporting agency, much like a printing vendor, is a 'ministerial intermediary,'" Reply at 11 (quoting *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 736 (7th Cir. 2023)), "that merely 'pass[es] the information' on to its ultimate intended recipient," *id.* (quoting *Hunstein*, 48 F.4th at 1248). But the cases it relies on to make this point concern privacy torts, not defamation—and privacy torts require more widespread publication than does defamation. *See Nabozny*, 84 F.4th at

738 ("The 'publication' element in a defamation claim includes disclosure to just one person, while the 'publicity' element of the privacy tort at issue here requires disclosure to many." (citation omitted)); *Hunstein*, 48 F.4th at 1246 n.5 ("The 'publicity' required for public disclosure differs from the 'publication' required for defamation." (citation omitted)).

The Department also argues that *Ewing* "did not consider that a furnisher's transmission of credit information to a consumer reporting agency is a 'communication [that] is made to a . . . business associate in the ordinary or natural course of business.'" Reply at 11 (quoting *Beck v. Oden*, 13 S.E.2d 468, 471 (Ga. App. 1941)). But *Beck* was a case addressing whether there was "an actionable publication" when "the defendant dictated to his office stenographer the contents of [an] alleged libelous letter." 13 S.E.2d at 471. And *Ewing* expressly addressed the line of cases cited by *TransUnion* "that dealt with liability for dictating defamatory matter to a stenographer." *Ewing*, 24 F.4th at 1154 (citing *TransUnion*, 594 U.S. at 434 n.6). And it explained that those cases "were concerned with whether the stenographer was simply mechanically transmitting the words or whether she perceived or understood the defamatory significance of what was dictated." *Id.* (citing *Ostrowe v. Lee*, 175 N.E. 505, 505 (N.Y. 1931)). Indeed, one of the cases cited in *TransUnion*, *see* 504 U.S. at 434 n.6, held in no uncertain terms that "[t]here is publication of a libel if a stenographer reads the notes that have been taken by another" and that the result is the same if "the notes that he reads have been taken by himself," *Ostrowe*, 175 N.E. at 506 (Cardozo, C.J.). It is true that when *Beck* was decided about a decade later in a different state, the Court of Appeals of Georgia chose to adopt the more "modern" rule that communication made to a business associate was not actionable for libel. 13 S.E.2d at 471. But that one decision cannot erase the historical evidence on the other side. And the Department certainly cannot argue that *Ewing* failed to consider this issue altogether.

Having established that the essential question for publication is whether the third party "underst[ood] the defamatory nature of the communication," *Ewing*, 24 F.4th at 1154, the Court also concludes that Ms. Henkel has sufficiently alleged facts to support an inference that the consumer reporting agencies understood the incorrect debt reports. In *Ewing*, the Seventh Circuit concluded that the consumer reporting agency understood the significance of the reports because it "included the debts in the Consumers' credit reports" and its "assessment of [the plaintiffs'] creditworthiness took into account [the erroneous information]," *id.*, as evidenced by an increased credit score upon correction, *see id.* at 1149, 1150. And Ms. Henkel similarly alleges both of these facts. First, she alleges that the incorrect information was included in her credit reports. *See, e.g.*, Am. Compl. ¶ 75–76 ("In January of 2024, Plaintiff reviewed her credit reports and discovered that [the Department] . . . was still directly and/or indirectly reporting that she had an open student loan account with a balance of approximately $68,505" even as the Department "was directly and/or indirectly reporting that Plaintiff had an *additional* federal student loan account due to [the Department] with a total loan balance of approximately $68,548."). Second, she alleges harm to her credit score as a result. *See id.* ¶ 14 ("As a result of [the Department's] conduct, Plaintiff and members of the Class she seeks to represent falsely appear on their credit reports to owe double the amount of federal student loan debt and suffer injury and damages in the form of harm to credit reputation and credit score[.]"), *id.* ¶ 90 (similar). This is enough to plausibly allege that the consumer reporting agencies understood the defamatory nature of the incorrect debt report.

The Department argues that Ms. Henkel fails to allege "that her credit information 'was actually read and not merely processed.'" Reply at 14 (quoting *TransUnion*, 594 U.S. at 434 n.6). But *Ewing* explains that "[r]eading was a proxy for understanding rather than just mechanically transmitting information" and that it "was not always required." 24 F.4th at 1154

(citations omitted). And the Court has already decided that Ms. Henkel plausibly alleges understanding on the part of the consumer reporting agencies. *See supra*, at 21. The Court is therefore satisfied that she has sufficiently alleged an injury-in-fact on this basis.

### ii.    Emotional Distress

Ms. Henkel next argues that "emotional distress" is a sufficient basis for standing. *See* Opp'n at 19. And she is correct on this point for all the same reasons she was correct about reputational harm. Courts look to history "[i]n assessing whether an emotional harm can satisfy the Article III injury-in-fact requirement[.]" *Magruder*, 540 F. Supp. 3d at 9. And the Court has already concluded that she has been harmed in a way that is analogous to victims of defamation. *See supra*, at 16–22; *see also Magruder*, 540 F. Supp. 3d at 11–12 (concluding that a claim of emotional harm was sufficiently concrete in part because there is 'a significant history, including at common law, of lawsuits based on . . . the disclosure of adverse information claimed to have been misleading or false'" (quoting *Gambles v. Sterling Infosystems, Inc.*, 234 F. Supp. 3d 510, 522 (S.D.N.Y. 2017)) (collecting cases)).

The Department argues that emotional harm can never be concrete. *See* Reply at 17 (citing *Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995)). And it cites broad language from the D.C. Circuit stating that "general emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." *Humane Soc'y of U.S.*, 46 F.3d at 98 (citations omitted)). But standing doctrine has developed quite a bit since those words were penned. Fifteen years ago, a court in this District explained that *Humane Society* still allowed some emotional harm to be concrete: "[A] plaintiff can only establish an Article III injury in fact based on emotional harm if that alleged harm stems from the infringement of some legally protected, or judicially cognizable interest that is either 'recognized at common law or specifically recognized

as such by the Congress.'" *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 25 (D.D.C. 2010) (cleaned up) (quoting *Sargeant v. Dixon*, 130 F.3d 1067, 1069 (D.C. Cir. 1997). Then several years later, another court in this District echoed that same test but seemed to treat the final disjunctive as more of a conjunctive out of respect for *Spokeo*'s teaching that "history *and* the judgment of Congress" matter. *Magruder*, 540 F. Supp. 3d at 8 (emphasis added) (quoting *Spokeo*, 578 U.S. at 331); *see also id.* at 10 ("Both considerations weigh in favor of the conclusion that Magruder has alleged enough to satisfy Article III."). In the post-*TransUnion* landscape, it stands to reason that emotional distress counts as concrete as long as plaintiffs identify a historical analogue.[1] *See TransUnion*, 594 U.S. at 436 n.7 ("We take no position on whether or how such an emotional or psychological harm could suffice for Article III purposes—for example, by analogy to the tort of intentional infliction of emotional distress."). Ms. Henkel therefore plausibly alleges concrete emotional harm.

### 2.    Traceability

"Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "To be fairly traceable, there must be a 'causal connection between the assertedly unlawful conduct and the alleged injury.'" *Doe 1 v. Apple Inc.*, 96 F.4th 403, 409 (D.C. Cir. 2024) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). "Article III standing does not require that the defendant

---

[1] The Court notes that the same might be true even without a historical analogue. *See TransUnion*, 594 U.S. at 425 ("Various intangible harms can also be concrete. *Chief among them* are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." (emphasis added)).

be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries[.]" *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017). "But if the injury would occur regardless of the challenged action—say, because some separate action would independently cause it in full— then the fair-traceability test is not met." *Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022) (citing *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015)). Traceability is easily met in this case for all three concrete harms.

*First*, Ms. Henkel was injured when she had to waste time and resources "lodging futile disputes and trying to correct [the Department's] false credit reporting." Am. Compl. ¶ 14; *see also id.* ¶ 90. This injury would not have occurred but for the Defendant's challenged action. Ms. Henkel challenges the Department's failure to "report a $0 balance, correct the inaccurate information, and fulfill all of its duties under FCRA [S]ection 1681s-2(b)." Am. Compl. ¶ 120. And if the Department had not resisted correcting the inaccurate information, Ms. Henkel would not have had to continue expending time and resources. *See Cherokee Nation*, 643 F. Supp. 3d at 106 ("[I]f some part of the alleged injury would not have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action." (citation omitted)). This includes everything that occurred after the furnishing of the information triggered Subsection 1681s-2(b)'s requirement to fix the error. *See* Am. Compl. ¶¶ 81 ("Plaintiff disputed Defendant's false, duplicative balance reporting through the CRAs, including Experian, Equifax, and TransUnion throughout 2023 and 2024."), 84 ("Plaintiff also sent complaints about Defendant's duplicative credit reporting to the Better Business Bureau and the Federal Student Aid Ombudsman Group in January 2024[.]"), 87 ("Plaintiff repeatedly requested an explanation of the 'suppression' Defendant added to her account, but Nelnet never provided it.").

The Department does not challenge traceability for this harm in so many words. *See* Mot. Dismiss at 19–21 (ambiguously challenging this harm as being insufficient for "standing"); Reply at 16 (challenging this harm as being insufficiently "concrete"). It instead argues that Ms. Henkel's waste of time and resources was a self-inflicted harm meant to mitigate the risk of future harm, *see* Mot. Dismiss at 19–21, which would pose a traceability problem, *see Vilsack*, 808 F.3d at 919 ("In *Clapper*, the Supreme Court explained that plaintiffs cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending because such injuries are not fairly traceable to the conduct creating that fear." (cleaned up)). But this argument misses the mark. Ms. Henkel does not allege that she is acting to avoid some speculative future legal wrong; she instead took these steps to remedy an ongoing violation. *See* Opp'n at 18.

*Second*, Ms. Henkel's reputational harm is fairly traceable to the Department's failure to correct the false debt report. The Department argues that this harm is traceable to the initial furnishing of the disputed information to consumer reporting agencies instead of the Department's "subsequent failure to investigate and correct the disputed information after she disputed it with consumer reporting agencies." Mot. Dismiss at 13; *see also id.* at 18 (incorporating this argument for reputational harm); *Owens v. Bank of Am.*, No. 17-cv-2110, 2018 WL 4387572, at *8 (D.D.C. Sept. 14, 2018) ("[T]he FCRA does not create a private right of action enabling an individual to enforce" the provision prohibiting "an entity from 'furnish[ing] information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.'" (quoting 15 U.S.C. § 1681s-2(a)(1)) (citations omitted)). But even if the harm to her credit score were initially caused by the furnishing of the information, the ongoing harm she is suffering can locate its cause in more than one place. *See Attias*, 865 F.3d at 629

25

("Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries[.]"). Ms. Henkel alleges that the total amount of money someone has borrowed accounts for about thirty percent of one's FICO score and that "total credit usage" is "highly influential" in calculating the scoring model created by the big three consumer reporting agencies. *See* Am. Compl. ¶ 92 (citations omitted). Accepting these facts as true and drawing all inferences in her favor at this stage, correcting the error on Ms. Henkel's credit report would lead to some positive effect on her credit score—an effect that she has been robbed of by the Department's alleged indifference. *See Cherokee Nation*, 643 F. Supp. 3d at 106 ("[I]f some part of the alleged injury would not have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action." (citation omitted)).

The Department argues that the D.C. Circuit has foreclosed this theory of traceability. *See* Mot. Dismiss at 13, 18.  It cites *Lo Shippers Action Comm. v. Interstate Com. Comm'n*, 808 F.2d 64 (D.C. Cir. 1986), for the proposition that Ms. Henkel cannot allege causation by relying on the Department's failure to "abat[e] [a] pre-existing injury." Mot. Dismiss at 13 (quoting *Lo Shippers*, 808 F.2d at 65). But that is not quite right. In *Lo Shippers*, the petitioner challenged an order by the Interstate Commerce Commission cancelling a tariff that had become effective on January 1, 1985. *See Lo Shippers*, 808 F.2d at 64–65. The petitioner, who had won before the Commission, argued the order did not go far enough because it did not also cancel an earlier tariff from over two years prior, which the petitioner had already previously challenged to no avail. *See id.* at 65. The D.C. Circuit rejected this argument, explaining that an allegation that a defendant "did not go far enough in abating a pre-existing injury" would "not suffice to confer standing." *Id.* The Department reads this line to essentially declare that a plaintiff never has standing to challenge someone's declination to alleviate an injury with a distinct cause. *See* Mot. Dismiss at 13.

But *Lo Shippers* undercuts this reading in the very next paragraph. There, it explains that the real causes of the petitioner's injury were the 1983 tariffs and the earlier decision that "refused to either investigate or suspend the tariffs." *Id.* While that earlier decision was "not subject to judicial review," *id.*, it stands as an example of an entity's choice not to remedy some earlier harm counting as a cause of that very same harm.

This reading is reinforced by *Lo Shippers*'s citation to *California Association of the Physically Handicapped, Inc. v. FCC*, 778 F.2d 823 (D.C. Cir. 1985), also cited by the Department, *see* Mot. Dismiss at 13. There, the D.C. Circuit held that certain injuries were not traceable to the FCC's approval of a transfer of company stock to someone who had already controlled the company for many years. *Cal. Ass'n of the Physically Handicapped*, 778 F.2d at 825. It explained that the plaintiff could not "fairly trace its ongoing injury—either in origin *or in endurance*—to the transfer in question" and that its "real plea is that the transfer will furnish no cure—it will not cause the injury to abate." *Id.* (emphasis added). The D.C. Circuit therefore acknowledged that an ongoing injury can be traceable "in endurance" to some behavior that did not cause it "in origin." *Id.* That is exactly what is happening here.

The Department also offers an out-of-circuit FCRA opinion as an example of a court finding "no standing as [the] plaintiff failed to show that [her] injury 'is fairly traceable to [the] allegedly inadequate investigation' rather than to the initial furnishing of the information." Reply at 4 (quoting *Thompson v. Equifax Info. Servs., LLC*, 441 F. Supp. 3d 533, 544 (E.D. Mich. 2020)). But it misreads that case. The court there found that the plaintiff failed to establish after discovery that her intangible harm was traceable to either the inadequate investigation or the inaccurately reported information—this was because there was an accurately reported loan of a much greater magnitude on her trade line. *Thompson*, 441 F. Supp. 3d at 544. But declaring as a matter of law

at the motion-to-dismiss stage that consumers' intangible harms flow solely from the initial furnishing of information would make it impossible for anyone to bring a claim under Subsection 1681s-2(b). *Cf. Woodward v. GEICO Advantage Ins. Co.*, No. 21-cv-952, 2022 WL 2953053, at *5 (D. Md. July 25, 2022) ("If the preexisting high rates caused by [the] inaccurate information insulate an insurer from liability for causing a continuation of those high rates by refusing to conduct a proper investigation, insurers would have virtual impunity for inaccurate information on consumers' CLUE Reports."). That is why courts routinely allow such claims to proceed. *See* Opp'n at 8–9 (collecting cases).

*Third*, Ms. Henkel's emotional harm is also fairly traceable to the Department's failure to correct the inaccurate debt report. She alleges that the inaccurate student loan information caused her to be "distraught, dismayed, and distressed." Am. Compl. ¶ 102. And she "manifested [her] negative emotional responses to [the Department's] direct and/or indirect reporting of inaccurate Student Loan Information by disputing it with one or more CRAs." *Id.* ¶ 103. These negative emotions would therefore subside were the Department of Education to resolve her disputes, making them fairly traceable to the Department's failure to do so. *See Cherokee Nation*, 643 F. Supp. 3d at 106 ("[I]f some part of the alleged injury would not have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action." (citation omitted)). Any counterargument that attempts to pin her emotional harm on the initial furnishing of information alone suffers from the same problems the Court identified above when discussing traceability for Ms. Henkel's reputational harms. *See supra*, at 25–28.

### 3.    Redressability

"Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (cleaned up). "This analysis is 'virtually always

the reciprocal' of the second, fair-traceability requirement." *Cherokee Nation*, 643 F. Supp. 3d at 106 (quoting *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 658 (D.C. Cir. 2010)). "Thus, if the defendant's challenged actions are a but for cause of the plaintiff's alleged injury, then that injury generally is likely redressable for standing purposes." *Id.* Here, all of Ms. Henkel's concrete injuries occurred because the Department of Education failed to fix the incorrect information. *See supra*, at 23–28. An award of damages would therefore likely redress her injury. *See Cherokee Nation*, 643 F. Supp. 3d at 106 ("Typically, redressability is absent only when the Court's decision would have 'no real effect' on the plaintiff's injury." (quoting *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (cleaned up))).

### B.    Merits

Turning to the merits, the Court finds that Ms. Henkel has plausibly alleged a claim under 15 U.S.C. § 1681s-2(b). She sufficiently alleged that the Department provided the challenged information to consumer reporting agencies. And the Court reads the statutory provision to allow for vicarious liability as well, making her allegations about the Department's agents sufficient at this stage. The Court also finds that damages for non-pecuniary and non-economic harms are available under the FCRA. It therefore denies the Defendant's Rule 12(b)(6) motion.

### 1.    Direct Liability

The Department of Education argues that it does not fit the description of entities covered by Subsection 1681s-2(b). That Subsection provides: "After receiving notice . . . of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall . . . conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)(1)(A). The statutory obligations therefore apply to a "person" only after that person has (1) "provided" information to a consumer reporting agency and

(2) "receiv[ed] notice" of a dispute about that information. *Id.* Ms. Henkel has sufficiently alleged both of these conditions.

*First*, Ms. Henkel plausibly alleges that the Department provided the disputed information to a consumer reporting agency. According to the Amended Complaint, "information about [one of her student loans] is listed on her credit report as being furnished by 'Dept of Ed/Aidvantage' and information about another is listed as being furnished by 'MOHELA/DEPT OF ED.'" Am. Compl. ¶ 5. Drawing all inferences in her favor, as the Court must at this stage, it reads this allegation to be saying that the Department of Education furnished the information. Discovery might reveal that this was not the case. *See Ellis v. Pa. Higher Educ. Assistance Agency*, No. 07-cv-4498, 2008 U.S. Dist. LEXIS 129710, at *18–19 (C.D. Cal. Aug. 12, 2008) (finding at the summary judgment stage that "[t]here is no evidence that KeyBank separately provided information to the CRAs" even though the "Plaintiff's credit report lists PHEAA and KeyBank jointly as the entities responsible for his loans"). But the allegations suffice at the pleading stage.

*Second*, again drawing all inferences in her favor, Ms. Henkel plausibly alleges that the Department of Education received notice of her dispute. *See* Am. Compl. ¶ 120 ("After receiving notice from one or more CRAs of Plaintiff's and Class members' disputes of inaccurate information that Defendant, directly and/or indirectly through its agents, had previously furnished to the CRA about them . . . ."); *see also id.* ¶ 82 ("[T]he CRAs provided notice of Plaintiff's disputes to Defendant directly and/or indirectly through its agents."). The Department therefore falls within the gamut of Subsection 1681s-2(b).

## 2.    Vicarious Liability

The Department next argues that Subsection 1681s-2(b) does not make it vicariously liable for any violations committed by its agents—including Nelnet. *See* Mot. Dismiss at 25–28.

"Vicarious liability is a common law concept, wherein one may be liable for the acts of another[.]" *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 73 (D.D.C. 2011) (cleaned up); *see also Est. of Wilson v. District of Columbia*, No. 23-cv-1987, 2024 U.S. Dist. LEXIS 180485, at *15 (D.D.C. Sept. 29, 2024) ("Respondeat superior is not an independent tort claim, but rather a legal theory of vicarious liability that transfers liability from an agent to its principals." (citations omitted)). And "courts may take it as a given that Congress has legislated with an expectation that . . . [common law] principle[s] will apply except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534 (1993) (cleaned up). "In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." *Id.* (cleaned up).

Subsection 1681s-2(b) does not speak directly to the question of vicarious liability, so the Court will join the chorus of courts holding that vicarious liability applies. *See, e.g.*, *Ellis*, 2008 U.S. Dist. LEXIS 129710, at *19–21; *Haddad v. Charles Riley & Assocs.*, No. 09-cv-12597, 2010 U.S. Dist. LEXIS 103623, at *34–38 (E.D. Mich. Apr. 12, 2010); *Feldmann v. Lakeview Loan Servicing L.L.C.*, No. 20-cv-580, 2021 WL 1627048, at *4 (W.D. Wash. Apr. 27, 2021), *partially reconsidered on different grounds*, 2021 WL 2036703 (W.D. Wash. May 21, 2021).

The Department points to no case holding otherwise. *See* Mot. Dismiss at 25–28; Reply 21–23. It instead attempts to weaken the persuasive value of these cases by advancing a textual argument not addressed in those opinions. *See* Reply at 23 ("These cases failed to consider that Sections 1681b and 1681d expressly codify vicarious liability while Section 1681s-2(b) does not, an omission that courts presume to be intentional." (citations omitted)). It explains that other provisions of the FCRA contain "language making one actor responsible for a different actor's actions." Mot. Dismiss at 26–27 (collecting provisions). And it highlights Subsection 1681s-2(b)'s

relative silence, arguing that this implies a statutory abrogation of vicarious liability principles. *See id.*

But this argument from implication is a far cry from the direct speech required for abrogation. *See Texas*, 507 U.S. at 534; *see, e.g.*, *In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders v. United States of America*, 964 F.3d 1121, 1130 (D.C. Cir. 2020) ("[T]he Rule expressly directs secrecy as the default position, and thus displaces the common-law right of access." (citation omitted)). And Ms. Henkel has advanced a plausible explanation for this textual irregularity. *See* Opp'n at 26–27. She explains that the other provisions deal with employment and investigative reports, which "are often one-off inquiries conducted through a third-party data broker." *Id.* And she argues that the one-off nature of these relationships makes an agency relationship unlikely. *See id.* at 27. It therefore makes sense that Congress would have expressly incorporated vicarious liability in its text, even while leaving the background principle to apply to Subsection 1681s-2(b), which involves more ongoing relationships with consumer reporting agencies. *See id.* Regardless of whether this was the true congressional purpose, the Court finds this argument persuasive enough that it cannot conclude that a statutory purpose of abrogation is "evident." *Texas*, 507 U.S. at 534. This is especially true given the FCRA's remedial nature. *See Wilson v. Corelogic SafeRent, LLC*, No. 14-cv-2477, 2017 WL 4357568, at *4 (S.D.N.Y. Sept. 29, 2017) ("FCRA is undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it." (cleaned up)).

The Department also tries to undercut two of the above cases by arguing that they incorrectly relied on the idea that plaintiffs would be without a remedy unless vicarious liability were available. *See* Reply at 23 (citing *Ellis*, 2008 WL 11363649, at *7; *Haddad*, 2010 WL 3906955, at *12). It explains that a remedy would be available under its reading—the plaintiff

would just need to sue the entity that actually furnished the information. *See id.* But even if that were true, it does not explain how Subsection 1681s-2(b) can be read to speak clearly to the question of vicarious liability, which is what is required for abrogation, *see Texas*, 507 U.S. at 534.

Finally, the Department argues that "even under principles of agency [law]," it would still not be responsible for Nelnet's actions because "[a]gency law does not make an actor responsible for an independent contractor's torts[.]" Mot. Dismiss at 28 (citations omitted). Ms. Henkel counters by arguing that courts have found "questions of actual control to be issues of fact." Opp'n at 29 (collecting cases); *see, e.g.*, *Haddad*, 2010 U.S. Dist. LEXIS 103623, at *36–38 (holding that whether an entity was an agent was "a question of fact for a jury to decide" because the entity's "mere status as an 'independent contractor' [was] not dispositive of this issue"); *see also* Opp'n at 32 ("At minimum, as discussed, *supra*, the degree of control Defendant exercises over Nelnet is a question of fact not appropriate for determination in a motion to dismiss."). And the Department cites no case stating the opposite. In fact, it never really addresses this argument at all. *See* Reply at 23–25. The Court therefore agrees with Ms. Henkel and will leave this factual question for a later stage of these proceedings.

### 3.    Actual Damages

Finally, the Department argues that the FCRA's civil liability provisions limit damages to proven pecuniary or economic harm and that Ms. Henkel failed to plausibly allege any such harm. *See* Mot. Dismiss at 21–22. Those provisions state that consumers are entitled to "any actual damages sustained by the consumer as a result of the failure" to comply with the FCRA. 15 U.S.C. §§ 1681n(a)(1)(A), 1681o(a)(1). "Because the term 'actual damages' has [a] chameleon-like quality, we cannot rely on any all-purpose definition but must consider the particular context in which the term appears." *F.A.A. v. Cooper*, 566 U.S. 284, 294 (2012).

The Court is persuaded that the FCRA allows for damages for non-pecuniary and non-economic harms given the decades of out-of-circuit case law reaching this same conclusion. *See, e.g.*, *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834–35 (8th Cir. 1976) (finding no error for an award based in part on "loss of sleep, nervousness, frustration and mental anguish over the report"); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513–14 (5th Cir. 1982) (per curiam) ("Even when there are no out-of-pocket expenses, humiliation and mental distress do constitute recoverable elements of damage under the Act."); *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir. 1983) ("Even where no pecuniary or out-of-pocket loss has been shown, the FCRA permits recovery for humiliation and mental distress." (citations omitted)); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("The term 'actual damages' has been interpreted to include recovery for emotional distress and humiliation." (collecting cases)); *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 418 (4th Cir. 2001) ("Dalton alleges that he suffered emotional distress and a loss of reputation as a result of the false report. Damages for such injuries are recoverable under FCRA."); *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 363 (6th Cir. 2005) (upholding damages award for "pain, suffering and humiliation" and collecting cases upholding emotional distress damages); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 719 (3d Cir. 2010) ("[D]amages for violations of the FCRA allow recovery for humiliation and embarrassment or mental distress even if the plaintiff has suffered no out-of-pocket losses." (citation omitted)).

The Department pushes back against this mountain of case law by pointing to *Cooper*, a Supreme Court case holding that "actual damages" under the Privacy Act were limited to proven pecuniary or economic harm. *See* Reply at 17–19; *see also Cooper*, 566 U.S. at 299. It explains that *Cooper* concluded the Privacy Act's remedial scheme should parallel that of the common-law

torts of libel per quod and slander, which allow plaintiffs to recover general damages only if they first prove pecuniary loss in the form of special harm. *See* Reply at 17–18 (citing *Cooper*, 566 U.S. at 295–96). And it highlights two grounds for the Court's conclusion, arguing that they apply to the FCRA as well. *See id.* First, "the Privacy Act's remedial provision authorizes plaintiffs to recover a guaranteed minimum award of $1,000 for violations of the Act, but only if they prove at least some 'actual damages.'" *Cooper*, 566 U.S. at 295 (cleaned up). And the Department reads the FCRA to do something similar, *see* Reply at 18, although the text does not clearly demand such a reading either on its own terms or in comparison to the Privacy Act, *compare* 15 U.S.C. § 1681n(a)(1)(A) (FCRA providing for "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000"), *with* 5 U.S.C. § 552a (Privacy Act providing for "actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person *entitled to recovery* receive less than the sum of $1,000" (emphasis added)). Second, the Privacy Act "serves interests similar to those protected by defamation and privacy torts." *Cooper*, 566 U.S. at 295. And the Department points out that these are the very same interests that Ms. Henkel argues the FCRA serves in her standing arguments. *See* Reply at 18 (citations omitted).

But *Cooper* itself explained why we should not import its reasoning to the FCRA context. When faced with lower court opinions holding that the FCRA allows for compensation for mental and emotional distress, *Cooper* emphasized that the FCRA provided "only [a] limited interpretive aid" "[s]ince the term 'actual damages' can mean different things in different contexts." 566 U.S. at 301–02. And it highlighted three differences between the Privacy Act and the FCRA. *See id.* at 302. First, it explained that the FCRA does not "contain[] text that precisely mirrors the Privacy Act." *Id.* Second, looking to legislative history, it explained that Congress did not "specifically

decline to authorize recovery for general damages"—which would have included non-pecuniary damages—when it enacted the FCRA but it did when it enacted the Privacy Act. *Id.* "And most importantly," the FCRA cases did not "involve[] the sovereign immunity canon." *Id.* The Department concedes that "the sovereign immunity canon does not apply here." Reply at 18 n.1. These three distinctions therefore persist. And just as *Cooper* declined to import the FCRA reasoning when construing the Privacy Act, so too does this Court decline to import *Cooper*'s reasoning to the FCRA context.

And even assuming the FCRA *does* limit recovery to damages for proven pecuniary or economic harm, Ms. Henkel plausibly alleged such harm in her Amended Complaint. *See, e.g.*, Am. Compl. ¶ 108 ("Plaintiff spent time writing a dispute letter with several exhibits and spent money to send it to one or more CRAs by certified mail.").

## CONCLUSION

For the foregoing reasons, the Court denies the Defendant's Motion to Dismiss, ECF No. 23.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date:   July 22, 2025