

January 21, 2026

<u>*Via ECF*</u>

The Honorable Sparkle L. Sooknanan
The U.S. District Court for the District of Colombia
333 Constitution Avenue, N.W.,
Courtroom 14
Washington D.C. 20001

JOHN SOUMILAS, ESQ.
1600 MARKET STREET
SUITE 2510
PHILADELPHIA, PA 19103
T: 215-735-8600
F: 215-940-8000
JSOUMILAS@CONSUMERLAWFIRM.COM

Re:  **<u>*Henkel v. U.S. Department of Education*</u>, No. 1:24-cv-1676-SLS (D.D.C.)**

Dear Judge Sooknanan,

Pursuant to LCvR 40.5(b)(3), co-counsel Courtney Weiner and I write to inform the Court of a related case, *Walsh v. U.S. Department of Education*, No. 1:26-cv-173-SLS, that was filed on January 21st. ECF No. 1. The cases have been marked as related pursuant to LCvR 40-I(f)(1)(B), based on common issues of fact. A copy of the Complaint in that matter is attached hereto.

Sincerely,

John Soumilas

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**ADRIANA WALSH**, *on behalf of herself and all others similarly situated,*

    *Plaintiff,*

      v.

**UNITED STATES DEPARTMENT OF EDUCATION**,

    *Defendant.*

---

Civil Action No.  1:26-cv-173

**CLASS ACTION COMPLAINT**

---

## I.    PRELIMINARY STATEMENT

1.    Plaintiff Adriana Walsh brings this lawsuit in a representative capacity of behalf of federal student loan borrowers like her because of Defendant's widespread violations of section 1681s-2(b) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x, and the Privacy Act of 1974, 5 U.S.C.A. §§ 552a *et seq*. ("Privacy Act").

2.    Defendant is a federal agency that regularly, directly and/or indirectly, provides information about student loan borrowers' account balances and repayment history to consumer reporting agencies (singular, "CRA").

3.    For example, on Plaintiff's credit reports, information about her federal student loans through the Department of Education appears as being furnished by "Dept of Ed/Nelnet" and "DEPARTMENT OF EDUCATION/NELN."

4.    Nelnet is an entity with which Defendant contracts for the servicing of certain federal student loans such as Plaintiff's.

5.    Defendant uses other agents as well in connection with its furnishing of credit information to CRAs about federal student loans. For example, information

about another of Plaintiff's federal student loans is listed on her credit report as being furnished by "MOHELA/DEPT OF ED."

6.     Nelnet and other agents must follow Defendant's instructions with respect to reporting federal student loan information.

7.     As a general matter, Defendant requires the furnishing of information about federal student loans to CRAs and controls the manner and content of said furnishing.

8.     According to the Consumer Reporting Resource Guide, the credit reporting industry's definitive guidelines for furnishers of credit information published by the Consumer Data Industry Association ("CDIA"), "[r]eporters of federal student loan information include lenders, servicers, secondary markets, collection agencies and the U.S. Department of Education ("ED")."[1]

9.     As Defendant knows or should know, after it transfers the servicing of student loan accounts from one servicer to another, no money remains owing to the first servicer, which should report a $0 balance to the CRAs for those accounts.

10.     Instead, when it transfers the servicing of student loan accounts from one servicer to another, Defendant directs the original servicer to place a "suppression" on the account.

11.     Defendant's directive regarding suppression results in reporting to the CRAs the full pre-servicing transfer account balance as open and due, when it should

---

[1]     CONSUMER DATA INDUSTRY ASSOCIATION, *Consumer Reporting Resource Guide*, at 12-2, 2022.

be reported at $0 under industry-standard credit reporting procedures in order to avoid the duplicate reporting of accounts.

12.     Later, when borrowers like Plaintiff see their transferred federal student loans on their credit reports with balances allegedly owing to Defendant via two separate servicers, they often exercise their rights under the FCRA to dispute the erroneous balance information which Defendant causes to be double reported.

13.     Even upon direct and/or indirect notice of a dispute through one or more CRAs, pursuant to standardized FCRA dispute processing procedures, Defendant directly and/or indirectly through its agents routinely and as a matter of practice fails to correct the nonexistent balances of transferred federal student loans to $0 and continues to report the pre-transfer balances as open and owing.

14.     Because of Defendant's suppression directive, servicers have no discretion to correct the balance to $0.

15.     As a result of Defendant's conduct, Plaintiff and members of the class or classes she seeks to represent falsely appear from their credit reports to owe double the amount of federal student loan debt and suffer injury and damages in the form of harm to credit reputation and credit score, lost credit opportunities, and waste of time and resources lodging futile disputes and trying to correct Defendant's false credit reporting.

16.     Defendant has long been aware of the problem of reporting a non-zero balance after the servicing transfer of federal student loans. Indeed, this problem has garnered the attention of the Consumer Financial Protection Bureau and the media.

According to recent reporting in the Washington Post in May 2024,[2] Defendant said it "has received about 500 credit reporting complaints since December" concerning the reporting of student loan balances not owed to the reporting servicer.

17.    Nonetheless, Defendant has taken no steps to correct this widespread known error in its credit reporting.

18.    Federal agencies that participate in the furnishing of information to CRAs may be sued under the FCRA. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 64, (2024) ("A consumer may sue 'any' federal agency for defying the [FCRA]'s terms.").Defendant's common course of conduct and legal violations entitle Plaintiff and those she seeks to represent to statutory damages, actual damages, punitive damages, and attorneys' fees and costs under the FCRA, and the Privacy Act.

## II.    <u>JURISDICTION & VENUE</u>

19.    Jurisdiction of this Court arises under  28 U.S.C. § 1331. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is located in this District.

## III.    <u>THE PARTIES</u>

20.    Plaintiff Adriana Walsh is a natural person and resident of New York. At all relevant times, she was a "consumer" as defined by FCRA section 1681a(c).

---

[2]    Danielle Douglas-Gabriel, *How a paperwork glitch is hurting student loan borrowers' credit scores*, THE WASHINGTON POST, May 29, 2024, *available at* https://www.washingtonpost.com/education/2024/05/29/student-loan-balance-duplicates-credit-reports/.

21.    Defendant United States Department of Education is a federal agency. Its headquarters are located at 400 Maryland Ave SW, Washington, D.C. At all relevant times, Defendant was a credit furnisher and "person" as defined by FCRA section 1681a(b).

22.    Millions of consumers in the United States have federal student loans. Defendant systematically collects and maintains sensitive and personal information including "[their] name, Social Security number (SSN), date of birth, student loan account information, contact information, driver's license and financial information."

23.    Defendant continues to request and maintain this information during the lifetime of the borrower's student loan, including "disclosing information to third parties that assist [the Department] in administering federal student aid programs." *Id.*

24.    To operate the federal student aid system, Defendant must collect and maintain this information for all borrowers.

25.    As a federal agency, Defendant is subject to the requirements of the Privacy Act, 5 U.S.C. § 552a, with respect to records that it maintains on individuals.

26.    Defendant is the creditor of Plaintiff and those she seeks to represent in this matter with respect to certain federal student loans.

27.    Defendant, directly and/or indirectly through various agents, furnishes and/or causes to be furnished information about federal student loan borrowers, including Plaintiff and those she seeks to represent, to one or more consumer reporting agencies.

28.     Defendant owns and controls the information furnished about Plaintiff and those she seeks to represent. To the extent that Defendant's various agents are involved in the flow of information about federal student loan borrowers to and from consumer reporting agencies, its agents have no discretion over how to report, update, correct, or cease the reporting of said information. Rather, with respect to loans transferred from one servicer to another and other reporting, they must obtain Defendant's approval prior to initiating any update, correction, or cessation of the reporting of the information.

## IV.    FACTUAL ALLEGATIONS

### *Applicable Legal Framework*

29.     "Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681).

30.     FCRA-covered entities must follow procedures in reporting consumer credit information that both "meet[ ] the needs of commerce" and are "fair and equitable to the consumer." *Saunders v. Branch Banking and Tr. Co. of Virgnia*, 526 F.3d 142, 147 (4th Cir. 2008) (quoting 15 U.S.C. § 1681(b)).

31.     In addition to well-known CRAs like Equifax, Experian, Trans Union, and Innovis, the FCRA regulates the conduct of persons who furnish information relating to consumers to CRAs.

32.     If a consumer disputes "the completeness or accuracy of any item of information contained in [his or her] file at a [CRA]," the FCRA requires the CRA to take several affirmative steps. *See* 15 U.S.C. § 1681i(a)(1)(A).

33.     Relevant here, the CRA that receives the consumer's dispute must "provide notification of the dispute to [the furnisher] who provided any item of information in dispute" [to the CRA] and "shall include all relevant information regarding the dispute that the [CRA] has received from the consumer[.]" 15 U.S.C. § 1681i(a)(2).

34.     After receiving notice of the consumer's dispute from the CRA, a furnisher such as Defendant must "conduct an investigation with respect to the disputed information[,] . . . review all relevant information provided by [the CRA, and] report the results of the investigation to the [CRA]." 15 U.S.C. § 1681s-2(b)(1)(A)-(C).

35.     The FCRA accordingly requires that a furnisher of credit information such as Defendant to "conduct a reasonable investigation of [its] records to determine whether the disputed information can be verified." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004); *Saunders*, 526 F.3d at 148 (the "FCRA requires furnishers to determine whether the information that they previously reported to a CRA is 'incomplete or inaccurate.'") (citation omitted).

36.     If the disputed information "is found to be inaccurate or incomplete or cannot be verified after any reinvestigation," the furnisher must promptly "modify

that item of information," "delete that item of information," or "permanently block the reporting of that item of information." 15 U.S.C. § 1681s 2(b)(1)(E)(i)-(iii).

37.    Furthermore, "[i]f the completeness or accuracy of any information furnished by any person to any [CRA] is disputed to such person by a consumer, the person may not furnish the information to any [CRA] without notice that such information is disputed by the consumer." 15 U.S.C. § 1681s-2b(a)(3).

38.    Circuit courts have repeatedly held that, upon receipt of notice of a dispute through a CRA, a furnisher must correct inaccurate information and minimally mark disputed accounts as "disputed." *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162-63 (9th Cir. 2009) (citing *Saunders*, 526 F.3d at 150); *see also Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014) (a furnisher violates FCRA section 1681s-2(b) "when, having received notice of a consumer's potentially meritorious dispute, [it] subsequently fails to report that the claim is disputed.").

39.    The complete and accurate furnishing of information about consumers is important because even small errors can disproportionately influence the cost of certain services, such as mortgages, automobile loans, and credit cards.

40.    Relatedly, designating disputed information as "disputed" is similarly important because "when a furnisher responds to a dispute verification form and relates an ongoing dispute, [a CRA] does not include the derogatory information in assessing the credit score." *Saunders*, 526 F.3d at 150.

*Defendant's FCRA-Regulated Conduct*

41.     Defendant is a federal agency tasked with, *inter alia*, overseeing various federal student loan programs, including that pursuant to which Plaintiff took out loans to finance her education.

42.     In its standard promissory notes with borrowers, Defendant defines itself to include its servicers.

43.     Defendant enters into contracts ("Servicing Contracts") with each servicer, including Nelnet, which governs the conducts of those servicers.

44.     The Servicing Contracts prescribe exactly how servicers must manage payments, data, correspondence, and other issues, reserving substantive decision-making authority with respect to student loans for Defendant.

45.     The Servicing Contracts also require servicers to follow practices that comport with federal law and regulations.

46.     In the normal course of business, Defendant maintains detailed business records concerning, *inter alia*, student loan borrowers' account balances and repayment histories ("Student Loan Information").

47.     The Servicing Contracts specify that Defendant retains full ownership and control over all Student Loan Information:

> It is understood and mutually agreed that the Department of Education has exclusive ownership of all information stored in, retrieved, modified, and/or archived in as part of this service. The contractor shall have no rights in such information and no rights to such information shall vest on the contractor by virtue of its performance of this contract. No other party has the right to copy, delete, archive, or transfer such information without the prior express written consent of the Department of Education. The contractor shall not use such information for any

marketing or solicitation purpose including, but not limited to, commercial advertising, credit offers, or similar campaigns.

https://studentaid.gov/sites/default/files/nelnet-061709.pdf, at C.1.4.6.

48. In the normal course, Defendant routinely furnishes Student Loan Information to CRAs, including Experian, Equifax, and Trans Union, directly and/or indirectly through its servicers, making it a "furnisher of information" as contemplated by the FCRA.

49. Indeed, federal law requires that Defendant "enter into an agreement with each consumer reporting agency to exchange information concerning student borrowers," including, but not limited to: "the total amount of loans made to any borrower . . . and the remaining balance of the loans;" and "information concerning the repayment status of the loan for inclusion in the file of the borrower[.]" 20 U.S.C. § 1080a(a)(2), (3).

50. These agreements "shall contain such provisions as may be necessary to ensure that . . . no information is disclosed by the Secretary or the guaranty agency, eligible lender, or subsequent holder unless its accuracy and completeness have been verified[.]" 20 U.S.C. § 1080a(c)(1).

51. Mindful of the importance of the vital protections afforded to student borrowers by the FCRA, Congress explicitly stated that, "nothing in this subsection shall be construed to affect any otherwise applicable provision of the Fair Credit Reporting Act[.]" 20 U.S.C. § 1080a(a)(3).

52.     Defendant requires that its servicers, including Nelnet, communicate Student Loan Information to CRAs using the METRO 2 format, a system of segments, fields, codes, and information unique to the credit reporting industry.

53.     Defendant, directly and/or indirectly through its agents, provide information, including the Student Loan Information, in the METRO 2 format so it can be received by the CRAs' systems, interpreted by those systems, and incorporated into the credit files of specific consumers for use in credit reporting.

54.     Using different METRO 2 codes, Defendant, directly and/or indirectly through its agents, communicates several important pieces of information about consumers' federal student loan accounts, each of which is referred to as a "tradeline" in credit reporting jargon.

55.     Certain codes identify the type of account at issue and enable the receiving CRAs to distinguish among, for example, mortgage, student loan, and credit card accounts.

56.     Other METRO 2 codes indicate whether a student borrower is current in their repayment of a federal student loan account or in arrears.

57.     CRAs understand Defendant's direct and/or indirect communications of Student Loan Information in the METRO 2 format to convey information relevant to the creditworthiness and credit reputations of the student borrowers about whom they furnishes information.

58. Accordingly, CRAs incorporate the Student Loan Information they receive directly and/or indirectly from Defendant into student loan borrowers' credit files and use it to prepare and sell consumer reports about them.

59. Actors in the credit industry rely on these consumer reports to accurately set forth consumers' outstanding debt, history of repayment, and other financial characteristics.

60. In addition, federal regulations include specific requirements for how different Student Loan Information must be reported.

61. For example, with respect to Borrower Defense to Repayment, the implementing regulations for the Higher Education Act provide that upon discharge of a borrower's obligations, "The Secretary also updates reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan." 34 C.F.R. § 685.206(e)(12).

62. With respect to rehabilitated defaulted loans, the rules require that "the Secretary instructs any consumer reporting agency to which the default was reported to remove the default form the borrower's credit history." 34 C.F.R. § 685.211(f)(8).

63. For loans subject to Closed School Discharge and discharge based on unauthorized payment, the regulation mandates that "[t]he Secretary reports the discharge of the loan under this section to all consumer reporting agencies to which the Secretary previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan." 34 C.F.R. §§ 685.214(b)(4), 215(b)(5).

64.     Pursuant to federal requirements, Defendant does not report a Direct Loan as delinquent until it has reached 90 days past due. *See* https://nelnet. studentaid.gov/content/faq/faqcreditreporting. *See also* https://cri.studentaid.gov/ content/faq/faqcreditreporting.

65.     In the event of a dispute, the Direct Loan Promissory Note between Defendant and borrowers provides, "If a consumer reporting agency contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the agency with a prompt response. We respond to objections submitted to consumer reporting agencies using the methods established by those agencies." https://studentaid.gov/sites/default/files/ Sub_Unsub_MPN_508-en-us.pdf at § 19.

66.     Defendant routinely transfers the servicing of federal student loans from one servicer to another for various reasons, including for the purpose of evaluating borrowers' eligibility for Total and Permanent Disability discharge and the Public Service Loan Forgiveness program, among other federal programs.

*Privacy Act: Applicable Legal Framework and Regulated Conduct*

67.     Defendant is an agency as defined under the Privacy Act of 1974, as amended, 5 U.S.C. §§ 5551(1), 552(f)(1).

68.     Defendant maintains records related to Plaintiff and class members within one more systems of records ("SORN") protected under the Privacy Act pursuant to 5 U.S.C. 552a(a)(4)-(5).

13

69. Most of the information collected by Defendant about student loan borrowers is stored in a system of record called the National Student Loan Database ("NSLDS"). The NSLDS is a database which contains, among other things, the complete cycle of federal student aid, including "disbursement, repayment, deferment, delinquency, and closure." [3]

70. Relevant here, the NSLDS contains records relating to:

"information on the aid recipient's loan(s) covering the period from the origination of the loan through final payment, consolidation, discharge, or other final disposition, including details such as loan amount, disbursements, balances, loan status, repayment plan payments and related information, collections, claims, deferments, forbearances, refunds, and discharges"[4]

*Plaintiff's Experience*

71. Plaintiff obtained federal student loans to finance her education. After her graduation from medical school, Nelnet was her student loan servicer.

72. During this period, Defendant directly and/or indirectly through its agents furnished information about Plaintiff's federal student loans each month to CRAs Experian, Equifax, and TransUnion as "DEPARTMENT OF EDUCATION/NELNET" and similar variations, depending upon the abbreviations adopted by the CRA to which Defendant directly and/or indirectly furnished the information.

73. Defendant, at its sole discretion, routinely transfers the servicing of federal student loans like Plaintiff's from one servicer to another.

---

[3] About the National Student Loan Data System, FAQs, https://nsldstraining.ed.gov/help/faq (last accessed September 12, 2025).
[4] 89 Fed. Reg. 44652, 44656–57.

74.    Defendant transferred Plaintiff's loan servicing from Nelnet to the Missouri Higher Education Loan Authority ("MOHELA"). At that time, the outstanding principal balance on Plaintiff's loans from Defendant was approximately $150,000.

75.    Nelnet confirmed this in correspondence dated May 1, 2023, when it notified Plaintiff of the following:

> The U.S. Department of Education (ED) will soon transfer the customer service of your federal student loan account to MOHELA, another member of ED's federal loan servicer team. Your loans are not being sold. ED will continue to own your loans; however, a different servicer will manage your loans and assist you on ED's behalf.

> ED is transferring your loan account to MOHELA because you requested to participate in the Public Service Loan Forgiveness (PSLF) Program. MOHELA is ED's servicer that provides customer service for all federal student loan borrowers who are potentially eligible for PSLF and tracks their progress toward qualifying for PSLF. This change in servicer will not impact the existing terms, conditions, interest rate, or available repayment plans of your federal student loans.

> Your loan account will be transferred to MOHELA on or about May 11, 2023. If ED doesn't transfer your account as planned, we'll let you know.

76.    After Defendant transferred the servicing of Plaintiff's student loan account from Nelnet to MOHELA, Plaintiff's Department of Education/Nelnet account was closed and MOHELA opened a new Department of Education account for Plaintiff with a new loan number.

77.    Defendant's records contained information showing the transfer from Nelnet to MOHELA and Plaintiff's student loan balance at the time of the transfer and after: still a total of approximately $150,000, now under the new MOHELA loan account number.

78.    Accordingly, Defendant, directly and/or indirectly through its agents, should have reported to the CRAs that the balances of Plaintiff's transferred student loan account at Nelnet was $0.

79.    Instead, Defendant, directly and/or indirectly through its agent(s), continued to report to the CRAs that the balance of Plaintiff's student loan account at Nelnet was in excess of $150,000, resulting in reporting a total balance amount between Nelnet and MOHELA of more than $300,000.

80.    Defendant, directly and/or indirectly through its agent(s), disseminated information that the balance of Plaintiff's student loans was in excess of $300,000. In approximately November 2023, Plaintiff saw on her credit report that Defendant was continuing to report outstanding balances on the Nelnet tradeline in excess of $150,000 for the student loans that had been transferred to MOHELA.

81.    Simultaneously, Defendant, as "MOHELA/DEPT OF ED" (or similar) was directly and/or indirectly reporting that Plaintiff had an *additional* federal student loan account due to Defendant with a total balance of approximately $150,000.

82.    That is, notwithstanding having itself transferred servicing of Plaintiff's single loan account with a balance of $150,000 from Nelnet to MOHELA, Defendant directly and/or indirectly through its agents furnished information to the CRAs, including Experian, Equifax, and TransUnion, that Plaintiff owed it more than $300,000 in total.

16

83. This was false, inaccurate and/or misleading. Plaintiff no longer had any open student loan accounts with Defendant serviced by Nelnet and did not owe it any amount for a student loan payable via Nelnet. Indeed, in correspondence after the transfer to MOHELA, Nelnet stated to Plaintiff directly that the balance of Plaintiff's student loans was $0.

84. As Defendant had transferred Plaintiff's loan account to MOHELA, it should only have reported to the CRAs that Plaintiff owed money to it pursuant to a single account, not two separate accounts with two separate servicers.

85. Upon information and belief, Defendant did not make any efforts to assure that the information it disseminated or caused to be disseminated about Plaintiff's loans or student loan balance was accurate or complete. Plaintiff disputed Defendant's false, duplicative balance reporting through the CRAs, including Experian, Equifax, and TransUnion, beginning in November of 2023 and continuing until at least March of 2024.

86. Pursuant to the CRAs' independent statutory obligation to notify the furnisher of disputed information upon receipt of a consumer's dispute of that information under FCRA section 1681i(a)(2), the CRAs provided notice of Plaintiff's disputes to Defendant directly and/or indirectly through its agents.

87. Nevertheless, in its responses to Plaintiff's disputes through the CRAs, Defendant, directly and/or indirectly through its agents, repeatedly failed to correct or reduce the duplicative balance to $0 and to fulfill its other obligations under FCRA section 1681s2(b). Instead, it continued to verify, directly and/or indirectly through

its agents, that Plaintiff owed it more than $150,000 through Nelnet and in total approximately $300,000 in federal student loans.

88.    Upon information and belief, Defendant added a "suppression" to Plaintiff's student loan and/or directed its agent Nelnet to do so, that forbade or otherwise prevented the furnishing of accurate data about Plaintiff's student loan account balance and/or the fact that her account had been transferred to another servicer.

89.    Upon information and belief, Defendant failed to make any reasonable efforts to assure that the information contained in its student loan records was accurate, complete, timely, and relevant.

90.    Defendant was aware of that the information it disseminated was inaccurate, based on disputes from Plaintiff and hundreds of similar disputes from putative class members.

91.    Defendant willfully ignored the known effect of its suppression directive and took no steps to correct it in order to render accurate the information it disseminated.

92.    At all relevant times, Defendant acted directly and/or indirectly through its duly authorized agents, and/or employees with respect to the above-alleged conduct.

93.    At all relevant times, Defendant willfully or negligently violated the requirements of FCRA section 1681s-2(b).

*Defendant's Conduct Causes Substantial Harm*

94.     As a result of Defendant's conduct, Plaintiff and members of the class or classes appeared from their credit reports to owe to Defendant far more in federal student loans than they actually did (usually double the amount actually owed), a major factor that depresses credit scores, and thus suffered injury and damages in the form of lost credit opportunities, harm to credit reputation and credit score, and waste of time and resources.

95.     By failing to accurately report Plaintiff and putative class omembers' transferred student loan accounts as having $0 balances, Defendant directly and/or indirectly through its agents misrepresented Plaintiff's and putative class  members' total amount of indebtedness to one or more CRAs.

96.     Defendant's direct and/or indirect misrepresentations have harmful, real-world consequences. According to the website of Experian, one of the three largest CRAs, the "total amount you've borrowed affects your credit score;" "[a]mounts owed are responsible for about 30% of your FICO® Score,"[5] and a consumer's "total credit usage" is "highly influential" in the calculation of the consumer's VantageScore, a credit scoring model created by Experian, TransUnion, and Equifax.[6]

---

[5]     EXPERIAN INFORMATION SOLUTIONS, INC., *What Affects Your Credit Scores?*, July 23, 2023, *available at* https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-affects-your-credit-scores/ (last viewed Sep. 20, 2024).

[6]     EXPERIAN INFORMATION SOLUTIONS, INC., *What Is a VantageScore?*, June 25, 2024, *available at* https://www.experian.com/blogs/ask-experian/what-is-a-vantagescore-credit-score/ (last viewed Sep. 20, 2024).

97.     Having a good credit score is extremely important because it "could be the difference between qualifying or being denied for an important loan, such as a home mortgage or car loan. And, it can directly impact how much you'll have to pay in interest or fees if you're approved."[7]

98.     Upon information and belief, Defendant's inaccurate Student Loan Information, which misstates Plaintiff and putative class members' total debt burdens, caused a diminution of Plaintiff and putative class members' credit scores, harming their ability to obtain credit.

99.     Upon information and belief, Defendant's inaccurate Student Loan Information caused Plaintiff's credit score to decrease.

100.     Upon information and belief, on several occasions, one or more CRAs published the inaccurate Student Loan Information Defendant had directly and/or indirectly caused to be furnished about Plaintiff and putative class members in consumer reports that it sold to their existing and prospective creditors.

101.     Upon information and belief, Experian published Nelnet's inaccurate Student Loan Information about Plaintiff to her prospective creditors, including to Citibank, N.A. on January 26, 2024.

102.     Consumers about whom Defendant directly and/or indirectly caused inaccurate Student Loan Information to be furnished are further injured by its misrepresentations when CRAs sell consumer reports about them to their existing

---

[7]     EXPERIAN INFORMATION SOLUTIONS, INC., *What Is a Good Credit Score?*, *available at* https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-is-a-good-credit-score/ (last viewed Sep. 20, 2024).

creditors and/or service providers (so-called "soft" inquiries), which can result in the additional financial harm of higher interest rates or insurance premiums, or reduced credit limits.

103.    Upon information and belief, Experian published Defendant's inaccurate Student Loan Information about Plaintiff to several other entities, including her existing creditors.

104.    Further, in addition to or in the alternative to the foregoing harm, the inaccurate Student Loan Information Defendant caused to be furnished about Plaintiff and putative class members cast them in a false light and interfered with their ability to control their personal information.

105.    This sort of injury has long been understood to be an invasion of the common-law right to privacy. *Long v. Se. Penn. Trans. Auth.*, 903 F.3d 312, 324 (3d Cir. 2018).

106.    Defendant's false light portrayal of Plaintiff and putative class members caused them to be distraught, dismayed, and distressed.

107.    Plaintiff and putative class members manifested their negative emotional responses to Defendant's direct and/or indirect reporting of inaccurate Student Loan Information by disputing it with one or more CRAs.

108.    Plaintiff was sufficiently upset by Defendant's false light portrayal of her as being burdened by additional approximately $150,000 of indebtedness that she did not owe that disputed the Student Loan Information responsible for that portrayal to Experian several times in 2023 and 2024.

21

109.   Further, in addition to or in the alternative to the foregoing harms, Defendant's failure as a matter of policy and/or practice to correct the inaccurate Student Loan Information it had previously furnished about Plaintiff and putative class members to one or more CRAs injured them by wasting the time and financial resources they invested in their disputes.

110.   Because disputing inaccurate credit information requires many steps, each of which requires consumers to expend time and financial resources, it is not economically neutral.

111.   First, consumers must obtain a copy of their credit report and carefully review it to locate the inaccurate information. Second, they must prepare a letter identifying the information and explaining why it is inaccurate. Third, consumers must print their letters and any supporting documents, such as identification documents or correspondence from a third party, which consumes paper and printing resources. Finally, consumers must properly address their letters, place them in an envelope, and pay for postage, often including additional fees for delivery confirmation and return receipts.

112.   Plaintiff spent time writing a dispute letter with several exhibits and spent money to send it to one or more CRAs by certified mail, expending at least $17 in postage.

113.   When Defendant, as a matter of policy and/or regular practice, directly and/or indirectly through its agents fails to correct the inaccurate information that

Plaintiff and Class Members have disputed, all the above-noted time and resources go to waste.

114.    Federal courts "have routinely found that wasted time resulting from a defendant's FCRA violation is a sufficiently concrete and particularized injury to establish [Article III] standing." *Healy v. Milliman*, Inc., No. C20-1473 (JCC), 2022 WL 1061921, at *3 (W.D. Wash. Apr. 8, 2022); *see also Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) ("Because there is no question that wasted time is a concrete harm, [Plaintiff] has standing to pursue his claims."); *Norman v. Trans Union, LLC*, 669 F. Supp. 3d 351, 372-73 (E.D. Pa. 2023) ("Because wasted time and expense are concrete harms, Plaintiffs sufficiently establish injury-in-fact on this theory[.]"); *Hines v. Equifax Info. Servs., LLC*, No. 19-CV-6701, 2022 WL 2841909, at *8 (E.D.N.Y. July 16, 2022) ("[Plaintiff's] wasted time and expense is a traditional monetary harm that is fairly traceable to [defendant's] policy . . . and is redressable by judicial relief."), *report and recommendation adopted as modified* 2024 WL 4132333 (E.D.N.Y. Sept. 10, 2024); *Henkel v. U.S. Dep't of Ed.*, No. 1:24-cv-01676-SLS, ECF 28 (D.D.C. July 22, 2025).

115.    As a result of the above, Plaintiff seeks damages for herself and the class or classes in order to recover for harms they suffered caused by Defendant's conduct, including: wasted time and money in futile dispute efforts; harm to reputation in the nature of defamation; and emotional distress.

## V.     CLASS ALLEGATIONS

116.   In light of the above, Plaintiff asserts that this matter is suitable for class action treatment and will seek the certification of one or more classes of similarly situated consumers at an appropriate time and based upon developments in discovery.

117.   Upon information and belief, Plaintiff alleges that the members of the class or classes she seeks to represent will share the following characteristics:

A.     They will have one or more federal student loan accounts;

B.     Defendant will have transferred one or more of their student loan accounts from one student loan servicer, the transferor, to another, the transferee;

118.   Defendant, directly and/or through its agents (*e.g.,* the transferee student loan servicer), will have furnished information about their transferred federal student loans to one or more CRAs;

119.   Defendant, directly and/or through its agents (*e.g.,* the transferor student loan servicer), will have placed a "suppression" on their student loan account(s) concerning the furnishing of data about them to CRAs;

120.   Defendant, directly and/or through its agents (*e.g.,* the transferor student loan servicer), will have received notice of a dispute of the information furnished about their transferred student loan accounts to one or more CRAs, which notice of dispute may be received during the period in which the "suppression" is in effect;

24

121.    In its responses to those notices of dispute through the CRAs, Defendant, directly or through its agents (*e.g.,* the transferor student loan servicer), will have failed to report a $0 balance for their transferred student loan accounts and/or will have failed to update the balance of their transferred student loan accounts to $0.

122.    Plaintiff reserves the right to tailor the above profile of the class or classes based upon developments in discovery or as otherwise appropriate and permitted and will propose a specific class definition in connection with her anticipated motion for class certification as permitted by FED. R. CIV. P. 23.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE
### On Behalf of Plaintiff and Members of the Class or Classes
### for Defendant's Violation of 15 U.S.C. § 1681s-2(b)

123.    Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

124.    After receiving notice from one or more CRAs of disputes of inaccurate information that Defendant, directly and/or indirectly through its agents, had previously furnished to the CRA about them, by Plaintiff and members of the class or classes she seeks to represent, Defendant, directly and/or indirectly through its agents, negligently or willfully failed to report a $0 balance, correct the inaccurate information, and fulfill all of its duties under FCRA section 1681s-2(b).

125.    Defendant is liable to Plaintiff and members of the Classes for all relief available pursuant to FCRA sections 1681n and 1681o.

COUNT TWO
**On Behalf of Plaintiff and Members of the Class or Classes for Defendant's
Violations of 5 U.S.C. § 552a**

126.    Plaintiff incorporates the foregoing paragraphs as though set forth at length therein.

127.    Defendant maintains records that pertain to Plaintiff and class members.

128.    Defendant violated 5 U.S.C. § 552a(e)(6) by intentionally and willfully failing to undertake reasonable efforts to assure that prior to disseminating records belonging to Plaintiff and class members, such records were accurate, complete, timely, and relevant for agency purposes.

129.    Consequently, determinations were made which were adverse to Plaintiff and class members, namely the dissemination of inaccurate student loan information and balances post-transfer, in violation of § 552a(e)(6).

130.    As a direct and proximate result of this violation, intentional and willful disclosures of releases of erroneous information were released to third parties and Plaintiff has suffered and "adverse effect" as defined under 5 U.S.C. § 552a(g)(1)(D), including but not limited to indirect and direct injury to Plaintiff's reputation and emotional distress.

**VII.    <u>JURY TRIAL DEMAND</u>**

131.    Plaintiff demands trial by jury on all issues so triable.

## VIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays this Honorable Court grant her the following relief:

A.      certifying a class or classes under FED. R. CIV. P. 23 and appointing Plaintiff and her counsel to represent them;

132.   awarding actual damages pursuant to 15 U.S.C. § 1681n(a) & o(a) and the Privacy Act;

133.   awarding statutory damages in the amount of not less than $100 and not more than $1,000 per violation pursuant to 15 U.S.C. § 1681n(a);

134.   awarding statutory damages in the amount of not less then $1,000 pursuant to 5 U.S.C. § 552a(g)(4)(A)

B.      awarding punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

135.   awarding costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o 5 U.S.C. § 552(a)(g)(2)-(4); and

C.      awarding such other and further relief as may be necessary, just, and proper.

Dated:     January 21, 2026                    Respectfully submitted,

ADRIANA WALSH, *individually, and on behalf of all others similarly situated*,

By:     */s/Courtney L. Weiner*
Courtney L. Weiner (#992797)
LAW OFFICE OF COURTNEY WEINER PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
T: (202) 827-9980
cw@courtneyweinerlaw.com

27